**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLENE COLEMAN, | ) | |
| | ) | Case No. 23-cv-3606 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| REMPREX, LLC, | ) | Magistrate Judge Jeannice W. Appenteng |
| | ) | |
| Defendant. | ) | |
| | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Before the Court is a motion for summary judgment filed by defendant

Remprex, LLC, Dkt. 87. For the following reasons, the motion is denied.

**Background**

The following facts are taken from the parties' Local Rule 56.1 submissions[1]

and the materials cited therein. The facts are undisputed unless otherwise stated.

Plaintiff Charlene Coleman was employed by defendant Remprex as a Field

Gate Operator from April 26, 2022, until July 28, 2022. Dkt. 95 ¶ 3. In this role,

plaintiff's job duties included servicing, repairing, and performing maintenance on

gate equipment, managing inventory, processing gate transactions, and entering

data as vehicles entered or exited the facility. *Id.* ¶ 4. Plaintiff's direct supervisors

were Anthony Garner and Tracy Massie. *Id.* ¶ 5.

---

[1] See Defendant's Local Rule 56.1 Statement of Material Facts, Dkt. 89; Plaintiff's Response
to Defendant's Statement of Material Facts, Dkt. 95; Plaintiff's Local Rule 56.1 Statement
of Additional Material Facts, Dkt. 96; Defendant's Response to Plaintiff's Statement of
Additional Facts, Dkt. 100.

During the relevant period, defendant had an employee handbook that contained an equal employment opportunity policy prohibiting discrimination based on race, color, and sexual orientation. *Id.* ¶ 8. The policy instructed employees to report discriminatory actions to a manager or human resources representative. *Id.* The handbook also included a policy about insubordination, warning employees that refusal of work assignments could result in disciplinary action, including termination of employment. *Id.* ¶ 9. Plaintiff saw an electronic version of the employee handbook during her onboarding process, but she did not think she had access to the handbook after onboarding (though she is not certain because she did not try to access it). Dkt. 95 ¶ 10; Dkt. 100 ¶ 1; Dkt. 89, Ex. A, 49:08-51:10.

Plaintiff is a Black woman and alleges she was fired and subject to a hostile work environment because of her race. The parties describe the following incidents that occurred during plaintiff's three-month employment with defendant.

### A. Alleged Incidents of Harassment

At the start of plaintiff's employment, plaintiff's coworkers discussed plaintiff shadowing other employees and at least one coworker referred to plaintiff as "a shadow" or "the shadow." Dkt. 95 ¶¶ 68-69. Plaintiff originally believed the references were intended to convey that plaintiff was learning about her position, but later she believed the word "shadow" was related to her race because one coworker told another: "Don't say shadow in front of a Black person." *Id.* ¶ 68. Plaintiff told her coworkers she was uncomfortable with the word "shadow" and informed them that using the word in reference to another's race could be offensive.

*Id.* ¶ 72. Four coworkers and two supervisors testified that they did not hear anyone refer to plaintiff or another employee as "a shadow" or "the shadow," but they agreed that referring to an employee in training as "shadowing" was common. *Id.* ¶¶ 74-75. Plaintiff did not contact human resources about her coworkers using the word "shadow" or complain to a supervisor about the conduct. *Id.* ¶ 72.

Plaintiff avers that at some point, Ms. Manning (a coworker) told plaintiff that Ms. McKay (another coworker) referred to plaintiff as a "dumb Black girl" or the "new Black girl," and that her coworkers placed bets about how long plaintiff would remain employed. *Id.* ¶ 39. Ms. Manning disputes this testimony. *Id.* ¶ 42.

On another occasion, plaintiff was walking by her coworker Jennifer Chaplin, and plaintiff heard Ms. Chaplin say the n-word while coughing. *Id.* ¶ 50; Dkt. 89, Ex. A, 133:18-134:21. Plaintiff then asked Ms. Chaplin what she said, and Ms. Chaplin replied, "nice Nikes," but plaintiff was wearing steel-toed boots, not Nike shoes. Dkt. 95 ¶ 50. Plaintiff did not report this incident to any defendant employee. *Id.* ¶ 51.

Throughout her employment, plaintiff's personal items went missing, including her drinks in the refrigerator and her preferred keyboard. *Id.* ¶¶ 66, 55. Plaintiff did not tell anyone that she believed her items were missing because of her race, but plaintiff did tell Mr. Massie, her supervisor, that her coworkers took her keyboard and that she considered this harassment. *Id.* ¶¶ 56, 67. Mr. Massie told plaintiff that she could keep her preferred keyboard in his office. *Id.* ¶ 57.

3

Plaintiff also experienced issues with her assigned trucks. She testified that her tires were sometimes flat, and she believes she was assigned to a truck with known exhaust issues. *Id.* ¶¶ 62, 64. Plaintiff testified that Ms. Manning told plaintiff that other employees were "messing with her truck" and intentionally deflating the tires. *Id.* ¶ 39. Plaintiff did not report the vehicle issues to any defendant employee. *Id.* ¶¶ 63, 65.

Plaintiff did, however, report other conduct to Mr. Massie. First, plaintiff told Mr. Massie that drivers at the facility occasionally yelled and screamed at her. *Id.* ¶¶ 60-61. Second, plaintiff told Mr. Massie she believed Ms. McKay did not want to sit by her because Ms. McKay said, "I don't want to look at you" or "I don't want to look at your face." *Id.* ¶¶ 47-48. Plaintiff told Mr. Massie that she believed Ms. McKay did not want to sit by her because of plaintiff's race. *Id.*

### B.      Documented Conflict with Coworkers

In June 2022, Mr. Massie received a verbal complaint from Ms. Chaplin, who reported that plaintiff was harassing Ms. Chaplin based on her sexual orientation. *Id.* ¶ 12. Mr. Massie was told, and plaintiff does not dispute, that plaintiff complained to other coworkers about Ms. Chaplin's body odor. *Id.* ¶ 13. Mr. Massie discussed the complaint with plaintiff and asked whether plaintiff also told coworkers that Ms. Chaplin is a devil. *Id.* ¶¶ 14-15, Dkt. 89, Ex. A, 67:11-68:19. Plaintiff clarified that she told others that Ms. Chaplin treats plaintiff as if plaintiff is a devil. Dkt. 95 ¶ 14; Dkt. 89, Ex. A, 68:03-06.

4

Mr. Massie avers that in early July 2022, he held a group meeting to address plaintiff and Ms. Chaplin's separate complaints of harassment. Dkt. 89, Ex. D, at ¶¶ 11-13. According to Mr. Massie, he did not reference either employee but explained that he did not tolerate harassment or any other violation of defendant's equal employment opportunity policy. *Id.* Plaintiff does not recall this group meeting. Dkt. 95 ¶ 16.

In or around the middle of July 2022, Ms. Chaplin made another verbal complaint to Mr. Massie about plaintiff's alleged discrimination. Dkt. 89, Ex. D, at ¶ 15. Mr. Massie reported the complaint to his direct supervisor, Jana Davies. *Id.* Ms. Chaplin also sent an email to Ms. Davies on July 14, 2022, reporting "some concerning employee behaviors regarding [plaintiff]," and describing interpersonal "drama" between the two employees. Dkt. 89, Ex. J, Ex. 2.

Also on July 14, 2022, plaintiff was involved in a "verbal altercation" with coworker Donna Spivey. Dkt. 95 ¶ 22. Both employees were disciplined and received a "Corrective Action Notice." Ms. Spivey's notice was marked as a "final warning" and described Ms. Spivey "yelling and cursing at [plaintiff] ... more than once." Dkt. 89, Ex. I, Ex. 2. Ms. Davies wrote the notice and documented that she did not hear plaintiff say anything in response to Ms. Spivey. *Id.* Ms. Spivey was then sent home for the day without pay, and her written notice warned that "[d]ue to the severity of this incident this is a final warning for this behavior." *Id.*; Dkt. 95 ¶ 24. Plaintiff received two versions of a Corrective Action Notice for her involvement in the incident with Ms. Spivey. *Id.* ¶ 26. Plaintiff's initial notice was marked as a "first

warning" and mentioned the verbal altercation with Ms. Spivey as well as plaintiff's prior comments about Ms. Chaplin. Dkt. 100 ¶ 10; *see also* Dkt. 89, Ex. C, Ex. 2. Mr. Massie wrote the initial notice, indicating "[t]his written warning is intended to remind employees we will speak professionally in the workplace and not use references to demons about other employees." Dkt. 89, Ex. C, Ex. 2. Shortly thereafter, Ms. Davies or a human resource employee asked Mr. Massie to escalate the notice to a "final warning," and modify the description of the incident. Dkt. 89, Ex. C, 30:19-33:09. The updated notice described plaintiff's "inappropriate and unprofessional behavior" as a violation of defendant's policy and cautioned that "[f]uture incidents of this or any other nature may result in [plaintiff's] immediate termination." Dkt. 89, Ex. C, Ex. 3.

### C. Plaintiff's Termination

Fourteen days after the incident with Ms. Spivey, on July 28, 2022, defendant terminated plaintiff's employment. On that day, Mr. Massie instructed plaintiff to work in Lot 15, even though plaintiff had not worked there before. Dkt. 95 ¶ 27. Plaintiff began working in Lot 15 "without any training or guidance," and the truck drivers swore and yelled at plaintiff while she was in the lot. Dkt. 100 ¶¶ 16-17.

After approximately thirty or forty minutes, plaintiff called Mr. Massie and told him she "did not want to be in this situation." Dkt. 95 at ¶ 28; Dkt. 89, Ex. A, 83:23-84:04. In response, Mr. Massie directed plaintiff to work in the driver assistance building, but plaintiff refused. Dkt. 95 ¶ 29. Plaintiff then went to Mr. Massie's office to request an alternative assignment, explaining she did not want to

work in the driver assistance building because it was "a hostile work environment" and other employees "treat[ed her] differently." *Id.* ¶ 31. Mr. Massie told plaintiff to go home, and plaintiff agreed but wanted him to document the dismissal in writing. *Id.* ¶ 32; Dkt. 89, Ex. A, 88:07-89:09; Ex. C, 37:15-18. Plaintiff and Mr. Massie continued to argue and eventually Mr. Massie called Ms. Davies while plaintiff waited outside Mr. Massie's office. Dkt. 100 ¶¶ 27, 29; Dkt. 95 ¶¶ 33, 36. Through the closed door, plaintiff heard "muffled[,] a lot of slurs that were kind of familiar, but [she] couldn't really understand the terminology." Dkt. 89, Ex. A, 91:12-14. Plaintiff also heard Mr. Massie say the word "black," but because the door was shut, she was not sure "what he was referring to." *Id.* at 91:17-21. After talking with Ms. Davies, Mr. Massie came outside his office and told plaintiff that her employment with defendant was terminated. Dkt. 95 ¶ 37.

Ms. Davies made the ultimate determination to fire plaintiff and authorized Mr. Massie to effectuate the termination of employment. Dkt. 89, Ex. B. Ms. Davies avers that her decision to terminate plaintiff's employment was based on plaintiff's harassment of Ms. Chaplin and plaintiff's refusal of multiple work assignments on July 28, 2022. *Id.*

Plaintiff challenges the basis of her termination. During her employment, plaintiff witnessed three white coworkers refuse work assignments, but she does not know whether they were disciplined. Dkt. 95 ¶¶ 76-77. At one point, Ms. Spivey (a white woman) refused an assignment and was issued a verbal warning. *Id.* ¶ 78.

7

Mr. Massie testified that he was asked to keep a log of incidents regarding plaintiff, but he did not keep a log for any other employee. Dkt. 100 ¶¶ 12-13.

Plaintiff testified that as a result of her termination, she has experienced lost wages, health and sleep issues, and lost the ability to live with her family. *Id.* ¶ 34.

## Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail on a motion for summary judgment, the movant can either highlight that an essential element of the non-movant's claim lacks evidence or present evidence that negates an essential element. *Ellison v. United States Postal Serv.*, 84 F.4th 750, 759 (7th Cir. 2023). The non-moving party can avoid a summary judgment ruling by offering evidence that would allow a reasonable jury to find in their favor. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). "The burden on the non-movant is not onerous" and she need not "persuade the court that [her] case is convincing." *Cruz v. Fox Sec., Inc.*, No. 24 C 4035, 2026 WL 370934, at *1 (N.D. Ill. Feb. 10, 2026) (quoting *Burton v. Kohn L. Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019)). The Court

8

must "construe all facts and draw all reasonable inferences in favor of the non-movant." *Upchurch v. Indiana*, 146 F.4th 579, 586 (7th Cir. 2025).

## Discussion

### A.     Wrongful Termination Claim

To survive summary judgment on her wrongful termination claim under Title VII and 42 U.S.C. § 1981, plaintiff must establish a prima facie case of discrimination. Plaintiff must show she: (1) belongs to a protected class, (2) met the defendant's legitimate expectations, (3) suffered an adverse employment action, and (4) was treated less favorably than similarly situated employees who are not members of the protected class. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017); *Johnson*, 892 F.3d at 894-95. If plaintiff establishes each element, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *David*, 846 F.3d at 225. Then, the burden shifts back to plaintiff to show that defendant's reason is pretext for discrimination. *Id.*

As to plaintiff's prima facie case of discrimination, it is undisputed plaintiff satisfies prongs one and three because she belongs to a protected class, and she suffered an adverse employment action when defendant terminated her. The Court, therefore, will begin by addressing whether plaintiff was meeting defendant's legitimate expectations and whether she was treated less favorably than similarly situated employees of a different race. When, as here, plaintiff argues she was disciplined more harshly than white employees, Dkt. 94 at 6, the Court "merge[s]

9

the second and fourth prongs of the *McDonnell Douglas* test" and focuses on whether there were similarly situated white employees who were treated differently than plaintiff. *Weber v. Universities Rsch. Ass'n, Inc.*, 621 F.3d 589, 594 (7th Cir. 2010).

Plaintiff identifies three potential comparators—Ms. Batchelor, Ms. Manning, and Ms. Spivey—who refused work assignments and were not "terminated on the spot" like plaintiff. Dkt. 94 at 6-8. But plaintiff does not identify whether Ms. Batchelor and Ms. Manning shared the same supervisor with plaintiff or were disciplined by the same manager. Accordingly, both are unsuitable comparators. *Coleman v. Donahoe*, 667 F.3d 835, 847-48 (7th Cir. 2012) ("In the usual case a plaintiff must *at least* show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances.") (emphasis added) (quotations omitted). Ms. Spivey, on the other hand, is a closer call.

Ms. Spivey and plaintiff held the same position (field gate operator), reported to the same manager (Mr. Massie), and engaged in similar conduct (refused a work assignment). Moreover, the record shows that Ms. Spivey, like plaintiff, refused a new assignment because it required learning on the job. Dkt. 88, Ex. C 42:03-22. But Ms. Spivey and plaintiff were disciplined differently. Mr. Massie reported plaintiff's refusal to work to Ms. Davies and terminated plaintiff. Meanwhile, Mr. Massie reported Ms. Spivey's refusal to work to Ms. Davies and Ms. Spivey received only a verbal warning. Ms. Davies's involvement in both cases is crucial because,

10

while sharing a supervisor is a consideration in finding comparators, "the real question is whether [the employees] were treated more favorably by the same decisionmaker." *Coleman*, 667 F.3d at 848 (emphasis and internal quotations omitted). In sum, the following weigh in favor of Ms. Spivey serving as a comparator to plaintiff: the similar justification for refusing a work assignment; their shared position, supervisor, and decisionmaker, and the different discipline outcome. *See Coleman*, 667 F.3d at 847-48; *Eaton v. Indiana Dep't of Corr.*, 657 F.3d 551, 557-58 (7th Cir. 2011) (explaining plaintiff provided evidence of similarly situated comparator when both employees refused work assignment from same supervisor, held same position, and shared ultimate decisionmaker). The question now becomes whether differentiating circumstances or mitigating factors sufficiently distinguish Ms. Spivey from plaintiff, making Ms. Spivey an unsuitable comparator.

Defendant first argues that plaintiff's disciplinary history distinguishes her from Ms. Spivey. Dkt. 88 at 8. But the record suggests otherwise. Ms. Spivey, like plaintiff, received a corrective action notice prior to refusing a work assignment. *See* Dkt. 95 ¶ 24 (undisputed that Ms. Spivey was disciplined for verbal altercation on July 14, 2022); Dkt. 88, Ex. C, 42:03-22 (Mr. Massie's testimony that Ms. Spivey refused an assignment sometime after July 28, 2022). Furthermore, both Ms. Spivey and plaintiff were reprimanded for unprofessional speech and interpersonal conflict with a coworker. Ms. Spivey yelled and cursed at plaintiff whereas plaintiff referred to Ms. Chaplin as a demon. And both notices were classified as "final warnings." However, Ms. Spivey's warning was more lenient, noting termination

11

was possible for future examples of the behavior at issue, whereas plaintiff's warning threatened immediate termination for any violation of defendant's policies. Mr. Massie's deposition did not explore whether he and Ms. Davies considered Ms. Spivey's disciplinary history when she refused her work assignment. But Ms. Davies was at least aware of Ms. Spivey's final warning at the time of Ms. Spivey's refusal because Ms. Davies was also involved in that disciplinary decision. Dkt. 89, Ex. K 33:10-35:06 (Ms. Davies' testimony). For all these reasons, the Court finds that Ms. Spivey's disciplinary history supports Ms. Spivey's status as a comparator instead of distinguishing Ms. Spivey from plaintiff.

Defendant next attempts to differentiate plaintiff by arguing she refused *two* work assignments (assignments in Lot 15 and the driver assistance building) after receiving the written final warning. Dkt. 88 at 8. Plaintiff disputes this, arguing she did not refuse to work at Lot 15. Dkt. 94 at 9-10. Viewing the record in the light most favorable to plaintiff, the Court agrees. Rather than refusing to work at Lot 15, plaintiff agreed to work there despite lacking training or experience. She worked at the lot for thirty or forty minutes and, when she experienced harassment by drivers at the lot, plaintiff called Mr. Massie for help. At that point, Mr. Massie reassigned plaintiff to the driver assistance building, which she refused. On this record, the Court finds that plaintiff is sufficiently similar to Ms. Spivey. *See Coleman*, 667 F.3d at 846 ("We are looking for comparators, not 'clone[s].'") (quoting *Chaney v. Plainfield Healthcare Center*, 612 F.3d 908, 916 (7th Cir. 2010)); *Eaton*, 657 F.3d at 558 (explaining plaintiff "was not required to show that [comparator's]

12

refusal to work was *identical* to hers") (emphasis in original). Since the Court finds plaintiff has established her prima facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.

Defendant maintains its legitimate, nondiscriminatory reason for terminating plaintiff is she violated company policy by harassing Ms. Chaplin and refusing her work assignments. To defeat summary judgment, plaintiff must show this reason is pretext by highlighting "weaknesses, implausibilities, inconsistencies, or contradictions," such that "a reasonable person could find [the reason] unworthy of credence." *Coleman*, 667 F.3d at 852 (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)). The Court finds plaintiff has offered enough evidence of pretext to avoid summary judgment.

First, plaintiff's comparator evidence is relevant to the pretext inquiry because "[i]t suggests that [defendant's] decision-makers here did not take the rule against [insubordination or unprofessional conduct] as seriously as they claimed." *Id.* at 853 (noting the Supreme Court, Seventh Circuit, and other circuits have held "a discrimination plaintiff may employ such comparator evidence to discharge her burden at the pretext stage"). As noted above, that evidence highlights inconsistencies and contradictions in the discipline defendant imposed on plaintiff versus Ms. Spivey for refusing a work assignment and otherwise violating defendant's policies.

13

Additionally, plaintiff has provided some evidence of "failure to investigate an employee's claims of discrimination, 'ambiguous or suggestive comments or conduct,' or 'shifting and inconsistent explanations for an adverse employment action,' [which] can support an inference that an employer's stated reason was a pretext for intentional discrimination." *Cruz*, 2026 WL 370934, at *6 (quoting *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 915 (7th Cir. 2025)). First, plaintiff asserts that "no one took [her concerns about discrimination] seriously." Dkt. 94 at 8. Despite the anti-discrimination policy requiring defendant to "investigate all allegations of discrimination or harassment," Dkt. 89, Ex. A, Ex. 2 (Employee Handbook), there is no evidence in the record that Mr. Massie investigated plaintiff's claims that she was treated differently and harassed (which she raised on the day of her termination and earlier during her employment). Moreover, Mr. Massie informed Ms. Davies that plaintiff refused her work assignment in part because of a "hostile work environment," but there is no evidence Ms. Davies investigated plaintiff's allegations before deciding to terminate plaintiff's employment.

Next, plaintiff highlights her testimony that she overheard "muffled" slurs and potential references to her race when Mr. Massie was talking with Ms. Davies.

Finally, plaintiff casts doubt on the "final warning" in the corrective action notice. Defendant repeatedly relies on the final warning as a basis for her termination. However, the Court finds it suspicious that defendant never addressed (to plaintiff or in its briefs) why that corrective action notice was escalated from a

14

first warning to a final warning, apart from Mr. Massie testifying that Ms. Davies or a human resources employee asked him to change it. Also suspect is Ms. Davies' instruction to Mr. Massie that he keep a log of incidents concerning plaintiff, when Mr. Massie did not keep a log for any other employee (including Ms. Spivey). Taken together, these facts—a similarly situated employee who received less severe discipline, a lack of inquiry into plaintiff's complaints, ambiguous statements overheard at the time of plaintiff's termination, and inconsistent disciplinary documentation—support an inference of pretext. *Coleman*, 667 F.3d at 854-55 ("An evaluation of context is essential to determine whether an employer's explanation is fishy enough to support an inference that the real reason must be discriminatory.") (quoting *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011)). When "considering the evidence as a whole and construing all facts and drawing all reasonable inferences in favor of plaintiff," *Cruz*, 2026 WL 370934, at *6, the Court finds that plaintiff has pointed to enough suspect facts to suggest pretext.

For the foregoing reasons, defendant's motion for summary judgment on plaintiff's wrongful termination claim is denied.

### B.    Hostile Work Environment Claim

To prove race discrimination based on a hostile work environment, plaintiff must show that "(1) she was subject to unwelcome harassment; (2) the harassment was based on her race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability." *Paschall v. Tube Processing*

15

*Corp.*, 28 F.4th 805, 813-14 (7th Cir. 2022) (*quoting Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 895-96 (7th Cir. 2016)).

The Court begins with whether plaintiff was subject to unwelcome, race-based harassment that was severe or pervasive. Plaintiff argues she was subjected to both severe harassment and "lesser harassment that compounded" over time, alleging various instances of mistreatment to establish liability. Dkt. 94 at 13. Plaintiff has not demonstrated that all the "complained-of conduct had a racial character or purpose," such as missing personal items, being yelled at by drivers, or experiencing truck issues. *Paschall*, 28 F.4th at 814. But the Court finds that the following incidents support a hostile work environment claim: Ms. Chaplin called plaintiff the n-word; coworkers referred to plaintiff as a shadow in a racially charged manner; Ms. McKay referred to plaintiff as a "dumb Black girl"; Ms. Manning loudly played music that used the n-word in plaintiff's presence; and Ms. McKay said she did not want to look at plaintiff's face, which plaintiff interpreted as racially motivated. Plaintiff's repeated exposure to explicit racial epithets and more ambiguous or suggestive comments about race, regardless of whether they were directed at her or not, can support an inference of race-based harassment. *Johnson*, 892 F.3d at 901-04. Furthermore, "one-time use of the n-word can be found to be severe enough to warrant liability." *Paschall*, 28 F.4th at 815. Accordingly, plaintiff raises a jury question about the first three elements of her hostile-work-environment claim.

16

Defendant responds by arguing plaintiff has not provided admissible, credible evidence of severe or pervasive race-based harassment. Dkt. 88 at 12; Dkt. 99 at 9. For example, defendant argues that plaintiff's "primary support for her harassment claim appears to stem from hearsay." Dkt. 88 at 12. The Court agrees that at least one incident (Ms. Manning informing plaintiff that Ms. McKay called plaintiff a "dumb Black girl") is likely inadmissible hearsay. *Allen v. Ford Motor Co.*, No. 21-CV-962, 2023 WL 5830685, at *5 (N.D. Ill. Sept. 8, 2023), *aff'd*, No. 23-2969, 2024 WL 1986004 (7th Cir. May 6, 2024) (explaining plaintiff's testimony that coworkers informed plaintiff of derogatory comments was inadmissible hearsay for both summary judgment and trial). However, hearsay is not the only evidence offered, and plaintiff's first-hand testimony about hearing derogatory comments and racial epithets is sufficient at the summary judgment stage. *Johnson*, 892 F.3d at 901 ("The plaintiffs cited to deposition testimony and sworn declarations in which the plaintiffs testified that they heard racially derogatory language. Nothing more is required on summary judgment."); *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 980 (7th Cir. 2014) (explaining "testimony based on first-hand experience" is sufficient evidence at summary judgment).

Further, defendant insists plaintiff's testimony is "incredulous" and improperly based on "her belief" of racial bias. Dkt. 99 at 9. In other words, defendant disagrees with, and distrusts, plaintiff's version of events. But at the summary judgment stage, it is not the Court's role to resolve credibility issues, such as whether plaintiff's interpretation of the disputed conduct is trustworthy.

17

*Johnson*, 892 F.3d at 893. Moreover, the existence of disputed conduct (for example whether Ms. Manning played music with the n-word in plaintiff's presence) and ambiguous intent (whether coworkers called plaintiff a shadow and refused to look at her because of her race) counsels against summary judgment. *Id.* (explaining "disputed facts often signal the need for a trial on the facts" and disputes of material fact preclude summary judgment). Since plaintiff's testimony is sufficient evidence to raise a jury question about her harassment claim, the Court must evaluate the fourth element of the claim: employer liability.

Plaintiff alleges harassment by her coworkers, so defendant is liable "only if it has been negligent in discovering or remedying the harassment." *Equal Emp. Opportunity Comm'n v. Vill. At Hamilton Pointe LLC*, 102 F.4th 387, 403 (7th Cir. 2024). "Because [the Court] do[es] not expect employers to be aware of every impropriety committed by every low-level employee, 'notice or knowledge of the harassment is a prerequisite for liability.'" *Clacks v. Kwik Trip, Inc.*, 108 F.4th 950, 957 (7th Cir. 2024) (quoting *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1035 (7th Cir. 1998)). Moreover, "this notice must be specific" such that the employee provided "enough information to make a reasonable employer think that there was some probability that she was being … racially harassed." *Id.* (cleaned up). The notice must be given to someone with the authority to take remedial action or "the point person identified by the employer for receiving complaints." *Equal Emp. Opportunity Comm'n*, 102 F.4th at 403-04.

18

Plaintiff argues liability is appropriate because she told Mr. Massie that (1) Ms. McKay called her a "dumb Black girl," (2) plaintiff believed Ms. McKay did not want to look at her face because she is Black, and (3) Lot 15 was a "hostile work environment" and people "treated her differently" in the driver assistance building. Dkt. 94 at 14-15. It is undisputed that defendant's employee handbook instructed employees to report harassment to manager, and Mr. Massie was a manager. Dkt. 95 ¶¶ 8, 5. Accordingly, the Court finds that a reasonable jury could agree with plaintiff that the above-three reports provided adequate notice to defendant to impose liability.

Defendant argues it was not negligent to discover racial harassment because plaintiff did not notify Mr. Massie that most of the complained-of conduct (such as the drivers yelling at her or her missing items) was related to her race. Dkt. 88 at 16. Defendant's focus on arguably race-neutral harassment is misplaced. First, the Court finds that plaintiff's reports about Ms. McKay's statements are explicitly racial and sufficient to notify Mr. Massie of, at the very least, "some probability" that plaintiff was subject to racial harassment. *Clacks*, 108 F.4th at 957. Second, "forms of harassment that might seem neutral in terms of race ... can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status." *Cole v. Bd. of Trs. of N. Illinois Univ.*, 838 F.3d 888, 896 (7th Cir. 2016). Plaintiff's testimony about hearing the n-word is evidence of "overt racial hostility [which] can support an inference

19

that other harassment that at first seems race-neutral also has an undercurrent of racial animus." *Id.*

Defendant also argues it cannot be liable for failure to remedy the alleged harassment because Mr. Massie "did not assign [plaintiff] to work at the [driver assistance building]" after plaintiff complained to Mr. Massie about Ms. McKay's harassment. Dkt. 88 at 17. Defendant's assertion is unsupported by the record evidence. Mr. Massie indicated that he did not assign plaintiff to work in that building after she complained about drivers yelling at her, but his declaration is silent on steps he took after plaintiff reported Ms. McKay's conduct. Dkt. 89, Ex. D, at ¶ 16. Notably, "[a] prompt investigation is the first step toward a reasonable corrective action," and defendant does not assert that Mr. Massie spoke with Ms. McKay or otherwise investigated plaintiff's concerns. *Cole*, 838 F.3d at 898. Additionally, defendant does not clarify whether Ms. McKay worked only in the driver assistance building such that assigning plaintiff elsewhere would have any remedial impact. In sum, defendant has not demonstrated that it took any action in response to plaintiff's complaints of racial harassment to avoid liability. *Cf. id.* (concluding no employer liability when supervisor investigated instance of racial harassment and reported incident to higher-ups); *Williams v. Waste Mgmt. of Illinois*, 361 F.3d 1021, 1030 (7th Cir. 2004) (concluding no employer liability when supervisor issued warning to harassing coworker and directed plaintiff to work elsewhere, which "had both the purpose and effect of eliminating further race-based harassment").

20

For all these reasons, the Court denies the motion as to plaintiff's hostile work environment claim.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment, Dkt. 88, is denied.

**So Ordered.**

_____
**Jeannice W. Appenteng**
**United States Magistrate Judge**

21