**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CHARLENE COLEMAN, | |
| Plaintiff, | |
| v. | No. 23 CV 03606 |
| REMPREX, LLC, | Magistrate Judge Jeannice W. Appenteng |
| Defendants. | |

**PLAINTIFF'S MOTION *IN LIMINE* TO BAR EVIDENCE OF HARASSMENT ON THE BASIS
OF SEXUAL ORIENTATION BY PLAINTIFF**

The Plaintiff, by and through her attorneys Joseph J. Perkoski, Nikoleta Lamprinakos, and Natalie A. Jakubowski of ROBBINS SCHWARTZ, LTD., for her Motion *in Limine* to bar evidence of harassment on the basis of sexual orientation by Plaintiff states as follows:

1. Plaintiff has conferred with Defendant, who confirmed that Defendant intends to offer the evidence sought to be excluded in this Motion *in Limine.*

2. Plaintiff alleges that she endured employment discrimination and workplace harassment on the basis of her color and race by her former employer, Defendant. Dkt. 27, ¶ 2.

3. Ms. Chaplin directly supervised Plaintiff when she was employed by Defendant. **Exhibit A:** Chaplin Dep. 18:9-13.

4. Defendant's initial Rule 26(a) disclosures indicated that Ms. Chaplin was believed to have information related to: Plaintiff's allegations; Defendant's defenses; Plaintiff's employment history, job duties/responsibilities, and conduct; and interactions with Plaintiff.

1

5. During Ms. Chaplin's April 10, 2025, deposition, she alleged that Plaintiff harassed her on the basis of her sexual orientation.[1] **Exhibit A:** Chaplin Dep. 18:22-24 – 19:1-8.

6. Federal Rule of Evidence 401 requires that evidence has a tendency to make a fact of consequence in determining the action more or less probable and the fact is of consequence in determining the action. Fed. R. Evid. 401.

7. Any evidence relating to harassment or discrimination on the basis of sexual orientation by Plaintiff that Ms. Chaplin alleges to have occurred while they were employed by Defendant is irrelevant to Plaintiff's claims related to discrimination and harassment under Title VII of the Civil Rights Act of 1964.

8. Federal Rule of Evidence 403 permits the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, undue delay, or a waste of time. Fed. R. Evid. 403.

9. Even if Defendant were to show there is connection between evidence related to Ms. Chaplin's allegations that Plaintiff harassed her on the basis of her sexual orientation to Plaintiff's claims relating to discrimination and harassment by Defendant, such evidence would be more prejudicial than probative.

10. In *Manuel v. City of Chicago*, the Seventh Circuit found that introducing testimony from a former employee that would label a supervisor as a "racist", after the supervisor testified that they never treated any employee differently, could be unfairly prejudicial and would likely result in arguments over the truthfulness of the allegations leading to undue delays during trial. *Manuel v. City of Chicago*, 335 F.3d 592, 594-97 (7th Cir. 2003).

---

[1] The example referenced in Paragraph 4 is a representation and not a complete list of all deposition testimony which would be barred for being evidence of harassment of Ms. Chaplin on the basis of her sexual orientation by Plaintiff.

11. While Defendant will argue that Plaintiff's alleged harassment of Ms. Chaplin on the basis of her sexual orientation was part of the reason for her termination, none of the corrective action notices nor the final termination characterize Plaintiff's conduct towards Ms. Chaplin as harassment on the basis of her sexual orientation. **Exhibit B**: Corrective Action Notice for Final Warning; **Exhibit C**: Corrective Action Notice for Termination.

12. The Corrective Action Notice issued to Plaintiff after the incident with Ms. Spivey only stated that Plaintiff engaged in "inappropriate comments concerning Ms. Jennifer Chaplin". **Exhibit B**: Corrective Action Notice for Final Warning.

13. The Corrective Action Notice issued to Plaintiff subsequent to her termination did not include any mention of her actions towards Ms. Chaplin, besides a reference to the previous Corrective Action Notice. **Exhibit C**: Corrective Action Notice for Termination.

14. Further, Defendant did not conduct a formal investigation into this allegation of Plaintiff harassing Ms. Chaplin on the basis of her sexual orientation nor did Human Resources follow up with Ms. Chaplin regarding this allegation. Defendant instead issued Plaintiff a Corrective Action Notice which generally referenced "inappropriate comments concerning Ms. Jennifer Chaplin". **Exhibit A:** Chaplin Dep. 28:10-17; 46:2-16; **Exhibit B**: Corrective Action Notice for Final Warning; **Exhibit D:** Massie Dep. 19:20-24 – 20:1-22; **Exhibit E:** Davies Dep. 21:12-24 – 22:1.

15. Accordingly, introduction of evidence alleging that Plaintiff harassed Ms. Chaplin on the basis of her sexual orientation would be for the purpose of prejudicing the trier of fact against Plaintiff.

16. Additionally, introduction of evidence alleging that Plaintiff harassed Ms. Chaplin on the basis of her sexual orientation would likely shift the focus to Ms. Chaplin's own allegation of harassment, resulting in undue delays over the truthfulness of the allegation which has little

probative value to the Plaintiff's allegations of racial discrimination and workplace harassment against Defendant.

17. Plaintiff ultimately claims that she was terminated based on racial discrimination and endured workplace harassment. Regardless of whether Plaintiff harassed a colleague on the basis of their sexual orientation, such evidence does not go to Plaintiff's allegations of racial discrimination related to her termination or workplace harassment.

18. Any introduction of evidence alleging that Plaintiff harassed Ms. Chaplin on the basis of her sexual orientation would be unfairly prejudicial, as its use would be to inflame Plaintiff's character, rather than for any probative value related to this case and would likely cause undue delays.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court grant this Motion *in Limine* in its entirety and order such other relief as the Court deems just and proper.

Respectfully submitted,

CHARLENE COLEMAN

By:   s/ Natalie A. Jakubowski

One of Her Attorneys

Joseph J. Perkoski (6216678)
Nikoleta Lamprinakos (6274018)
Natalie Jakubowski (6349376)
**ROBBINS SCHWARTZ LTD.**
190 S. LaSalle St., Suite 2550
Chicago, IL 60603
(312) 332-7760
jperkoski@robbins.schwartz.com
nlamprinakos@robbins-schwartz.com
njakubowski@robbins-schwartz.com

4

**PROOF OF SERVICE**

I, Natalie A. Jakubowski, an attorney, certify that the foregoing Plaintiff's Motion *in Limine* was electronically filed with the Clerk of the Court using the CM/ECF system on this June 18, 2026, which constitutes service on all counsel of record, registered filing users, pursuant to Fed. R. Civ. P. 5(b)(2)(D).

/s/ Natalie A. Jakubowski

# Exhibit A

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

_____

CHARLENE COLEMAN,

     Plaintiff,

  v.                         Case No.

REMPREX, LLC,               2023 CV 03606

     Defendant.

_____

DEPOSITION OF

JENNIFER MCMAHAN

DATE:         Thursday, April 10, 2025

TIME:         11:11 a.m.

LOCATION:     Remote Proceeding

              Braceville, IL 60407

REPORTED BY:  Brittany Olis

JOB NO.:      7278703

Page 2

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF CHARLENE COLEMAN:

NATALIE A. JAKUBOWSKI, ESQUIRE (by

videoconference)

Robbins Schwartz, Ltd.

190 South LaSalle Street, Suite 2550

Chicago, IL 60603

njakubowski@robbins-schwartz.com

(312) 332-7760


ON BEHALF OF DEFENDANT REMPREX, LLC:

PETER E. HANSEN, ESQUIRE (by videoconference)

Amundsen Davis, LLC

3815 East Main Street, Suite A-1

St. Charles, IL 60174

phansen@amundsendavislaw.com

(630) 587-7910

Page 3

I N D E X

EXAMINATION:                                          PAGE

    By Ms. Jakubowski                                6

    By Mr. Hansen                                   48

    By Ms. Jakubowski                               52


E X H I B I T S

NO.                DESCRIPTION                      PAGE

Exhibit 1          Email re Employee Conflict –

                    07/02/2022                       24

Exhibit 2          Documentation Email – 07/14/2022   27

Exhibit 3          Corrective Action Notice – Donna

                    Spivey                           34

Exhibit 4          Corrective Action Notice –

                    Charlene Coleman, First Warning     37

Exhibit 5          Corrective Action Notice –

                    Charlene Coleman, Final Warning     37

Exhibit 6          Handwritten Notes                38

Page 4

P R O C E E D I N G S

THE REPORTER:  Good morning.  My name is Brittany Olis.  I'm the reporter signed by Veritext to take the record of this proceeding.  We are now on the record at 11:11 a.m.

This is a deposition of Jennifer McMahan taken in the matter of Charlene Coleman vs. Remprex, LLC on Thursday, April 10, 2025.

I'm a notary authorized to take acknowledgments and administer oaths in Illinois. Parties agree that I will swear in the witness remotely.

Additionally, absent objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and
- shall constitute written stipulation of such.

Page 5

At this time will everyone in attendance please identify yourself for the record, beginning with the witness.

MS. MCMAHAN: Jennifer McMahan.

MS. JAKUBOWSKI: Natalie Jakubowski, attorney for the plaintiff.

MR. HANSEN: Peter Hansen, attorney for Defendant.

THE REPORTER: Thank you.

Hearing no objection, I will now swear in the witness.

WHEREUPON,

JENNIFER MCMAHAN, called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: -- begin.

MS. JAKUBOWSKI: Good morning, everyone. My name's Natalie Jakubowski. I represent the plaintiff in this case, Charlene Coleman, in Charlene Coleman vs. Remprex, LLC.

Let the record reflect that this is the discovery deposition of Ms. Jennifer McMahan taken pursuant to notice and in accordance with the Federal

Page 6

Rules of Civil Procedure and the local rules for the Northern District of Illinois.

This deposition is being taken via remote Zoom. We're all on video and can see and hear each other. I will also be sharing some exhibits via the share screen feature.

Attorney Hansen, you've received a copy of these exhibits this morning; correct?

MR. HANSEN: [No audible response.]

MS. JAKUBOWSKI: Sorry. I couldn't hear it.

THE REPORTER: Was that a yes?

MS. JAKUBOWSKI: Yeah.

MR. HANSEN: Yeah. Sorry. Do not -- yeah. Sorry.

MS. JAKUBOWSKI: No worries. Thank you.

EXAMINATION

BY MS. JAKUBOWSKI:

Q    All right. Ms. McMahan, have you ever been deposed before?

A    No.

Q    Okay. So we'll just go over some ground rules, and we'll go from there. So, first, I just

Page 7

want to remind you that we need to state all answers out loud.  The court reporter, Brittany, cannot capture shrugs or actions.  So just make sure to say "yes" or "no" rather than "mm-hm."

We cannot talk over one another.  That also makes it more difficult for the court reporter to capture everything.  So we need to make sure that only one person is speaking at a time.  I will do my best to let you finish speaking, and I hope that you will do your best to let me finish speaking.  I know sometimes you might anticipate a question, but I just ask that you please let me finish before you answer.

If at any point you do not understand a question I ask, please let me know, and I'm happy to rephrase it.  If you answer a question that I have asked, I will assume that you understood it as the way I asked it; is that fair?

A    Yes.

Q    Okay.  And also, if you need a break at any point, please let me know.  We can definitely take a break.  The only caveat is that if there is a question pending, please answer the question first, and then we can take a break.  Understood?

A    Yes.

Page 8

Q    There also may be times during this deposition where Attorney Hansen may object.  You should listen to the objection, but you will still be able to answer the question after listening and hearing the objection, unless it's a type of objection that prevents you from answering.  Do you have any questions for me before we begin?

A    No.

Q    Okay.  Okay.  Ms. McMahan, have you ever been involved in any other lawsuit?

A    Involved in a lawsuit, yes.

Q    What type of lawsuit?

A    An injury.

Q    How many years ago was that?

A    It's still pending.

Q    Okay.  And are you a party to that lawsuit?

A    Yes.

Q    Plaintiff, or a defendant?

A    Plaintiff.

Q    Okay.  Have you reviewed any documents in preparation for today's deposition?

A    Yes.

Q    What documents have you reviewed?

A    Just an outline of everything.

Page 9

Q    And what do you mean when you say "everything"?

A    Just what to expect 'cause I've never done this before.

Q    Did you meet with anyone before this deposition in anticipation for this deposition?

A    Mr. Hansen.

Q    How many times did you meet?

A    Once on -- on call and then phone call.

Q    Did you speak about this deposition with any other Remprex employee?

A    Jana Davies, yes.

Q    Who is Jana Davies?

A    My immediate supervisor.

Q    And what is her position?

A    She's a -- her -- I -- I don't -- I don't remember her title, but it's above mine.

Q    That's okay.  And what did you discuss with Jana?

A    Just that this was happening, and then I'd be here today.

Q    Did you discuss any of the details regarding the incidents?

A    I -- I'm sorry.  I gave her a written

Page 10

statement, just pretty much the details of what we discussed.

Q   Did you discuss this deposition with anyone else?

A   Yes.

Q   Who did you discuss it with?

A   My wife.

Q   And what did your wife and you discuss?

A   Just how anxious I was with it.

Q   Did you discuss any further details?

A   Just how it was -- it's not fair.  It -- just -- just the details of it.  Yeah.

Q   And when you say "not fair," not fair that you have to attend?

A   Everything's false.

Q   These are just some questions that we ask of everyone, so please do not be offended.  Have you ever been convicted of a felony?

A   No.

Q   Have you ever been convicted of a crime involving dishonesty, such as perjury or fraud?

A   No.

Q   Are you currently on any medication that would affect your ability to understand and answer my

questions?

A    No.

Q    We're going to go into some personal background questions about yourself now.  What is your date of birth?

A    5/10/84.

Q    Do you plan on moving out of Illinois in the next year or so?

A    No.

Q    What is your highest level of education?

A    High school diploma.

Q    What year did you graduate?

A    2003.

Q    And do you have any other licenses or certifications?

A    Not at this time, no.

Q    We'll now walk through your employment history.  Where did you first start working after you graduated from high school?

A    McDonald's.

Q    Were you there for a long time?

A    No.

Q    Where did you go after?

A    Speedway.

Page 12

Q    What did you do at Speedway?

A    I was a manager.

Q    How long were you a manager there?

A    For about, I would say, five years maybe.

Q    And why did you leave Speedway?

A    Better opportunity with Caterpillar.

Q    I assume your next position was at Caterpillar?

A    Yes.

Q    What did you do at Caterpillar?

A    I was a Q and A representative.

Q    Can you explain what a Q and A representative is?

A    Basically, just looking over equipment, making sure it was water tested and good to go, there's no defects on it.

Q    And how long did you do that?

A    Maybe one or two years.

Q    Okay.  And where did you go after Caterpillar?

A    Remprex.

Q    Remprex.  Do you remember the date that you started at Remprex?

A    I think it was January 1st of 2010 or '9.

Page 13

I'm not real sure.  I don't remember.

Q    And when you first started at Remprex, what position did you hold?

A    Yard checker.

Q    Okay.  How long were you a yard checker?

A    I -- I don't -- I don't recall.  I don't -- I'm not sure.

Q    What did you do after being a yard checker?

A    I was a supervisor.

Q    Is that your current position?

A    No.  My current position's terminal manager.

Q    Going back to when you were a supervisor, was there a specific department that you supervised?

A    A very small group of people that, like -- just, like, other yard checkers.

Q    And how long were you a supervisor?

A    I -- I don't know.  I moved around so much in the company.

Q    So were you any other position between being a supervisor and terminal manager?

A    Yes.

Q    What position?

A    I was a supervisor.  I was a CSR.  I was CSR, customer service representative.

Page 14

Q    Thank you.

A    And then I was a -- an ATM, was assistant terminal manager, inventory coordinator.  And then I was a terminal manager again, and then an assistant terminal manager again, and then now a terminal manager.

Q    Do you remember what position you held in the year 2022?

A    I was in between positions, between a ATM and a CSR.

Q    What were your duties as an ATM?

A    Assist with the TM with daily activities, reporting, overseeing staff, delegating work, making sure things would get done.

Q    And then what were your duties as a CSR?

A    Inventory specialist.  Basically, just take care of customer engagements, be the liaison between Remprex and the BNSF customer, and take care of inventory.

Q    Besides the positions we went through, did you hold any other positions while at Remprex?

A    I don't think I forgot any, no.

Q    Have you personally ever been subjected to discrimination while working at Remprex?

Page 15

A    Me, myself?

Q    Correct.

A    Yes.

Q    Can you talk about that?

A    Well, it's with Ms. Coleman.

Q    Has anyone else ever complained to you about feeling discriminated while at Remprex?

A    Not that I can recall, no.

Q    Are you aware of your duty as a ATM to report complaints of discrimination or harassment to Human Resources?

A    Yes.

Q    And who would you go to back in 2022 with any human resources-related problems?

A    Well, first I would contact my supervisor, immediate supervisor at the time, if comfortable.  And then it would be Human Resources.

Q    You said first you would contact your immediate supervisor back in 2022.  Who would that have been?

A    Between Anthony Garner and Tracy Massie.

Q    And if after the supervisor you went to HR back in 2022, who would you have gone to?

A    I honestly don't remember who was in HR that

Page 16

time.

Q    Okay.  Ms. McMahan, are you familiar with Charlene Coleman?

A    Yes.

Q    How do you know Charlene?

A    We were coworkers.

Q    Do you know Charlene outside of work?

A    No.

Q    How long did you work with Charlene?

A    I don't -- I don't remember how long it was.

Q    Did you work with Charlene the entire time that she worked at Remprex?

            MR. HANSEN:  Objection.  Lacks foundation.

BY MS. JAKUBOWSKI:

Q    Do you know when Charlene started working at Remprex?

A    No.

Q    Did Charlene work at Remprex in the year 2022?

A    I believe so.  I'm not good with dates.

Q    Was the last time you worked with Charlene in 2022?

A    I think so, yes.

Page 17

Q    Did you work with Charlene less than a year?

A    I honestly don't know how long I worked with -- with her.

MS. JAKUBOWSKI:  Okay.  Can I take a quick five-minute break?  Is that okay?

MR. HANSEN:  Yeah.  Yeah.  I -- yeah.

MS. JAKUBOWSKI:  Thank you.

MR. HANSEN:  Yeah.

THE REPORTER:  Okay.  Going off the record, 11:28 a.m.

(Off the record.)

THE REPORTER:  One moment.  All right.  Back on the record, 11:33 a.m.

MS. JAKUBOWSKI:  Thank you.  And would we be able to have the last question read from the record, whenever that was?

(The reporter repeated the record as requested.)

BY MS. JAKUBOWSKI:

Q    Ms. McMahan, how often did you work alongside Charlene when you did work together?

A    I don't know how many times.  I mean, I can't count how many times.  It was random, here and there.

Page 18

Q   Did you see each other every single day?

A   No.

Q   Okay.  How often would you say in a week you would see each other?

A   I don't know exact.  A few.

Q   Few?  Maybe more than one, but less than five?

A   Yes.

Q   When you and Charlene were working together, you were a supervisor; correct?

A   Yes.

Q   And did you supervise Charlene directly?

A   I did.

Q   What are some of the duties with supervising a subordinate employee?

A   What do you mean?

Q   Let me rephrase.  What are some of the things that you have to do as a supervisor when you're working with a subordinate employee?

A   Training, guiding, answering questions, making sure that the employees are in task.

Q   How would you describe your working relationship with Charlene?

A   Not good.

Page 19

Q    Why was it not good?

A    I -- I was harassed by her.

Q    What do you mean by "harassed"?

A    Well, I mean, she made comments to me like -- like I'm a demon.  A whole -- about my sexual orientation.  She'd play Bible music every time I would enter the driver assistance building.  She didn't want to touch the things that I touched.

Q    Okay.  We'll go through each one of those things more in depth.  Let's start with the comments about being a demon.  Did she say this directly to you?

A    She said it to my peers.

Q    Do you know who the peers were?

A    Yeah.  Do you want me to name them off?

Q    Yes.  You can name the peers.

A    Jocelyn, Donna, Kari, Janine, Jana, Tracy. I mean, I don't remember.  But I know those are the ones that I worked every day.

Q    And those individuals that you listed, they specifically told you that Ms. Coleman said you are a demon?

A    Yes.

Q    Did they tell this to you all at the same

Page 20

time or individually?

    A    Individually, throughout the time we were working.

    Q    Okay.  Okay.  And I do want to go into further detail about the other incidences that you are saying you felt were harassment.  But before we get there, I'll just go through some other questions.  Can you describe what training you received as a supervisor or ATM?

    A    On-the-job training with other --

    Q    Yes.  On --

    A    -- supervisors.  This -- I mean, my manager would train me.  Managers, I should say.

    Q    And who are those managers?

    A    I received training from Nicole Kovacevic. She was a previous manager of mine.  Anthony Garner. By the time Tracy Massie was there, I'd already received training.

    Q    Did you ever receive any discrimination or harassment training?

    A    Yes.

    Q    What did this training entail?

    A    Just how to notice discrimination, harassment, how to report it, how to follow up.

Page 21

Q    Can you talk about the reporting procedures that you received from this training?

A    The reporting procedures would be to get a statement and then report it to my immediate supervisor.  And if I was uncomfortable with the immediate supervisor, then directly to HR.

Q    Did this also include training on reporting incidents of discrimination or harassment that were reported to you by another employee?

A    Yes.

Q    Was the process different for reporting those kinds of complaints?

A    No.

Q    When you first started at Remprex, during training were you ever referred to as "the shadow"?

A    No.

Q    Is it typical to refer to an employee who's training as someone is "shadowing"?

A    Yes.

Q    Is it typical to refer to an employee who is training as "the shadow"?

A    No.

Q    Did you ever tell Charlene that she is the shadow?

Page 22

A    No.

Q    Did you ever hear anyone else say that she is the shadow?

A    No.

Q    Did Charlene ever tell you that someone called her "the shadow"?

A    No.

Q    Did Charlene ever tell you that she was uncomfortable with the word "the shadow"?

A    No.

Q    Could the term "shadow" be derogatory to Black people?

A    I'm not sure what you mean.

Q    If someone were to call a Black person "the shadow," could it be taken in a derogatory way?

MR. HANSEN:  Objection.  Calls for speculation.

BY MS. JAKUBOWSKI:

Q    You can still go ahead and answer, Ms. McMahan.

A    I mean, I'm -- I guess I would assume they'd -- it'd be derogatory or -- yeah.

Q    Would it be derogatory to call anyone a shadow?

Page 23

A    To call them a shadow, yes.

Q    Did you ever hear from anyone else that Charlene was uncomfortable with the term "shadow"?

A    No.

Q    Are you familiar with Remprex's discrimination policy?

A    Yes.

Q    And that's in the Employee Handbook; correct?

A    Yes.

Q    Would it be a violation of the discrimination policy to call a Black employee a shadow after they asked to not be called that?

A    I mean, I would assume it would be.

Q    Would it be a violation of the discrimination policy to treat a Black employee differently than a non-Black employee because of their race?

A    Yes.

Q    Are you familiar with Remprex's harassment policy?

A    Yes.

Q    And that's located in the Employee Handbook; correct?

Page 24

A    Yes.

Q    Would it be a violation of the harassment policy to call a Black employee a shadow after they asked to not be called that?

A    Yes.

Q    Okay.  I will now show you what is going to be marked as Exhibit 1.  I'll share my screen momentarily.

(Exhibit 1 was marked for identification.)

MS. JAKUBOWSKI:  Okay.  Is everyone able to see my screen?

MR. HANSEN:  Yes.

THE WITNESS:  Yes.

BY MS. JAKUBOWSKI:

Q    Okay.  This is marked as Exhibit 1. Ms. McMahan, do you know what this is?

A    Yes.

Q    And let me know if you need me to zoom in at all.  I can definitely do that.

Do you recall sending this email?

A    I do.

Q    You sent this on July 2, 2022, around 10:13 a.m.; correct?

Page 25

A   Yes.

Q   You wrote this email yourself?

A   I did.

Q   Did anyone ask you to write this email?

A   No.

Q   And who was this email to?

A   My supervisor and Jana Davies.

Q   And your supervisor at the time was Tracy Massie; correct?

A   Yes.

Q   Why did you send this email to Tracy and Jana?

A   Because of a employee conflict.

Q   Who was the employee conflict between?

A   Myself and Charlene.

Q   This email states "This morning about 9:57 a.m. Charlene approached me as well as accusing me of taking her keyboard out of the office that belonged to her.  She was upset and confrontational. She went in the truck I was using, taking the keyboard from it"; is that correct?

A   Yes.

Q   What keyboard do you typically use at work?

A   There's a lot of keyboards.  So I don't -- I

Page 26

don't know.  They switch from truck to truck.

Q    Does anyone use their personal keyboard?

A    Not that I know of.

Q    Are people permitted to bring a personal keyboard?

A    You can if you choose.

Q    And you do not bring your own personal keyboard to work; correct?

A    Now I do, yes.

Q    Why do you bring your personal keyboard to work now?

A    Because it makes nice clicks.

Q    Did Charlene have a personal keyboard?

A    Not that I was aware of.

Q    Did you know where Charlene kept the keyboard that she used?

A    No.

Q    Did you know that Charlene's keyboard went missing?

A    No, I did not.

Q    Was the keyboard that you were referring to in this email the one that Charlene used?

A    It -- it was a keyboard.  I didn't know it was specifically hers.

Page 27

Q    Did you end up returning this keyboard back to her?

A    She took it.

Q    What keyboard did you use after that?

A    Another random one.

Q    I will scroll down and show you what is marked as Exhibit 1.  Apologies.  Strike that.

I will now show you what is marked as Exhibit 2.

(Exhibit 2 was marked for identification.)

Do you know what this is, Ms. McMahan?

A    Yes.

Q    What is this?

A    It's a documentation.

Q    Documentation of what?

A    Some of my experiences with Ms. Coleman.

Q    And this documentation was sent in an email; correct?

A    Correct.

Q    Who did you send this to?

A    Ms. Jana Davies.

Q    And you wrote this yourself; correct?

A    I did.

Page 28

Q    Did anyone tell you to write this?

A    I was asked to document my experience.

Q    Who asked you to do so?

A    I don't remember if it was Jana or Tracy Massie.

Q    So either Jana or Tracy Massie told you to document.  Did they tell you to send an email to Jana Davies?

A    I sent it to Jana.

Q    Why did they tell you to send this documentation?

A    Because of my complaints with Ms. Charlene.

Q    And you had gone to HR with complaints?

A    No.  I went to Mr. Tracy Massie.

Q    To your knowledge, did Tracy Massie go to HR with your complaints?

A    Not to my knowledge.

Q    Okay.  I'm just going to scroll down just so you can see the full document.  If you need me to pause anywhere, just let me know.  I will go back up to the email.

In the email you say "So I brought it up to Tracy.  I did say I'm not sure what I did, but her lack of professionalism is making things difficult to

Page 29

do my job.  And she thinks I'm the devil."  It says that in the email; correct?

A    Yes.

Q    Did Charlene say this directly to you?

A    She said it to my peers.

Q    And that were the peers that you listed earlier; correct?

A    Correct.

Q    What was the context of her calling you a devil?

A    I'm not sure what you mean.

Q    Why would she have called you a devil?

A    I can only make an assumption of my sexual orientation.

Q    Okay.  And what is your sexual orientation?

A    I'm a lesbian and married to a woman.

Q    Did Charlene know your sexual orientation?

A    She did.

Q    How did she know?

A    She started talking to me about her husband. She was married to a man, and I mentioned I was married to a woman.  And that's as far as the conversation went.

Q    Looking back at the exhibit, it states "When

Page 30

she did work next to me, she would sit on a raincoat because I smelled bad and listen to church service on her phone"; correct?

A    Correct.

Q    Did you witness Charlene sitting on a raincoat around you?

A    Yes.

Q    Did she explain why she was sitting on a raincoat?

A    Not to me.

Q    Who did she explain to?

A    My -- my peers.

Q    What peers?

A    The -- Kari -- want me to list them again?

Q    Yes, please.

A    Kari McKay, Janine, Jocelyn, Tracy Massie, Janine.  I don't know if I said that.  Just everybody daily that we worked in the DAB with is who I listed.

Q    Did Charlene ever say anything specifically to you about your sexual orientation?

A    She said that she knew somebody that was interested in the gay.

Q    And to your understanding, what does to "the gay" mean?

A    I have no idea.

Q    Okay.  In the exhibit it says she would "listen to church service on her phone"; correct?

A    Yes.

Q    Did anyone else listen to music at work?

A    Here and there, yes.

Q    Was it common for people to listen to music at work?

A    Sometimes, depending on the day.

Q    What would it depend on?

A    How slow it was 'cause we would deal directly with customers.

Q    Would people use earbuds?

A    Sometimes, yes.

Q    Would sometimes people listen to music out loud?

A    Here and there, depending, like I said, the day.

Q    Were there any rules against listening to music?

A    Not that I can recall.  I mean, just not to have any, like, curse words and stuff like that.

Q    Did you ever hear people playing music with curse words?

Page 32

A    No.

Q    And Bible or gospel music typically did not have curse words; correct?

A    Correct.

Q    Would it be appropriate for someone to listen to Bible music at work?

A    I mean, it -- I don't think it would be a problem unless somebody disagreed with it.

Q    Would it be inappropriate to listen to music with racial slurs in it?

A    What do you mean?

Q    Would it be inappropriate to listen to music with the N word?

A    I mean, I'm not -- oh.  At work?

Q    At work, correct.

A    Okay.  Yes.

Q    In Exhibit 2 it states "During this conversation we were in 2119 coming back from a lane. I did try and teach her how to switch out an edgecom at out 5 or 3, and she refused to participate because she did not want to break anything"; is that correct?

A    Correct.

Q    Can you explain what an edgecom is?

A    Edgecom is a -- it's -- it's like a battery

Page 33

powering a computer.

Q   How big is an edgecom?

A   No bigger than an iPad.  I mean, lengthwise.

Q   And what's the process for switching out an edgecom?

A   You unplug it.

Q   Do you have to pull any wires when you unplug it?

A   The wire that's plugged into it, yeah.

Q   Do you typically switch out an edgecom while the computer is on?

A   The computer can't be on when the edgecom is -- it -- it -- that's the part that's broke.  It would -- it gives the power.

Q   Is it dangerous to switch out an edgecom?

A   No.

Q   You stated that Charlene "refused to participate because she did not want to break anything."  Is that what she told you?

A   Yes.

Q   Was there any other reason why she did not want to participate that she told you?

A   No.  She stated that she wanted it in writing in case she was accused of breaking something.

Page 34

Q    If you don't know what you are doing when switching out an edgecom, could it be dangerous?

A    No.

Q    Did you complete the task instead?

A    Yes, I did.

Q    Are there any tasks that you do that require you to pull wires of any sort?

A    Like, unplug something?

Q    Unplug something, sure.

A    Every -- I mean it -- the computers all have wires that plug in, so yes.

Q    Would you ever keep a computer or machine on while fixing wires or plugging in wires?

A    No.

Q    Is it because it's dangerous to do so?

A    No.  It's just best practice to power cycle.

Q    Did you ever ask Charlene to pull wires while a machine or computer was on?

A    The switching out of the edgecom is the only time that I asked her to pull a wire.

Q    I will now show you what is marked as Exhibit 3.

            (Exhibit 3 was marked for

            identification.)

Page 35

Have you seen this document before, Ms. McMahan?

A    Yes.

Q    And what is this document?

A    It is a Corrective Action Notice for Ms. Spivey.

Q    Who is Donna Spivey?

A    She was a coworker.

Q    What position was Ms. Spivey?

A    I believe it was at the time field gate operator.

Q    Is that the same position Ms. Coleman was?

A    Yes.

Q    So Ms. Spivey and Ms. Coleman were the same position; correct?

A    Correct.

Q    And this Corrective Action Notice, Exhibit 3, is from July 14, 2022; correct?

A    Correct.

Q    Did you write this Corrective Action Notice?

A    No, I did not.

Q    Do you know who wrote this notice?

A    Either Jana Davies or Tracy Massie.

Q    That's your signature at the bottom;

Page 36

correct?

A    Correct.

Q    So you reviewed this document after it was written by either Jana Davies or Tracy Massie; correct?

A    Correct.

Q    Did you review any other documentation before you signed off on this notice?

A    Just this -- this Corrective Action Notice.

Q    Okay.  Do you typically participate in the disciplinary process with subordinate employees?

A    When asked to, yes.

Q    And you were asked to review and sign this notice; correct?

A    I was asked to present the notice to Ms. Spivey.

Q    And you observed the incident that is described in this notice; correct?

A    No.

Q    Did you interact with either Donna Spivey or Charlene Coleman after this incident occurred?

A    I did not, no.  It was Jana -- Ms. Jana Davies.

Q    Jana Davies was the one that witnessed this

Page 37

incident?

A    Yes.

Q    I will now show you what is marked as Exhibit 4.

(Exhibit 4 was marked for identification.)

Do you know what this document is, Ms. McMahan?

A    It's another Corrective Action Notice.

Q    Have you seen this particular Corrective Action Notice before?

A    Not that I can recall.

Q    And you did not review this notice in preparation for today?

A    No.  I didn't see this one.

Q    So you did not write this document?

A    No.

Q    You did not assist anyone in writing this document?

A    Nope.

Q    I will now show you what is marked as Exhibit 5.

(Exhibit 5 was marked for identification.)

Page 38

Do you know what this document is?

A    No.  It -- I mean, it looks like -- almost like the same one that was from Jana.  It's a Corrective Action Notice.

Q    And when you say "the same one" from Jana, are you referring to the document that I just previously showed you or the --

A    The one before that with my signature, yeah.

Q    Understood.  You've never seen this particular Corrective Action Notice before?

A    Not that I can recall, no.

Q    And you did not write this?

A    No, I did not.

Q    And you did not assist anyone in writing this?

A    No.

Q    I will now show you Exhibit 6, and I will just scroll through so you can see all the documents.

                (Exhibit 6 was marked for

                identification.)

Ms. McMahan, have you ever seen these before?

A    No.

Q    You did not review these documents?

Page 39

A     I did not, no.

Q     Okay.  Ms. McMahan, are you aware of a bet between certain Remprex employees regarding how long Charlene would last at Remprex?

A     No.

Q     Have you ever heard anyone at Remprex talk about a bet?

A     No.

Q     Are you aware of a deal between Remprex employees involving a referral bonus?

A     No.

Q     Have you ever heard anyone at Remprex discuss a deal regarding a referral bonus?

A     No.

Q     Are you aware of an incident involving Charlene being told to sit away from others?

A     No.

Q     Have you ever witnessed Charlene sitting further away from others?

A     I mean, the way that the computers are set up is you have no choice to sit away from other people.

Q     Have you ever heard anyone tell another person to sit away from someone else?

Page 40

A    No.

Q    Okay.  Are you aware of an incident involving Charlene having to go to the hospital after inhaling carbon monoxide from a Remprex truck?

A    I heard of that, yes.

Q    Who did you hear it from?

A    Kari -- Kari McKay.

Q    And who is Kari McKay?

A    She was -- I believe at the time she was a -- a supervisor, I believe.

Q    And you both worked together?

A    Occasionally, yes.

Q    Did she supervise Charlene?

A    She did.

Q    Okay.  And what did Kari tell you about this incident?

A    That she tried to get ahold of her, Ms. Charlene, via phone call 'cause she took it upon herself to go to the hospital.

Q    Do you know why she went to the hospital?

A    She said that the fumes in the truck were bothering her.

Q    Did Ms. Coleman return to work that day?

A    I don't recall.

Page 41

Q    Did Charlene tell you anything about this incident?

A    No, she did not.

Q    Are you aware of the events leading to Charlene's termination?

A    I -- yes.  Some --

Q    What do you --

A    I'm aware that there was a argument or disagreement between Ms. Charlene and Mr. Massie about refusal to work, and I heard that the police were contacted.

Q    Do you know what the work that they were disagreeing about was?

A    I don't.

Q    Do you know why the police were contacted?

A    I do not.

Q    Do you know who contacted the police?

A    Either Charlene or Tracy.  I'm not sure.

Q    From your perspective as an ATM supervisor, what is the typical process for terminating an employee?

A    You get progressive discipline.  And then you can either do it yourself or HR can do it, depending on what the employee's being let go for.

Page 42

Q    Can you explain what progressive discipline is?

A    Steps, like stage one, verbal warning, step -- first warning, second warning, third warning, and then final.

Q    And what comes after a final warning?

A    Termination.

Q    Is it common for employees to be immediately terminated?

A    Egregious behavior would account for immediate termination.

Q    And what would constitute egregious behavior?

A    Threats, direct threatening behavior to the BNSF contractor, unprofessionalism.  Those are just some examples.

Q    Did Charlene have any progressive discipline to your knowledge?

A    Not that I -- I never give her -- gave her any.  So not to my knowledge, no.

Q    Are you aware of any employees at Remprex who were terminated for refusing to perform an assignment?

A    I mean, refusing to come to work?  Yes.

Page 43

Refusing an -- assignments?  I'm not sure.  No.

Q    Have you ever observed an employee refuse an assignment because it was dangerous?

A    No.

Q    Are you aware of any employees who refused to perform a dangerous duty but were not terminated?

A    No.

Q    Okay.  Ms. McMahan, I want to go back to something you said earlier.  You mentioned that Charlene would not touch things that you had touched.  Could you explain a little bit more?

A    Yeah.  Going back to the edgecom incident, she refused to touch it.  Like, she refused to touch the equipment.  She refused to step up on the ladder to even pull the wire.  And, like, the trucks that I would drive and stuff like that, keys, chairs, keyboards.  Like, if -- if I used the keyboards, they were sprayed down, like, with Lysols and stuff like that.  So --

Q    Would Charlene spray down other equipment, such as equipment that you didn't touch?

A    I touched all the equipment.

Q    Did Charlene seem to be a hygienic person?

A    Not that I was aware of.

Page 44

Q    Did Charlene ever tell you why she wouldn't touch things that you had touched?

A    No.

Q    When you would pull the wire out for the edgecom, would the computer still be on?

A    No.  It -- it was broke.  It didn't -- it didn't run.

Q    So there was no electricity running through the wire?

A    No.

Q    Could someone believe that there is electricity running through the wire?

            MR. HANSEN:  Objection.  Calls for speculation.

BY MS. JAKUBOWSKI:

Q    You can go ahead and answer, Ms. McMahan.

A    Would someone believe that there's -- it -- everything was shut off.  It's not running, not making any noises.  The lights were off.  I mean, there's no noises coming from it.

Q    Has Charlene ever made a comment to you specifically about your sexual orientation?

            MR. HANSEN:  Objection.  Asked and answered.

Page 45

Go ahead.

BY MS. JAKUBOWSKI:

Q    Go ahead, Ms. McMahan.

A    The only comment that she made towards my sexual orientation is that someone she knew had questions or was curious about the gay.

Q    When did she say this to you?

A    When we worked together.  I don't know.  I don't have specific dates.

Q    Did anyone else hear this?

A    I don't recall who was in the room at the time.  It was just her and I at the driver's assistance window.

Q    Did you report this to anyone?

A    No.

Q    Why didn't you report it?

A    I mean, I threw it off as a -- a joke or as -- I shrugged my shoulders to it.  So --

Q    Has Ms. Coleman ever called you a slur?

A    Yes.

Q    What slur?

A    A couple.  A -- a dyke.  Demon.  I feel demon's a slur.

Q    When did she call you a dyke?

Page 46

A    She would call me a dyke to my peers.  So --

Q    She never said "dyke" to you?

A    Not to my face, no.

Q    And what peers told you about this?

A    Jocelyn, Kari McKay, Janine, Donna Spivey.

Q    Did they tell you this all at the same time or individually?

A    It -- it went on individually throughout the time we worked together.

Q    And was this ever reported to HR?

A    This was reported to Tracy Massie.

Q    Did Tracy Massie report this to HR?

A    Not that I'm aware of.

Q    And HR never reached out to you to discuss this?

A    No.

MS. JAKUBOWSKI:  Okay.  We can take a five-minute break.  I'm just going to look through my notes.  I think that might be all that I have for you, but I just want to confirm that I don't have anything else.

Does that sound good with you, Attorney Hansen?

MR. HANSEN:  Sure.  Yep.  Works.

Page 47

MS. JAKUBOWSKI:  Okay.  Great.

We can go cameras off and mutes until 12:25?

MR. HANSEN:  Sure.  Thank you.

MS. JAKUBOWSKI:  Thanks.

THE REPORTER:  -- the record, 12:19.

(Off the record.)

THE REPORTER:  Back on the record, 12:25 p.m.

MS. JAKUBOWSKI:  Thanks.

BY MS. JAKUBOWSKI:

Q   I just have a few follow-up questions, Ms. McMahan.  So Charlene's comments to you, they were never directed specifically to you, like, you didn't hear them yourself?

A   No.

MR. HANSEN:  Objection.

That mischaracterizes your testimony.

Go ahead.

THE WITNESS:  No.

BY MS. JAKUBOWSKI:

Q   You only heard these comments from other people; correct?

A   From my peers, yes.

Page 48

Q    And that was all the peers that we've already listed; correct?

A    Yes.

Q    And just one final question.  Was Jana Davies the HR point of contact in 2022?

A    I don't know.

Q    Was there any other individual in Human Resources that you would've gone to with any HR problems?

A    Just -- I just went to my immediate supervisor.

MS. JAKUBOWSKI:  I think that's all of my questions.  I will turn it over to Attorney Hansen if he has any follow-up.

EXAMINATION

BY MR. HANSEN:

Q    I do.

Jennifer, did you ever refer to Ms. Coleman as the N word?

A    No.

Q    And you know what I mean when I say the N word; correct?

A    Yes.  Yes.

Q    Did you ever hear anyone else refer to

Page 49

Ms. Coleman as the N word?

A    No.

Q    Did you ever hear anyone make any racially disparaging comments about or towards Ms. Coleman?

A    No.

Q    Did your peers tell you -- going back to your comments about the raincoat, did your peers tell you why she sat on a raincoat?

A    Because I smelled bad.  And, I mean, I could only make assumptions from there.

Q    You say you saw Ms. Coleman spraying Lysol on things after you touched them; is that correct?

A    Yes.  Yes.

Q    Why do you believe she did that?

A    I feel and believe that she's doing that because I'm gay.

Q    Is there any particular reason -- let me rephrase.  How soon after you touched something would you see Ms. Coleman spray Lysol on the object?

A    If she was using the item, I mean, right away.  She --

Q    So -- go ahead, please.

A    She would wipe it down with Lysol wipes and stuff like that and the little aerosol can.

Page 50

Q    She would do that in front of you?

A    Yes.

Q    Would she do this -- what? -- would you say almost immediately after you used the object, touched the object?

A    Yeah.  And, I mean, she would wait a couple seconds until I get to another area.  But yes.

Q    Did you see her do that when anybody else touched an object?

A    Not that I can recall, no.

Q    To your knowledge, did Ms. Coleman listen to church music other than when you were present?

A    I -- it didn't start until after she found out I was gay.

Q    Can you explain what you mean by that?

A    When she -- when she talked about her husband, that she was married, and I informed her that I was married to a woman, she found out I was gay. And I didn't hear her listening to any music until after that.  Like, she listened to the church music.

Q    So prior to you letting her know that you were married to a woman, you didn't hear her listen to any kind of music?

A    No.

Page 51

Q     Okay.  Moving to a different topic.  Have you ever seen any employee at Remprex outright refuse to perform an assignment?

A     No.

Q     Did you ever see Ms. Coleman refuse to perform an assignment?

A     Yes.

Q     All right.  So other than Ms. Coleman, no other employee you saw refuse to complete an assignment?

A     No.

Q     Do you believe that an employee, let's say anyone, who refused to complete an assignment would be disciplined?

A     Yes.

Q     Would that be grounds for immediate termination?

A     I'm not sure.

Q     Why do you say that?

A     Well, I mean, depending on, like, if -- depending on who the manager was at the time, I mean, there could be reasons as to why she refused or who refused that particular assignment.  And maybe there was chances to, you know, fix it.

Page 52

Q    You said, "fix."  Can you explain?

A    Maybe if someone would refuse to do an assignment, maybe they weren't fully trained and didn't understand the assignment.  Maybe further training was needed or -- in that case.

Q    Right.  Would it depend on, let's say, factors like previous discipline?

A    Yes.

Q    How often they had refused an assignment?

A    Correct.

MR. HANSEN:  I don't believe I have anything further.

Natalie?

MS. JAKUBOWSKI:  Thanks.

EXAMINATION

BY MS. JAKUBOWSKI:

Q    I just have a few more questions.

All right.  Ms. McMahan, did Charlene ever tell you that you smelled bad?

A    Not to my face.

Q    Who did she tell this to?

A    My peers.

Q    The same peers that we've already listed?

A    Yes.

Page 53

Q    Why do you believe that Charlene Coleman cleaned and Lysoled because of your sexual orientation?

A    Why do I believe?  I mean, it was -- to me, it's -- I didn't feel like she was a good person.

Q    Why did you feel she wasn't a good person?

A    I mean, anybody that's been harassed would probably feel the same way.

Q    Did you tell Charlene that you were bothered by her cleaning and Lysoling?

A    No.

Q    Did you tell anyone that it bothered you?

A    No.

Q    Is it possible that Charlene cleaned and Lysoled everything?

A    What do you mean?

Q    Is it possible that when you were not around Charlene cleaned things?

A    I'm not sure.

Q    Is it possible that Charlene was a germophobe?

A    I don't know.

Q    Is it possible that she cleaned things because she was a germophobe?

Page 54

A    I mean, I -- I couldn't say.  I don't know.

Q    Okay.  Now, going to the music incident, is it possible that Charlene listened to Bible music not around you?

A    I mean, I don't know what she does in her own time.

Q    You're not always constantly around Charlene; correct?

A    Correct.

Q    Has anyone else ever told you that Charlene listened to Bible music?

A    No.

Q    Do you know why Charlene refused to do an assignment?

A    With me, or in general?

Q    Do you know why Charlene refused to do the assignment that Tracy Massie asked her to do?

A    No, I do not.

Q    Is it possible that she refused to do the assignment because she lacked training?

MR. HANSEN:  Objection.  Calls for speculation.

BY MS. JAKUBOWSKI:

Q    Go ahead, Ms. McMahan.

Page 55

A    I can't say.  I mean, the jobs were fairly easy.

Q    Were there any jobs that were more difficult?

A    No.

Q    And you were not constantly around Charlene while she was completing assignments; correct?

A    Correct.

Q    Okay.

MS. JAKUBOWSKI:  Okay.  I believe that's all I have for you.

All right.  I will mark the exhibits and send them over to the court reporter for inclusion into the record as well.

THE REPORTER:  Okay.  Signature? Mr. Hansen?

MR. HANSEN:  What?

THE REPORTER:  A signature?

MR. HANSEN:  Yeah, please.

THE REPORTER:  Reserve?

MR. HANSEN:  Mm-hm.

THE REPORTER:  Okay.

MR. HANSEN:  Yes.  Yes.  Sorry.

THE REPORTER:  Okay.

Page 56

Going off the record at 12:36 p.m.

(Signature reserved.)

(Whereupon, at 12:36 p.m., the

proceeding was concluded.)

Page 57

CERTIFICATE OF DEPOSITION OFFICER

I, BRITTANY OLIS, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

BRITTANY OLIS

Notary Public in and for the

State of Illinois

[X] Review of the transcript was requested.

Page 58

CERTIFICATE OF TRANSCRIBER

I, HELENE GUERIN, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

HELENE GUERIN

Page 59

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

April 27, 2025

To: Peter E. Hansen, Esq.

Case Name: Coleman, Charlene v. Remprex, LLC

Veritext Reference Number: 7278703

Witness: Jennifer McMahan       Deposition Date:  4/10/2025

Dear Sir/Madam:

Enclosed please find a deposition transcript.  Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change.  Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

Page 60

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7278703
CASE NAME: Coleman, Charlene v. Remprex, LLC
DATE OF DEPOSITION: 4/10/2025
WITNESS' NAME: Jennifer McMahan
In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
I have made no changes to the testimony
as transcribed by the court reporter.

_____          _____
Date                              Jennifer McMahan

Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn
        Statement; and
Their execution of this Statement is of
        their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20_____.

        _____
        Notary Public
        _____
        Commission Expiration Date

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

Page 61

                    DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS

        ASSIGNMENT REFERENCE NO: 7278703
        CASE NAME: Coleman, Charlene v. Remprex, LLC
        DATE OF DEPOSITION: 4/10/2025
        WITNESS' NAME: Jennifer McMahan
        In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
        I have listed my changes on the attached
Errata Sheet, listing page and line numbers as
well as the reason(s) for the change(s).
        I request that these changes be entered
as part of the record of my testimony.

        I have executed the Errata Sheet, as well
as this Certificate, and request and authorize
that both be appended to the transcript of my
testimony and be incorporated therein.
_____        _____
Date                    Jennifer McMahan

        Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:
        They have read the transcript;
        They have listed all of their corrections
            in the appended Errata Sheet;
        They signed the foregoing Sworn
            Statement; and
        Their execution of this Statement is of
            their free act and deed.
        I have affixed my name and official seal
this _____ day of_____, 20____.
            _____
            Notary Public


            _____
            Commission Expiration Date

Page 62

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 7278703

PAGE/LINE(S) /        CHANGE        /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____         _____

Date                      Jennifer McMahan

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

              _____

              Notary Public

              _____

              Commission Expiration Date

**[03606 - amundsen]**

Page 1

**0**

**03606** 1:8
**07/02/2022** 3:10
**07/14/2022** 3:11

**1**

**1** 2:14 3:9 24:7 24:9,16 27:7
**10** 1:13 4:8
**10:13** 24:24
**1100** 59:1
**11:11** 1:14 4:5
**11:28** 17:10
**11:33** 17:13
**12:19** 47:6
**12:25** 47:3,9
**12:36** 56:1,3
**14** 35:18
**1820** 59:2
**190** 2:6
**1st** 12:24

**2**

**2** 3:11 24:23 27:9,10 32:17
**20** 60:16 61:22 62:22
**2003** 11:13
**2010** 12:24
**2022** 14:8 15:13,19,23 16:20,23 24:23

35:18 48:5
**2023** 1:8
**2025** 1:13 4:8 59:4
**21128** 57:16
**2119** 32:18
**216-523-1313** 59:3
**24** 3:10
**2550** 2:6
**27** 3:11 59:4

**3**

**3** 3:12 32:20 34:22,23 35:18
**312** 2:9
**32460** 58:14
**332-7760** 2:9
**34** 3:13
**37** 3:15,17
**38** 3:18
**3815** 2:14

**4**

**4** 3:14 37:4,5
**4/10/2025** 59:8 60:3 61:3
**44114** 59:2
**48** 3:4

**5**

**5** 3:16 32:20 37:22,23
**5/10/84** 11:6

**52** 3:5
**587-7910** 2:17

**6**

**6** 3:3,18 38:17 38:19
**60174** 2:15
**60407** 1:16
**60603** 2:7
**630** 2:17

**7**

**7278703** 1:18 59:7 60:2 61:2 62:2

**9**

**9** 12:24
**9:57** 25:17

**a**

**a.m.** 1:14 4:5 17:10,13 24:24 25:17
**ability** 10:24 57:10 58:7
**able** 8:4 17:15 24:12
**above** 9:17 59:17
**absent** 4:13
**accordance** 5:24 60:5 61:5
**account** 42:10
**accurate** 57:9 58:5

**accused** 33:24
**accusing** 25:17
**acknowledge** 60:11 61:16
**acknowledg...** 4:10
**act** 60:14 61:20
**action** 3:12,14 3:16 35:5,17 35:20 36:9 37:9,11 38:4 38:10 57:12,16 58:8,12
**actions** 7:3
**activities** 14:12
**additionally** 4:13
**address** 59:15
**administer** 4:10
**aerosol** 49:24
**affect** 10:24
**affixed** 60:15 61:21
**ago** 8:14
**agree** 4:11,15
**ahead** 22:19 44:16 45:1,3 47:19 49:22 54:24
**ahold** 40:17
**alongside** 17:21
**amundsen** 2:13

**[amundsendavislaw.com - breaking]** Page 2

| | | | |
|---|---|---|---|
| **amundsenda...** 2:16 | 28:2,3 34:20 36:12,13,15 44:23 54:17 | **audible** 6:9 | 44:11,17 49:14 49:15 51:12 52:11 53:1,4 55:10 |
| **answer** 7:12,15 7:22 8:4 10:24 22:19 44:16 | **assignment** 42:23 43:3 51:3,6,10,13,23 52:3,4,9 54:14 54:17,20 60:2 61:2 62:2 | **audio** 57:8 58:3 | |
| | | **authorize** 61:11 | |
| **answered** 44:24 | | **authorized** 4:9 | **belonged** 25:19 |
| **answering** 8:6 18:20 | | **ave** 59:1 | **best** 7:8,10 34:16 57:10 58:6 |
| | | **aware** 15:9 26:14 39:2,9 39:15 40:2 41:4,8 42:21 43:5,24 46:13 | |
| **answers** 7:1 | **assignments** 43:1 55:7 | | **bet** 39:2,7 |
| **anthony** 15:21 20:16 | **assist** 14:12 37:18 38:14 | | **better** 12:6 |
| | | | **bible** 19:6 32:2 32:6 54:3,11 |
| **anticipate** 7:11 | **assistance** 19:7 45:13 | **b** | |
| **anticipation** 9:6 | **assistant** 14:2,4 | **b** 3:7 | **big** 33:2 |
| **anxious** 10:9 | **assume** 7:16 12:7 22:21 23:14 | **back** 13:12 15:13,19,23 17:13 27:1 28:20 29:24 32:18 43:8,12 47:8 49:6 59:15 | **bigger** 33:3 |
| **anybody** 50:8 53:7 | | | **birth** 11:5 |
| | | | **bit** 43:11 |
| **apologies** 27:7 | **assumption** 29:13 | | **black** 22:12,14 23:12,16,17 24:3 |
| **appear** 60:11 61:15 | **assumptions** 49:10 | | |
| | | **background** 11:4 | **bnsf** 14:18 42:15 |
| **appended** 61:11,18 | **atm** 14:2,9,11 15:9 20:9 41:19 | **bad** 30:2 49:9 52:19 | **bonus** 39:10,13 |
| **applicable** 4:19 | | | **bothered** 53:9 53:12 |
| **approached** 25:17 | **attached** 61:7 | **basically** 12:14 14:16 | |
| | **attend** 10:14 | | **bothering** 40:22 |
| **appropriate** 32:5 | **attendance** 5:2 | **battery** 32:24 | |
| | **attorney** 5:6,7 6:7 8:2 46:22 48:13 57:14 58:10 | **beginning** 5:3 | **bottom** 35:24 |
| **april** 1:13 4:8 59:4 | | **behalf** 2:2,11 | **braceville** 1:16 |
| | | **behavior** 42:10 42:13,14 | **break** 7:19,21 7:23 17:5 32:21 33:18 46:18 |
| **area** 50:7 | | | |
| **argument** 41:8 | | **believe** 16:21 35:10 40:9,10 | |
| **asked** 7:16,17 23:13 24:4 | | | **breaking** 33:24 |

**[bring - computers]**

**bring** 26:4,7,10
**brittany** 1:17
  4:3 7:2 57:2,17
**broke** 33:13
  44:6
**brought** 28:22
**building** 19:7

**c**

**c** 2:1 4:1
**ca** 59:24
**call** 9:9,9 22:14
  22:23 23:1,12
  24:3 40:18
  45:24 46:1
**called** 5:14 22:6
  23:13 24:4
  29:12 45:19
**calling** 29:9
**calls** 22:16
  44:13 54:21
**cameras** 47:2
**capture** 7:3,7
**carbon** 40:4
**care** 14:17,18
**case** 1:7 5:20
  33:24 52:5
  59:6 60:3 61:3
**caterpillar** 12:6
  12:8,10,20
**cause** 9:3 31:11
  40:18
**caveat** 7:21

**certain** 39:3
**certificate** 57:1
  58:1 61:11
**certification**
  60:1 61:1
**certifications**
  11:15
**certified** 4:15
**certify** 57:4
  58:2
**chairs** 43:16
**chances** 51:24
**change** 59:13
  59:14 61:8
  62:3
**changes** 59:12
  60:7 61:7,9
**charlene** 1:5
  2:2 3:15,17 4:7
  5:20,21 16:3,5
  16:7,9,11,16,19
  16:22 17:1,21
  18:9,12,23
  21:23 22:5,8
  23:3 25:15,17
  26:13,15,22
  28:12 29:4,17
  30:5,19 33:17
  34:17 36:21
  39:4,16,18
  40:3,13,18
  41:1,9,18
  42:17 43:10,20
  43:23 44:1,21

52:18 53:1,9
53:14,18,20
54:3,8,10,13,16
55:6 59:6 60:3
61:3
**charlene's**
  26:18 41:5
  47:13
**charles** 2:15
**checker** 13:4,5
  13:8
**checkers** 13:15
**chicago** 2:7
**choice** 39:21
**choose** 26:6
**church** 30:2
  31:3 50:12,20
**civil** 6:1 60:5
  61:5
**cleaned** 53:2,14
  53:18,23
**cleaning** 53:10
**cleveland** 59:2
**clicks** 26:12
**coleman** 1:5
  2:2 3:15,17 4:7
  5:20,21 15:5
  16:3 19:21
  27:17 35:12,14
  36:21 40:23
  45:19 48:18
  49:1,4,11,19
  50:11 51:5,8
  53:1 59:6 60:3

61:3
**come** 42:24
**comes** 42:6
**comfortable**
  15:16
**coming** 32:18
  44:20
**comment** 44:21
  45:4
**comments** 19:4
  19:10 47:13,22
  49:4,7
**commission**
  60:19 61:25
  62:25
**common** 31:7
  42:8
**company** 13:18
**complained**
  15:6
**complaints**
  15:10 21:12
  28:12,13,16
**complete** 34:4
  51:9,13
**completed**
  59:15
**completing**
  55:7
**computer** 33:1
  33:11,12 34:12
  34:18 44:5
**computers**
  34:10 39:20

**[concluded - describe]**

**concluded** 56:4
**confirm** 46:20
**conflict** 3:9
  25:13,14
**confrontational**
  25:19
**constantly** 54:7
  55:6
**constitute** 4:23
  42:12
**contact** 15:15
  15:18 48:5
**contacted**
  41:11,15,17
**context** 29:9
**contractor**
  42:15
**conversation**
  29:23 32:18
**convicted**
  10:18,20
**coordinator**
  14:3
**copy** 6:7
**correct** 6:8
  15:2 18:10
  23:9,24 24:24
  25:9,21 26:8
  27:19,20,23
  29:2,7,8 30:3,4
  31:3 32:3,4,15
  32:21,22 35:15
  35:16,18,19
  36:1,2,5,6,14

36:18 47:23
48:2,22 49:12
52:10 54:8,9
55:7,8
**corrections**
  59:12 61:17
**corrective** 3:12
  3:14,16 35:5
  35:17,20 36:9
  37:9,10 38:4
  38:10
**counsel** 57:11
  57:14 58:7,10
**count** 17:23
**county** 60:10
  61:15
**couple** 45:22
  50:6
**court** 1:1 7:2,6
  55:13 60:7
**coworker** 35:8
**coworkers** 16:6
**crime** 10:20
**csr** 13:23,24
  14:10,15
**curious** 45:6
**current** 13:10
  13:11
**currently** 10:23
**curse** 31:22,24
  32:3
**customer** 13:24
  14:17,18

**customers**
  31:12
**cv** 1:8
**cycle** 34:16

**d**

**d** 3:1 4:1
**dab** 30:18
**daily** 14:12
  30:18
**dangerous**
  33:15 34:2,15
  43:3,6
**date** 1:13 11:5
  12:22 59:8
  60:3,9,19 61:3
  61:13,25 62:20
  62:25
**dates** 16:21
  45:9
**davies** 9:12,13
  25:7 27:22
  28:8 35:23
  36:4,23,24
  48:5
**davis** 2:13
**day** 18:1 19:19
  31:9,18 40:23
  60:16 61:22
  62:22
**days** 59:18
**deal** 31:11 39:9
  39:13

**dear** 59:10
**deed** 60:14
  61:20
**deemed** 59:19
**defects** 12:16
**defendant** 1:9
  2:11 5:8 8:18
**definitely** 7:20
  24:20
**delegating**
  14:13
**demon** 19:5,11
  19:22 45:22
**demon's** 45:23
**department**
  13:13 59:22
**depend** 31:10
  52:6
**depending** 31:9
  31:17 41:24
  51:20,21
**deposed** 6:21
**deposition** 1:11
  4:6,21 5:23 6:3
  8:2,21 9:6,6,10
  10:3 57:1 59:8
  59:11 60:1,3
  61:1,3
**depth** 19:10
**derogatory**
  22:11,15,22,23
**describe** 18:22
  20:8

**[described - entire]** Page 5

described 36:18
description 3:8
detail 20:5
details 9:22 10:1,10,12
devil 29:1,10 29:12
different 21:11 51:1
differently 23:17
difficult 7:6 28:24 55:4
digital 57:8 58:3
diploma 11:11
direct 42:14
directed 47:14
directly 18:12 19:11 21:6 29:4 31:12
disagreed 32:8
disagreeing 41:13
disagreement 41:9
disciplinary 36:11
discipline 41:22 42:1,17 52:7
disciplined 51:14

discovery 5:23
discriminated 15:7
discrimination 14:24 15:10 20:19,23 21:8 23:6,12,16
discuss 9:18,22 10:3,6,8,10 39:13 46:14
discussed 10:2
dishonesty 10:21
disparaging 49:4
district 1:1,2 6:2
division 1:3
document 28:2 28:7,19 35:1,4 36:3 37:7,16 37:19 38:1,6
documentation 3:11 27:15,16 27:18 28:11 36:7
documents 8:20,23 38:18 38:24
doing 34:1 49:15
donna 3:12 19:17 35:7 36:20 46:5

drive 43:16
driver 19:7
driver's 45:12
duly 5:14 57:5
duties 14:11,15 18:14
duty 15:9 43:6
dyke 45:22,24 46:1,2

**e**

e 2:1,1,12 3:1,7 4:1,1 59:5
earbuds 31:13
earlier 29:7 43:9
east 2:14
eastern 1:3
easy 55:2
edgecom 32:19 32:23,24 33:2 33:5,10,12,15 34:2,19 43:12 44:5
education 11:10
egregious 42:10,12
either 28:6 35:23 36:4,20 41:18,23
electricity 44:8 44:12

email 3:9,11 24:21 25:2,4,6 25:11,16 26:22 27:18 28:7,21 28:22 29:2 59:17
employed 57:11,14 58:8 58:11
employee 3:9 9:11 18:15,19 21:9,17,20 23:8,12,16,17 23:23 24:3 25:13,14 41:21 43:2 51:2,9,12 57:13 58:10
employee's 41:24
employees 18:21 36:11 39:3,10 42:8 42:21 43:5
employment 11:17
enclosed 59:11
engagements 14:17
entail 20:22
enter 19:7
entered 61:9
entire 16:11 60:5 61:5

**[equipment - good]**

**equipment**
12:14 43:14,20
43:21,22
**errata** 59:13,18
61:7,10,18
62:1
**es** 57:4
**esq** 59:5
**esquire** 2:3,12
**events** 41:4
**everybody**
30:17
**everything's**
10:15
**evidentiary**
4:20
**exact** 18:5
**examination**
3:2 6:18 48:15
52:15
**examined** 5:16
**examples** 42:16
**executed** 61:10
**execution**
60:14 61:19
**exhibit** 3:9,11
3:12,14,16,18
24:7,9,16 27:7
27:9,10 29:24
31:2 32:17
34:22,23 35:18
37:4,5,22,23
38:17,19

**exhibits** 6:5,8
55:12
**expect** 9:3
**experience** 28:2
**experiences**
27:17
**expiration**
60:19 61:25
62:25
**explain** 12:12
30:8,11 32:23
42:1 43:11
50:15 52:1

**f**

**face** 46:3 52:20
**factors** 52:7
**fair** 7:17 10:11
10:13,13
**fairly** 55:1
**false** 10:15
**familiar** 16:2
23:5,20
**far** 29:22
**feature** 6:6
**federal** 5:24
**feel** 45:22 49:15
53:5,6,8
**feeling** 15:7
**felony** 10:18
**felt** 20:6
**field** 35:10
**final** 3:17 42:5
42:6 48:4

**financially**
57:15 58:11
**find** 59:11
**finish** 7:9,10,12
**first** 3:15 5:14
6:24 7:22
11:18 13:2
15:15,18 21:14
42:4
**five** 12:4 17:5
18:7 46:18
**fix** 51:24 52:1
**fixing** 34:13
**follow** 20:24
47:12 48:14
**follows** 5:16
**foregoing** 57:3
57:4 58:4
60:13 61:18
**forgot** 14:22
**forward** 59:15
**found** 50:13,18
**foundation**
16:14
**fraud** 10:21
**free** 60:14
61:20
**front** 50:1
**full** 28:19
**fully** 52:3
**fumes** 40:21
**further** 10:10
20:5 39:19
52:4,12 57:13

58:9

**g**

**g** 4:1
**garner** 15:21
20:16
**gate** 35:10
**gay** 30:22,24
45:6 49:16
50:14,18
**general** 54:15
**germophobe**
53:21,24
**give** 42:19
**gives** 33:14
**go** 6:23,24 11:3
11:23 12:15,19
15:13 19:9
20:4,7 22:19
28:15,20 40:3
40:19 41:24
43:8 44:16
45:1,3 47:2,19
49:22 54:24
**going** 11:3
13:12 17:9
24:6 28:18
43:12 46:18
49:6 54:2 56:1
**good** 4:2 5:18
12:15 16:21
18:24 19:1
46:22 53:5,6

**[gospel - jakubowski]**

gospel 32:2

graduate 11:12

graduated 11:19

great 47:1

ground 6:23

grounds 51:16

group 13:14

guerin 58:2,15

guess 22:21

guiding 18:20

**h**

h 3:7

handbook 23:8 23:23

handwritten 3:18

hansen 2:12 3:4 5:7,7 6:7,9 6:14 8:2 9:7 16:13 17:6,8 22:16 24:13 44:13,23 46:23 46:24 47:4,17 48:13,16 52:11 54:21 55:16,17 55:19,21,23 59:5

happening 9:20

happy 7:14

harassed 19:2,3 53:7

harassment 15:10 20:6,20 20:24 21:8 23:20 24:2

hear 6:4,11 22:2 23:2 31:23 40:6 45:10 47:15 48:24 49:3 50:19,22

heard 39:6,12 39:23 40:5 41:10 47:22

hearing 5:10 8:5

held 14:7

helene 58:2,15

hereto 57:15 58:11

high 11:11,19

highest 11:10

history 11:18

hm 7:4 55:21

hold 13:3 14:21

honestly 15:24 17:2

hope 7:9

hospital 40:3 40:19,20

hr 15:22,24 21:6 28:13,15 41:23 46:10,12 46:14 48:5,8

human 15:11 15:14,17 48:7

husband 29:20 50:17

hygienic 43:23

**i**

idea 31:1

identification 24:10 27:11 34:24 37:6,24 38:20

identify 5:2

il 1:16 2:7,15

illinois 1:2 4:10 6:2 11:7 57:19

immediate 9:14 15:16,19 21:4 21:6 42:11 48:10 51:16

immediately 42:8 50:4

inappropriate 32:9,12

incidences 20:5

incident 36:17 36:21 37:1 39:15 40:2,16 41:2 43:12 54:2

incidents 9:23 21:8

include 21:7

included 59:13

inclusion 55:13

incorporated 61:12

indicating 59:13

individual 48:7

individually 20:1,2 46:7,8

individuals 19:20

informed 50:17

inhaling 40:4

injury 8:13

intended 4:18

interact 36:20

interested 30:22 57:15 58:12

inventory 14:3 14:16,19

involved 8:10 8:11

involving 10:21 39:10,15 40:3

ipad 33:3

it'd 22:22

item 49:20

**j**

jakubowski 2:3 3:3,5 5:5,5,18 5:19 6:10,13 6:16,19 16:15

**[jakubowski - machine]**

17:4,7,14,19 22:18 24:11,15 44:15 45:2 46:17 47:1,5 47:10,11,21 48:12 52:14,16 54:23 55:10

**jana** 9:12,13,19 19:17 25:7,12 27:22 28:4,6,7 28:9 35:23 36:4,22,22,24 38:3,5 48:4

**janine** 19:17 30:16,17 46:5

**january** 12:24

**jennifer** 1:12 4:6 5:4,13,23 48:18 59:8 60:4,9 61:4,13 62:20

**job** 1:18 20:10 29:1

**jobs** 55:1,3

**jocelyn** 19:17 30:16 46:5

**joke** 45:17

**july** 24:23 35:18

**k**

**kari** 19:17 30:14,16 40:7 40:7,8,15 46:5

**keep** 34:12

**kept** 26:15

**keyboard** 25:18,20,23 26:2,5,8,10,13 26:16,18,21,23 27:1,4

**keyboards** 25:24 43:17,17

**keys** 43:16

**kind** 50:23

**kinds** 21:12

**knew** 30:21 45:5

**know** 7:10,14 7:20 13:17 16:5,7,16 17:2 17:22 18:5 19:14,18 24:17 24:19 26:1,3 26:15,18,23 27:12 28:20 29:17,19 30:17 34:1 35:22 37:7 38:1 40:20 41:12,15 41:17 45:8 48:6,21 50:21 51:24 53:22 54:1,5,13,16

**knowledge** 28:15,17 42:18 42:20 50:11 57:10 58:6

**kovacevic** 20:15

**l**

**lack** 28:24

**lacked** 54:20

**lacks** 16:13

**ladder** 43:14

**lane** 32:18

**lasalle** 2:6

**laws** 4:20

**lawsuit** 8:10,11 8:12,16

**leading** 41:4

**leave** 12:5

**legal** 59:1 62:1

**lengthwise** 33:3

**lesbian** 29:16

**letter** 59:19

**letting** 50:21

**level** 11:10

**liaison** 14:17

**licenses** 11:14

**lights** 44:19

**line** 59:13 61:7 62:3

**list** 30:14

**listed** 19:20 29:6 30:18 48:2 52:23 61:7,17

**listen** 8:3 30:2 31:3,5,7,15 32:6,9,12

50:11,22

**listened** 50:20 54:3,11

**listening** 8:4 31:19 50:19

**listing** 61:7

**little** 43:11 49:24

**llc** 1:8 2:11,13 4:8 5:21 59:6 60:3 61:3

**local** 6:1

**located** 23:23

**location** 1:15

**long** 11:21 12:3 12:17 13:5,16 16:9,10 17:2 39:3

**look** 46:18

**looking** 12:14 29:24

**looks** 38:2

**lot** 25:24

**loud** 7:2 31:16

**lysol** 49:11,19 49:23

**lysoled** 53:2,15

**lysoling** 53:10

**lysols** 43:18

**m**

**machine** 34:12 34:18

**[madam - notary]**

madam 59:10
made 19:4
  44:21 45:4
  60:7
main 2:14
make 7:3,7
  29:13 49:3,10
makes 7:6
  26:12
making 12:15
  14:13 18:21
  28:24 44:18
man 29:21
manager 12:2,3
  13:11,20 14:3
  14:4,5,6 20:12
  20:16 51:21
managers
  20:13,14
manner 4:21
mark 55:12
marked 24:7,9
  24:16 27:7,8
  27:10 34:21,23
  37:3,5,21,23
  38:19
married 29:16
  29:21,22 50:17
  50:18,22
massie 15:21
  20:17 25:9
  28:5,6,14,15
  30:16 35:23
  36:4 41:9

46:11,12 54:17
matter 4:7
mcdonald's
  11:20
mckay 30:16
  40:7,8 46:5
mcmahan 1:12
  4:7 5:4,4,13,23
  6:20 8:9 16:2
  17:20 22:20
  24:17 27:12
  35:2 37:8
  38:21 39:2
  43:8 44:16
  45:3 47:13
  52:18 54:24
  59:8 60:4,9
  61:4,13 62:20
mean 9:1 17:22
  18:16 19:3,4
  19:18 20:12
  22:13,21 23:14
  29:11 30:24
  31:21 32:7,11
  32:14 33:3
  34:10 38:2
  39:20 42:24
  44:19 45:17
  48:21 49:9,20
  50:6,15 51:20
  51:21 53:4,7
  53:16 54:1,5
  55:1

means 4:22
medication
  10:23
meet 9:5,8
mentioned
  29:21 43:9
midwest 59:17
  62:1
mine 9:17
  20:16
minute 17:5
  46:18
mischaracteri...
  47:18
missing 26:19
mm 7:4 55:21
moment 17:12
momentarily
  24:8
monoxide 40:4
morning 4:2
  5:18 6:8 25:16
moved 13:17
moving 11:7
  51:1
music 19:6 31:5
  31:7,15,20,23
  32:2,6,9,12
  50:12,19,20,23
  54:2,3,11
mutes 47:2

**n**

n 2:1 3:1 4:1
  32:13 48:19,22
  49:1
name 4:2 19:15
  19:16 59:6
  60:3,4,15 61:3
  61:4,21
name's 5:19
natalie 2:3 5:5
  5:19 52:13
need 7:1,7,19
  24:19 28:19
needed 52:5
neither 57:11
  58:7
never 9:3 38:9
  42:19 46:2,14
  47:14
nice 26:12
nicole 20:15
njakubowski
  2:8
noises 44:19,20
non 23:17
nope 37:20
northern 1:2
  6:2
notarized
  59:14
notary 4:9
  57:18 59:24
  60:10,18 61:15

**[notary - please]** Page 10

61:23 62:23
**note** 59:12
**notes** 3:18
46:19
**notice** 3:12,14
3:16 5:24
20:23 35:5,17
35:20,22 36:8
36:9,14,15,18
37:9,11,13
38:4,10
**number** 59:7
59:13
**numbers** 61:7

**o**

**o** 4:1
**oaths** 4:10
**object** 8:2
49:19 50:4,5,9
**objection** 4:13
5:10 8:3,5,5
16:13 22:16
44:13,23 47:17
54:21
**observed** 36:17
43:2
**occasionally**
40:12
**occurred** 36:21
**offended** 10:17
**office** 25:18
**officer** 57:1,2

**official** 60:15
61:21
**oh** 32:14
**ohio** 59:2
**okay** 6:23 7:19
8:9,9,16,20
9:18 12:19
13:5 16:2 17:4
17:5,9 18:3
19:9 20:4,4
24:6,11,16
28:18 29:15
31:2 32:16
36:10 39:2
40:2,15 43:8
46:17 47:1
51:1 54:2 55:9
55:10,15,22,24
**olis** 1:17 4:3
57:2,17
**once** 9:9
**ones** 19:19
**operator** 35:11
**opportunity**
12:6
**orientation**
19:6 29:14,15
29:17 30:20
44:22 45:5
53:3
**outcome** 57:16
58:12
**outline** 8:24

**outright** 51:2
**outside** 16:7
**overseeing**
14:13
**own** 26:7 54:6

**p**

**p** 2:1,1 4:1
**p.m.** 47:9 56:1
56:3
**page** 3:2,8
59:13,15 61:7
62:3
**part** 33:13 61:9
**participate**
32:20 33:18,22
36:10
**particular**
37:10 38:10
49:17 51:23
**parties** 4:11,14
57:12,14 58:8
58:11
**party** 8:16
**pause** 28:20
**peers** 19:13,14
19:16 29:5,6
30:12,13 46:1
46:4 47:24
48:1 49:6,7
52:22,23
**pending** 7:22
8:15

**people** 13:14
22:12 26:4
31:7,13,15,23
39:22 47:23
**perform** 42:22
43:6 51:3,6
**perjury** 10:21
**permitted** 4:18
26:4
**person** 7:8
22:14 39:24
43:23 53:5,6
**personal** 11:3
26:2,4,7,10,13
**personally**
14:23 60:11
61:15
**perspective**
41:19
**peter** 2:12 5:7
59:5
**phansen** 2:16
**phone** 9:9 30:3
31:3 40:18
59:3
**plaintiff** 1:6 2:2
5:6,20 8:18,19
**plan** 11:7
**play** 19:6
**playing** 31:23
**please** 5:2 7:12
7:14,20,22
10:17 30:15
49:22 55:19

59:11,11
**plug** 34:11
**plugged** 33:9
**plugging** 34:13
**point** 7:13,20
48:5
**police** 41:10,15
41:17
**policy** 23:6,12
23:16,21 24:3
**position** 9:15
12:7 13:3,10
13:19,22 14:7
35:9,12,15
**position's**
13:11
**positions** 14:9
14:20,21
**possible** 53:14
53:17,20,23
54:3,19
**power** 33:14
34:16
**powering** 33:1
**practice** 34:16
**preparation**
8:21 37:14
**prepared** 58:3
**present** 36:15
50:12
**pretty** 10:1
**prevents** 8:6
**previous** 20:16
52:7

**previously** 38:7
**prior** 50:21
57:5
**probably** 53:8
**problem** 32:8
**problems** 15:14
48:9
**procedural**
4:19
**procedure** 6:1
60:5 61:5
**procedures**
21:1,3
**proceeding**
1:15 4:4,17
56:4 58:4
**proceedings**
57:3,5,6,9 58:6
**process** 21:11
33:4 36:11
41:20
**produced** 4:16
**production**
59:15,17,22
**professionali...**
28:24
**progressive**
41:22 42:1,17
**public** 57:18
60:10,18 61:15
61:23 62:23
**pull** 33:7 34:7
34:17,20 43:15
44:4

**pursuant** 5:24

**q**

**qualified** 57:7
**question** 7:11
7:14,15,21,22
8:4 17:15 48:4
**questions** 8:7
10:16 11:1,4
18:20 20:7
45:6 47:12
48:13 52:17
**quick** 17:5

**r**

**r** 2:1 4:1
**race** 23:18
**racial** 32:10
**racially** 49:3
**raincoat** 30:1,6
30:9 49:7,8
**random** 17:23
27:5
**rather** 7:4
**reached** 46:14
**read** 17:15 60:5
60:6,12 61:5,6
61:17
**reading** 59:19
**real** 13:1
**reason** 33:21
49:17 59:14
61:8 62:3
**reasons** 51:22

**recall** 13:6 15:8
24:21 31:21
37:12 38:11
40:24 45:11
50:10
**receipt** 59:18
**receive** 20:19
**received** 6:7
20:8,15,18
21:2
**record** 4:4,5,14
5:2,22 17:10
17:11,13,16,17
47:6,7,8 55:14
56:1 57:9 58:5
61:9
**recorded** 4:21
57:6
**recording** 4:16
57:8 58:4
**reduced** 57:7
**refer** 21:17,20
48:18,24
**reference** 59:7
60:2 61:2
**referenced**
60:11 61:15
**referral** 39:10
39:13
**referred** 21:15
**referring** 26:21
38:6
**reflect** 5:22

**[refusal - shadow]** Page 12

**refusal** 41:10
**refuse** 43:2
  51:2,5,9 52:2
**refused** 32:20
  33:17 43:5,13
  43:13,14 51:13
  51:22,23 52:9
  54:13,16,19
**refusing** 42:22
  42:24 43:1
**regarding** 9:22
  39:3,13
**related** 15:14
  57:11 58:7
**relationship**
  18:23
**relative** 57:13
  58:10
**remember** 9:17
  12:22 13:1
  14:7 15:24
  16:10 19:18
  28:4
**remind** 7:1
**remote** 1:15 6:4
**remotely** 4:12
**remprex** 1:8
  2:11 4:8 5:21
  9:11 12:21,22
  12:23 13:2
  14:18,21,24
  15:7 16:12,17
  16:19 21:14
  39:3,4,6,9,12

40:4 42:21
  51:2 59:6 60:3
  61:3
**remprex's** 23:5
  23:20
**repeated** 17:17
**rephrase** 7:15
  18:17 49:18
**report** 15:10
  20:24 21:4
  45:14,16 46:12
**reported** 1:17
  21:9 46:10,11
**reporter** 4:2,3
  5:9,17 6:12 7:2
  7:6 17:9,12,17
  47:6,8 55:13
  55:15,18,20,22
  55:24 60:7
**reporting**
  14:13 21:1,3,7
  21:11
**represent** 5:19
**representative**
  12:11,13 13:24
**request** 61:9,11
**requested**
  17:18 57:21
**require** 34:6
**required** 59:24
**reserve** 55:20
**reserved** 56:2
**resources**
  15:11,14,17

48:8
**response** 6:9
**return** 40:23
**returned** 59:18
**returning** 27:1
**review** 36:7,13
  37:13 38:24
  57:21 59:12
  60:1 61:1
**reviewed** 8:20
  8:23 36:3
**right** 6:20
  17:12 49:20
  51:8 52:6,18
  55:12
**robbins** 2:5,8
**room** 45:11
**rules** 4:20 6:1,1
  6:24 31:19
  60:5 61:5
**run** 44:7
**running** 44:8
  44:12,18

**s**

**s** 2:1 3:7 4:1
  59:15 61:8,8
  62:3
**sat** 49:8
**saw** 49:11 51:9
**saying** 20:6
**says** 29:1 31:2
**school** 11:11,19

**schwartz** 2:5
**schwartz.com**
  2:8
**screen** 6:6 24:7
  24:12
**scroll** 27:6
  28:18 38:18
**seal** 60:15
  61:21
**second** 42:4
**seconds** 50:7
**see** 6:4 18:1,4
  24:12 28:19
  37:15 38:18
  49:19 50:8
  51:5
**seem** 43:23
**seen** 35:1 37:10
  38:9,21 51:2
**send** 25:11
  27:21 28:7,10
  55:13
**sending** 24:21
**sent** 24:23
  27:18 28:9
**service** 13:24
  30:2 31:3
**set** 39:20
**sexual** 19:5
  29:13,15,17
  30:20 44:22
  45:5 53:2
**shadow** 21:15
  21:21,24 22:3

**[shadow - sure]** Page 13

22:6,9,11,15,24
23:1,3,13 24:3
**shadowing**
21:18
**share** 6:6 24:7
**sharing** 6:5
**she'd** 19:6
**sheet** 59:13
61:7,10,18
62:1
**shoulders**
45:18
**show** 24:6 27:6
27:8 34:21
37:3,21 38:17
**showed** 38:7
**shown** 59:16
**shrugged** 45:18
**shrugs** 7:3
**shut** 44:18
**sign** 36:13
**signature** 35:24
38:8 55:15,18
56:2 57:16
58:14 59:14
**signed** 4:3 36:8
60:13 61:18
**signing** 59:19
**sincerely** 59:21
**single** 18:1
**sir** 59:10
**sit** 30:1 39:16
39:21,24

**sitting** 30:5,8
39:18
**skills** 57:10
58:6
**slow** 31:11
**slur** 45:19,21
45:23
**slurs** 32:10
**small** 13:14
**smelled** 30:2
49:9 52:19
**solutions** 59:1
62:1
**somebody**
30:21 32:8
**soon** 49:18
**sorry** 6:10,14
6:15 9:24
55:23
**sort** 34:7
**sound** 46:22
**south** 2:6
**speak** 9:10
**speaking** 7:8,9
7:10
**specialist** 14:16
**specific** 13:13
45:9
**specifically**
19:21 26:24
30:19 44:22
47:14
**speculation**
22:17 44:14

54:22
**speedway**
11:24 12:1,5
**spivey** 3:13
35:6,7,9,14
36:16,20 46:5
**spray** 43:20
49:19
**sprayed** 43:18
**spraying** 49:11
**st** 2:15
**staff** 14:13
**stage** 42:3
**start** 11:18
19:10 50:13
**started** 12:23
13:2 16:16
21:14 29:20
**state** 7:1 57:19
60:10 61:15
**stated** 33:17,23
**statement** 10:1
21:4 60:13,14
61:19,19
**states** 1:1 25:16
29:24 32:17
**stenographic**
4:22
**step** 42:4 43:14
**steps** 42:3
**stipulation**
4:23
**street** 2:6,14

**strike** 27:7
**stuff** 31:22
43:16,18 49:24
**subjected**
14:23
**subordinate**
18:15,19 36:11
**subscribed**
60:10 61:14
62:21
**suite** 2:6,14
59:2
**superior** 59:1
**supervise** 18:12
40:13
**supervised**
13:13
**supervising**
18:14
**supervisor** 9:14
13:9,12,16,20
13:23 15:15,16
15:19,22 18:10
18:18 20:9
21:5,6 25:7,8
40:10 41:19
48:11
**supervisors**
20:12
**sure** 7:3,7
12:15 13:1,7
14:14 18:21
22:13 28:23
29:11 34:9

**[sure - transcriptionist]**

41:18 43:1
46:24 47:4
51:18 53:19
**swear** 4:11
5:10
**switch** 26:1
32:19 33:10,15
**switching** 33:4
34:2,19
**sworn** 4:14
5:14 57:5
60:10,13 61:14
61:18 62:21

**t**

**t** 3:7
**take** 4:4,9 7:20
7:23 14:16,18
17:4 46:17
**taken** 4:7 5:23
6:3 22:15 57:3
57:12 58:9
**talk** 7:5 15:4
21:1 39:6
**talked** 50:16
**talking** 29:20
**task** 18:21 34:4
**tasks** 34:6
**teach** 32:19
**tell** 5:15 19:24
21:23 22:5,8
28:1,7,10
39:23 40:15
41:1 44:1 46:6

49:6,7 52:19
52:21 53:9,12
**term** 22:11
23:3
**terminal** 13:11
13:20 14:3,4,5
14:5
**terminated**
42:9,22 43:6
**terminating**
41:20
**termination**
41:5 42:7,11
51:17
**tested** 12:15
**testified** 5:16
**testifying** 57:5
**testimony**
47:18 60:6,7
61:6,9,12
**thank** 5:9 6:16
14:1 17:7,14
47:4
**thanks** 47:5,10
52:14
**things** 14:14
18:18 19:8,10
28:24 43:10
44:2 49:12
53:18,23
**think** 12:24
14:22 16:24
32:7 46:19
48:12

**thinks** 29:1
**third** 42:4
**thirty** 59:18
**threatening**
42:14
**threats** 42:14
**threw** 45:17
**thursday** 1:13
4:8
**time** 1:14 5:1
7:8 11:16,21
15:16 16:1,11
16:22 19:6
20:1,2,17 25:8
34:20 35:10
40:9 45:12
46:6,9 51:21
54:6
**times** 8:1 9:8
17:22,23
**title** 9:17
**tm** 14:12
**today** 9:21
37:14
**today's** 8:21
**together** 17:21
18:9 40:11
45:8 46:9
**told** 19:21 28:6
33:19,22 39:16
46:4 54:10
**took** 27:3 40:18
**topic** 51:1

**touch** 19:8
43:10,13,13,21
44:2
**touched** 19:8
43:10,22 44:2
49:12,18 50:4
50:9
**towards** 45:4
49:4
**tracy** 15:21
19:17 20:17
25:8,11 28:4,6
28:14,15,23
30:16 35:23
36:4 41:18
46:11,12 54:17
**train** 20:13
**trained** 52:3
**training** 18:20
20:8,10,15,18
20:20,22 21:2
21:7,15,18,21
52:5 54:20
**transcribed**
60:7
**transcriber**
58:1
**transcript** 4:16
57:21 58:3,5
59:11,12 60:5
60:12 61:5,11
61:17
**transcriptionist**
57:8

**[treat - writing]**

**treat** 23:16
**tried** 40:17
**truck** 25:20
  26:1,1 40:4,21
**trucks** 43:15
**true** 57:9 58:5
**truth** 5:15,15
  5:16
**try** 32:19
**turn** 48:13
**two** 12:18
**type** 8:5,12
**typewriting**
  57:7
**typical** 21:17
  21:20 41:20
**typically** 25:23
  32:2 33:10
  36:10

**u**

**uncomfortable**
  21:5 22:9 23:3
**under** 4:19
**understand**
  4:15 7:13
  10:24 52:4
**understanding**
  30:23
**understood**
  7:16,23 38:9
**united** 1:1
**unplug** 33:6,8
  34:8,9

**unprofession...**
  42:15
**upset** 25:19
**use** 25:23 26:2
  27:4 31:13
**used** 26:16,22
  43:17 50:4
**uses** 4:18
**using** 25:20
  49:20

**v**

**v** 1:7 59:6 60:3
  61:3
**verbal** 42:3
**veritext** 4:3
  59:1,7 62:1
**veritext.com.**
  59:17
**video** 6:4
**videoconfere...**
  2:4,12
**violation** 23:11
  23:15 24:2
**vs** 4:7 5:21

**w**

**wait** 50:6
**waived** 59:19
**walk** 11:17
**want** 7:1 19:8
  19:15 20:4
  30:14 32:21
  33:18,22 43:8
  46:20

**wanted** 33:23
**warning** 3:15
  3:17 42:3,4,4,4
  42:6
**water** 12:15
**way** 7:16 22:15
  39:20 53:8
**we've** 48:1
  52:23
**week** 18:3
**went** 14:20
  15:22 25:20
  26:18 28:14
  29:23 40:20
  46:8 48:10
**wife** 10:7,8
**window** 45:13
**wipe** 49:23
**wipes** 49:23
**wire** 33:9 34:20
  43:15 44:4,9
  44:12
**wires** 33:7 34:7
  34:11,13,13,17
**witness** 4:11,14
  4:15 5:3,11,14
  24:14 30:5
  47:20 57:4
  59:8,11 60:1,4
  60:11 61:1,4
  61:15
**witnessed**
  36:24 39:18

**witness'** 59:14
**woman** 29:16
  29:22 50:18,22
**word** 22:9
  32:13 48:19,22
  49:1
**words** 31:22,24
  32:3
**work** 14:13
  16:7,9,11,19
  17:1,20,21
  25:23 26:8,11
  30:1 31:5,8
  32:6,14,15
  40:23 41:10,12
  42:24
**worked** 16:12
  16:22 17:2
  19:19 30:18
  40:11 45:8
  46:9
**working** 11:18
  14:24 16:16
  18:9,19,22
  20:3
**works** 46:24
**worries** 6:16
**would've** 48:8
**write** 25:4 28:1
  35:20 37:16
  38:12
**writing** 33:24
  37:18 38:14

**[written - zoom]**                                    Page 16

| |
|---|
| **written**  4:23 9:24 36:4 **wrote**  25:2 27:23 35:22 |
| **x** |
| **x**  3:1,7 57:21 |
| **y** |
| **yard**  13:4,5,8 13:15 **yeah**  6:13,14,15 10:12 17:6,6,6 17:8 19:15 22:22 33:9 38:8 43:12 50:6 55:19 **year**  11:8,12 14:8 16:19 17:1 **years**  8:14 12:4 12:18 **yep**  46:24 |
| **z** |
| **zoom**  6:4 24:19 |

Illinois Code of Civil Procedure

Article II, Part E

Rule 207, Signing and Filing Depositions

**Signing and Filing Depositions**

(a) Submission to Deponent; Changes; Signing. Unless signature is waived by the deponent, the officer shall instruct the deponent that if the testimony is transcribed the deponent will be afforded an opportunity to examine the deposition at the office of the officer or reporter, or elsewhere, by reasonable arrangement at the deponent's expense, and that corrections based on errors in reporting or transcription which the deponent desires to make will be entered upon the deposition with a statement by the deponent that the reporter erred in reporting or transcribing the answer or answers involved. The deponent may not otherwise change either the form or substance of his or her answers. The deponent shall provide the officer with an electronic or physical address to which notice is to be sent when the transcript is available for examination and signing. When the deposition is fully transcribed, the officer shall deliver to the deponent, at the address supplied,

notice that it is available and may be examined at a stated place at stated times, or pursuant to arrangement. After the deponent has examined the deposition, the officer shall enter upon it any changes the deponent desires to make, with the reasons the deponent gives for making them. If the deponent does not appear at the place specified in the notice within 28 days after the mailing of the notice, or within the same 28 days make other arrangements for examination of the deposition, or after examining the deposition refuses to sign it, or after it has been made available to the deponent by arrangement it remains unsigned for 28 days, the officer's certificate shall state the reason for the omission of the signature, including any reason given by the deponent for a refusal to sign. The deposition may then be used as fully as though signed, unless on a motion to suppress under Rule 211(d) the court holds that the reasons given by the deponent for a refusal to sign require rejection of the deposition in whole or in part.

(b) Certification, Filing, and Notice of Filing.
(1) If the testimony is transcribed, the officer

shall certify within the deposition transcript that the deponent was duly sworn by the officer and that the deposition is a true record of the testimony given by the deponent. A deposition so certified requires no further proof of authenticity

(2) Deposition transcripts shall not be filed with the clerk of the court as a matter of course. The party filing a deposition shall promptly serve notice thereof on the other parties and shall file the transcript and any exhibits in the form and manner specified by local rule.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit B



# CORRECTIVE ACTION NOTICE

| **Employee:** Charlene Coleman | **Location:** LPC |
|---|---|
| **Date of Incident:** 7/14/2022 | **Time: 09:30** ☒**a.m.** ☐**p.m.** |

**TYPE OF CORRECTIVE ACTION:** ☐ 1st Warning ☐ 2nd Warning ☒ FINAL Warning ☐ Termination

**NATURE OF OCCURENCE:**

☐ Work Quality    ☐ No-Call/No-Show    ☐ Drug/ Alcohol    ☐ Absenteeism/ Tardiness

☒ Policy Violation    ☐ Insubordination    ☐ Job Abandonment    ☒ Other

**DESCRIPTION OF INCIDENT:** (include facts regarding when, why, how and what happened, any witnesses )

On 7/14/2022 Ms. Coleman engaged in an unprovoked and unprofessional conversation with Ms. Donna Spivey as well as inappropriate comments concerning Ms. Jennifer Chaplin amidst witnesses. Remprex policy clearly dictates that "inability or refusal to respect, or work in harmony, or cooperation with fellow employees so as to cause friction, conflict or lowering of group morale", is a terminatable offense.

As a direct result of your inappropriate and unprofessional behavior you are being given this FINAL WARNING. Future incidents of this or any other nature may result in your immediate termination.

**PREVIOUS WARNINGS:** (1st Warning, 2nd Warning, FINAL Warning dates, consequences if incident reoccurred)

Verbal warning by Tracy Massie

**EMPLOYEE STATEMENT:**




**CONSEQUENCE IF INCIDENT REOCCURS:**

☒ Further corrective action, up to and including termination of employment.  ☐ Immediate termination of employment

☐ Other: (give specific action)

I acknowledge that I have read and understand the above information and consequences.


_____        _____        _____
Employee Signature                              Print Name                          Date


_____        _____        _____
Manager Signature                               Print Name                          Date

REMPREX - 000046

Exhibit C



## CORRECTIVE ACTION NOTICE

| **Employee:** Charlene Coleman | **Location:** Logistics Park Chicago |
|---|---|
| **Date of Incident:** 7/28/2022 | **Time:** 10:25  ☒a.m. ☐p.m. |

**TYPE OF CORRECTIVE ACTION:** ☐ Verbal ☐ Written Warning ☐ Suspension ☒ Termination of Employment

**NATURE OF OCCURENCE:**

| ☐ Work Quality | ☐ No-Call/No-Show | ☐ Absenteeism | ☒ Insubordination | ☒ Misconduct |
|---|---|---|---|---|
| ☐ Policy Violation | ☐ Dress Code | ☐ Tardiness | ☒ Attitude | ☐ Other |

**DESCRIPTION OF INCIDENT:** (include facts regarding when, why, how and what happened, any witnesses )

On 7/28/2022, I instructed Ms. Coleman to help out at Lot 15 as we did not have a truck with an operable VMU. At 10:25am, Ms. Coleman called me from Lot 15 stating she cannot work there, she wasn't trained. I explained it is on the job training. She stated to me "No, I'm not working here." I instructed Ms. Coleman to come and work in the DAB, she stated "No." It is a hostile work environment.  Ms. Coleman asked if she could go home. I stated no, she either work at Lot 15 and learn, or go to the DAB and learn. She wanted to debate the issue. I stated for her to go home. At 10:45am, Ms. Coleman arrived at my office. She wanted to debate further about working at Lot 15 and the DAB. She asked if I would get it in writing that I was sending her home. I did begin writing an informal letter, but decided not to pursue as I would do it formally on this form as she wanted to disregard my instructions.  I instructed Ms. Coleman to leave the property 3 times, but she would not leave. Security escorted her off the property.

**PREVIOUS WARNINGS:** (verbal, written, dates, consequences if incident reoccurred)

No previous warnings or statements due to insubordination.  Ms. Coleman has been verbally warned and a statement written on 7/14/2022 for her attitude and misconduct towards another employee

**EMPLOYEE STATEMENT:**




**CONSEQUENCE IF INCIDENT REOCCURS:**

☐ Further corrective action, up to and including termination of employment. ☐ Immediate termination of employment

☒ Other: (give specific action)    Employee immediately terminated.

I acknowledge that I have read and understand the above information and consequences.

| _____ | _____ | _____ |
|---|---|---|
| Employee Signature | Print Name | Date |

| _____ | _____ | _____ |
|---|---|---|
| Manager Signature | Print Name | Date |

| _____ | _____ | _____ |
|---|---|---|
| Witness Signature | Print Name | Date |

REMPREX - 000056

# Exhibit D

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

_____

CHARLENE COLEMAN,

          Plaintiff,

     v.                              Civil Action No.

REMPREX, LLC,                        23 CV 03606

          Defendant.

_____

                DEPOSITION OF TRACY MASSIE

DATE:          Wednesday, April 16, 2025

TIME:          11:02 a.m.

LOCATION:      Remote Proceeding

               Decatur, IL 62521

REPORTED BY:   Danielle M. Craig

JOB NO.:       7312420

Page 2

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF CHARLENE COLEMAN:

NATALIE JAKUBOWSKI, ESQUIRE (by videoconference)

Robbins Schwartz

190 South LaSalle Street, Suite 2550

Chicago, IL 60603

njakubowski@robbins-schwartz.com

(312) 332-7760


JOSEPH PERKOSKI, ESQUIRE (by videoconference)

Robbins Schwartz

190 South LaSalle Street, Suite 2550

Chicago, IL 60603

jperkoski@robbins-schwartz.com

(312) 301-3868


ON BEHALF OF DEFENDANT REMPREX, LLC:

PETER HANSEN, ESQUIRE (by videoconference)

Amundsen Davis

3815 East Main Street, Suite A1

St. Charles, IL 60174

phansen@amundsendavislaw.com

(630) 587-7971

Page 3

I N D E X

EXAMINATION:                                          PAGE

    By Ms. Jakubowski                                 6

    By Mr. Hansen                                     64


                     E X H I B I T S

NO.                DESCRIPTION                        PAGE

Exhibit 1      Remprex Employee Handbook             13

Exhibit 2      Corrective Action Notice - First

               Warning, 07/14/2022                   29

Exhibit 3      Corrective Action Notice Dated

               7/14/2022 - Final Warning             30

Exhibit 4      Corrective Action Notice,

               07/28/2022                            33

Exhibit 5      Incident Log                          #


            QUESTIONS  INSTRUCTED NOT TO ANSWER

                    PAGE          LINE

                     9             19

Page 4

                    P R O C E E D I N G S

              THE REPORTER:  Good morning.  My name

is Danielle Craig; I am the reporter assigned by

Veritext to take the record of this proceeding.  We

are now on the record at 11:02 a.m.

              This is the deposition of Tracy Massie

taken in the matter of Charlene Coleman vs. Remprex,

LLC, on Wednesday, April 16, 2025, at Decatur,

Illinois.

              I am a notary authorized to take

acknowledgements and administer oaths in Illinois.

Parties agree that I will swear in the witness

remotely.

              Additionally, absent an objection on

the record before the witness is sworn, all parties

and the witness understand and agree that any

certified transcript produced from the recording of

this proceeding:

                   - is intended for all uses permitted

                     under applicable procedural and

                     evidentiary rules and laws in the

                     same manner as a deposition recorded

                     by stenographic means; and

                   - shall constitute written stipulation

Page 5

of such.

At this time, will everyone in attendance please identify yourself for the record.

MR. MASSIE:  My name is Tracy Massie.

MS. JAKUBOWSKI:  Natalie Jakubowski, attorney for the plaintiff.

MR. PERKOSKI:  Joseph Perkoski, attorney for the plaintiff.

MR. HANSEN:  Peter Hansen, attorney for Defendant.

THE REPORTER:  Thank you.  Hearing no objection, I will now swear in the witness.

Mr. Massie, if you could come off of mute and please raise your right hand.

WHEREUPON,

TRACY MASSIE,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER:  Thank you.

Counsel, you may now proceed.

MS. JAKUBOWSKI:  Thank you.  My name is Natalie Jakubowski; and I represent the plaintiff, Charlene Coleman, in the case Coleman vs. Remprex,

Page 6

LLC.  Let the record reflect that this is the discovery deposition of Tracy Massie taken pursuant to notice and in accordance with the Federal Rules of Civil Procedure, as well as the local rules of the Northern District of Illinois.

This deposition is being taken via remote Zoom.  We are all on video and we can see and hear each other.  I will also be sharing some exhibits using the Zoom screen share feature, and I've also sent them to Attorney Hansen, who has confirmed he has received them prior to the deposition.

EXAMINATION

BY MS. JAKUBOWSKI:

Q    Mr. Massie, have you ever been deposed before?

A    Yes, one time before.

Q    What kind of case were you deposed in before?

A    It was with another company other than Remprex.  It was with a railroad that we had a -- an employee that was terminated, and I had to bear witness on it.

Q    Were you involved with that employee's termination?

Page 7

A    Not -- I'm trying to think of the word here. Not directly, indirectly.

Q    So you're probably familiar with the deposition rules, but I'll just go over them just so we --

A    That's fine.

Q    -- are all on the same page.  Please make sure that you state all answers out loud so that the court reporter is able to capture everything that we are saying.  Please also avoid using actions such as shaking your head or shrugging because the court reporter cannot capture that in the transcript.

We cannot talk over one another because again, that will make it more difficult to capture everything.  I will do my best to let you finish speaking, and I would just hope that you would allow me to finish asking my questions as well.  If at any point you do not understand a question I ask, please let me know, and I'm happy to rephrase it.  If you answer a question that I have asked, I will assume that you have understood it; is that fair?

A    Yes, ma'am.

Q    And if you need a break at any point, please let me know.  The only caveat with that is that any

Page 8

question that is pending must be answered before we take a break; understood?

A    Yes, ma'am.

Q    There may also be times during the deposition where Attorney Hansen might make an objection.  You should listen to the objection, but you will still be able to answer the question after hearing the objection, unless it's an objection that prevents you from answering.  Do you have any other questions before we begin?

A    No, ma'am.

Q    Okay.  So previously you were involved in being deposed for another lawsuit at your prior company.  Were you the supervisor of that employee?

A    Yes.

Q    And was this at the same railroad that contracted with Remprex?

A    Yes, it was.

Q    And what was the name of that company?

A    BNSF.

Q    And what was your role at BNSF?

A    I was a terminal manager there from June of 2022, until November of 2023.

Q    And why did you leave BNSF?

Case: 1:23-cv-03606 Document #: 113 Filed: 06/18/26 Page 103 of 269 PageID #:1165

Page 9

A    I was not with BNSF.  I worked -- I was with Remprex.  I was the terminal manager of Remprex.  We were contractors for BNSF at that -- at their rail yard.

Q    Did you review any documents prior to today's deposition?

A    Yes, those documents that Mr. Hansen had sent me.

Q    And what documents were those?

A    Those were the court -- the court -- what was being put against us.  It was also the deposition of Ms. Coleman.

Q    And did you speak with Attorney Hansen over the phone?

A    I spoke with him, yes.

Q    And what did you speak about?

MR. HANSEN:  Objection.

THE WITNESS:  Just --

MR. HANSEN:  Don't answer that.  It's privileged conversation.

BY MS. JAKUBOWSKI:

Q    Did you speak with any family or friends?

A    I just spoke with my wife to let her know that I would be doing this, and I spoke to my employer

Page 10

to let them know I'd be out of work.

Q    And did you speak about this with any other current or former Remprex employees?

A    No.

Q    And these are questions that we ask of everyone, so please do not be offended, but have you ever been convicted of a felony?

A    No.

Q    Have you ever been convicted of a crime involving dishonesty such as fraud or perjury?

A    No.

Q    And are you currently on any medications that would affect your ability to understand and answer my questions?

A    No, ma'am.

Q    What is your date of birth?

A    October 17, 1969.

Q    And could you just confirm your current address for the record?

A    364 Point Bluff Drive, Decatur, Illinois 65 -- excuse me, 62521.

Q    And do you plan on moving out of the state of Illinois within the next year or so?

A    No.

Page 11

Q    What is your highest level of education?

A    I have a master's degree.

Q    Firm where?

A    Excelsior College.

Q    And what is the master's degree in?

A    It is in organizational management.

Q    And what is organizational management?

A    It's primarily how an organizational management is set up.  How it is run, the different facets of it.  It also includes the -- the ethics.  It includes the different types of strategic management within a company, all the way from first line supervisors up and up.

Q    And what year did you receive that master's degree?

A    2018.

Q    Do you hold any other licenses or certificates?

A    No, ma'am.

Q    And where are you currently employed?

A    Where am I currently employed with Railserve.

Q    And how long have you been with Railserve?

A    Railserve for over a year.  I'd say a year

Page 12

and three months.

Q    And what position do you hold at Railserve?

A    I'm a site leader.

Q    And where were you prior to Railserve?

A    Remprex.

Q    And what was your position at Remprex?

A    Terminal manager.

Q    And why did you leave Remprex?

A    I was let go.

Q    Why were you let go?

A    I was let go due to helping an employee.

Q    Helping an employee in what way?

A    He brought something on the property and I had him get it off the property, but I failed to let my supervisor know in a timely fashion.

Q    And what was the item that he brought on the property?

A    Yeah, it was a -- it was a weapon, which I got out of there.

Q    And how long were you with Remprex?

A    I was with Remprex approx -- almost two years.

Q    Did you hold any other positions besides terminal manager at Remprex?

Page 13

A    No.

Q    Okay.  I will now share my screen.  Are you all able to see Exhibit 1?

(Exhibit 1 was marked for identification.)

A    Yes.

Q    Thank you.  Mr. Massie, I'm now showing you a document that is marked as Exhibit 1.  Are you familiar with this document?

A    Yes.

Q    What is this document?

A    This is the Remprex Employee Handbook, which has policies and procedures in it.

Q    And when was this handbook effective?

A    As far as I know, 2018.

Q    And when you worked at Remprex, this was the handbook that you would utilize?

A    Yes, ma'am.

Q    Did you assist at all in creating this handbook?

A    No, ma'am.

Q    And is this handbook provided to every Remprex employee?

A    As far as I -- at the time, yes, ma'am.

Page 14

Q    Would an employee that was employed between May of 2022, through July of 2022, have received this handbook?

A    They should have.  If not, they could have come and asked for it.  I would've given it to them.

Q    Are new employees provided this handbook when they first start working at Remprex?

A    I know -- I'm going to say no, not that I know of.  Not at the -- at the corporate headquarters 'cause that's where they do their orientation.

Q    I will now direct you to page 3 of the handbook.  This section is titled "Equal Employment Opportunity"; correct?

A    Yes.

Q    This section states "Remprex is committed to providing equal employment opportunities to all qualified persons and all employment practices without regard to race, color, religion, national origin, age, gender, sexual orientation, marital status, disability, military or veteran status, or any other characteristic protected by federal, state, or local law"; correct?

A    Correct.

Q    Is it a violation of this policy to not

Page 15

provide equal employment opportunities to someone on the basis of their race?

A    I'm sorry.  Say it -- can you say it again, please?

Q    Of course.  Is it a violation of the Equal Employment Opportunity Policy to not provide equal employment opportunities to someone on the basis of race?

A    Yes.

Q    Is it a violation of this policy to not provide equal employment opportunities to someone on the basis of their color?

A    Yes.

Q    This section also states that there is a prohibition against discrimination and harassment by any Remprex employee or manager; correct?

A    Yes.

Q    It is a violation of this policy to discriminate against a Remprex employee as a manager; correct?

A    Yes.

Q    It is a violation of this policy to harass a Remprex employee as a manager; correct?

A    Correct.

Page 16

Q    On this page, there's also a section titled "At-Will Employment"; correct?

A    Yes.

Q    This section states that "employment at Remprex is at-will, meaning that your employment with Remprex can be terminated by either you or Remprex at any time with or without notice for any reason or for no reason, except as prohibited by law"; correct?

A    Yes.

Q    Is it your understanding that Remprex cannot terminate an employee for a reason that is prohibited by law?

A    Correct.

Q    Do you know of any termination reason that would be prohibited by law?

A    Those that would be stated by equal opportunity and above.

Q    So would terminating an employee on the basis of their race be a prohibited reason under this policy?

A    I'm sorry.  One more time.

Q    Of course.  Would terminating an employee on the basis of their race be a prohibited reason under the at-will employment policy?

Page 17

A    Yes.

Q    I will now direct you to page 27.  Bear with me as I scroll quite a bit on this page.  There is a section titled "Anti-Discrimination and Harassment Policy"; is that correct?

A    Yes.

Q    This section states that "In compliance with federal, state, and local laws, and as principle of sound business management, Remprex does not discriminate or allow discrimination against applicants or employees on the basis of race, color, religion, national origin, age, gender, sexual orientation, marital status, disability, military or veteran status, or any other status protected by federal, state, or local laws"; correct?

A    Yes.

Q    Would termination on the basis of an employee's race violate this policy?

A    Yes.

Q    Would disciplining an employee on the basis of their race violate this policy?

A    Yes.

Q    Would requiring a Black employee to perform duties that white employees are not required to

Page 18

perform be a violation of this policy?

A    Yes.

Q    And would requiring a Black employee to perform dangerous duties that white employees are not required to perform be a violation of this policy?

A    Yes.

Q    Okay.  This section also states that: "Any employee that suspects discrimination or harassment should report it immediately to HR.  Remprex will promptly investigate all complaints of this nature, report its findings back to the employee making the allegation, and take prompt remedial action against the perpetrator if warranted"; correct?

A    Yes.

Q    I will now direct you to a section titled "Reporting Discrimination, Harassment, or Inappropriate Conduct."  This section states: "It is the right and responsibility of each employee to report any harassment or discriminatory conduct to a manager or human resources.  Managers must report all discrimination, harassment, or inappropriate conduct complaints to human resources"; correct?

A    Yes.

Q    Per this policy, managers have a duty to

report all discrimination, harassment, or inappropriate conduct complaints to HR; correct?

A    Yes.

Q    If an employee told you they felt discriminated or harassed, you would report this to HR; correct?

A    Yes.

Q    What steps would you as a terminal manager take to report a complaint of discrimination or harassment to HR when you were employed at Remprex?

A    So I would do an investigation between the two parties, find out what happened at that -- at this location.  I actually reported it to my supervisor, which was the director of intermodal operations, Jana Davies.  She was in contact with HR from there. That's how I would report it.

Q    So did you ever have personal contact with HR?

A    No.

Q    Has anybody ever complained to you about feeling discriminated at Remprex?

A    Yes.

Q    What were the circumstances?

A    Circumstances, I had Jennifer Chaplin come

Page 20

to me personally, and had felt that she was being discriminated against by Charlene Coleman.

Q    And on what basis did she tell you she felt discriminated against?

A    On the basis of sexual orientation.

Q    And did you report this?

A    Yes, I did.

Q    Who did you report this to?

A    To Jana Davies.

Q    Do you know what Jana Davies did after you reported this to her?

A    I do not.

Q    And Jana Davies did not follow up with you after you reported this to her?

A    She reported -- she came back, explained to me to, you know, sit down, talk with Charlene, see what was going on, what had happened.

Q    And you didn't have any contact from any other human resource individual regarding this incident?

A    No, I did not.  Nobody gave me a call or anything.

Q    Was this the only complaint that you ever reported to human resources regarding an individual

Page 21

feeling discriminated?

A    When -- yes, that is correct.  I'm sorry.

Q    Has anyone ever complained to you about feeling harassed at Remprex?

A    Charlene.  And this is what I was getting at.  Charlene did come to me and felt she was being harassed by other folks.  When I -- I was hired in at Remprex in February of 2022.  I worked at another brand for Remprex.  In June, I was moved down to Remprex at LPC.  I was in Chicago.  And that's after they had fired former terminal manager Anthony Garner. That's when I was brought in.  When I first started, there wasn't much issue, but after -- after a while, Charlene Coleman did come to me and felt that she was being harassed.

Q    And did you report to Jana Davies Charlene's complaint about being harassed?

A    Not at that specific time.  I spoke to everybody else, and I explained as a group that, you know, I don't tolerate harassment.  I don't tolerate any of these things that's, you know, outlined in equal opportunity.  I said, it needs to stop.  I said, I'm trying to handle this on my own.  Any other issues that comes about, then I will forward them to

Page 22

Ms. Davies.

Q    Why did you not report this to Ms. Davies?

A    Again, I felt like I could handle it on my own, but later on it came about again.  That's when I did report it to Ms. Jana Davies.  And it wasn't a -- it was a short time period, within days.

Q    Did you report the complaint that Ms. Chaplin said to you --

A    Yes, I did.

Q    -- immediately?

A    No, I did the same thing.  I told Charlene to please stop if she was doing it.  And then again, it was just like with Charlene, there was a second. Jennifer came in a second time instead.  It was still ongoing.  That's when I reported it to Ms. Davis.

Q    I'll now direct you to page 36 of the handbook.  This section is titled "Discipline Policy." We will look at specifically the section titled "Grounds for Immediate Termination."  This section states: "Certain egregious incidents or conduct can constitute grounds for immediate termination. Depending on the circumstances, Remprex may regard a single act as sufficient reason for suspension, demotion, or dismissal"; correct?

Page 23

A    Yes.

Q    Have you ever terminated an employee for a single act?

A    No.

Q    Mr. Massie, are you familiar with Charlene Coleman?

A    Yes.

Q    How do you know Charlene?

A    She was an employee of mine when I worked at Remprex at Logistics Park Chicago.

Q    Did you know Charlene at all outside of work?

A    No.

Q    And how long would you say you worked with Charlene?

A    Again, I was brought down there I think mid-June, until she was terminated.

Q    And when was she terminated?

A    I believe that was in July or August of the same year.

Q    And what position did Charlene hold?

A    She was a field gate operator.

Q    And how often did you interact with Charlene?

Page 24

A     Every day she was there.

Q     Were you Charlene's direct manager?

A     Yes.

Q     And you were her direct manager the whole time that Charlene was employed with Remprex?

A     Correct.  Unless I was not -- let me back up.  Unless I was not there, such as on the weekend or in the evenings.  We had what was called assistant terminal managers that worked inside of the driver's assistance building.  If she was there during that time, then she was under them.

Q     Would you assign Charlene tasks?

A     Yes.

Q     What kind of tasks or assignments would you assign her?

A     Assignments would include -- her main function was inventory of the containers in the yard and the chassis.  If she needed to go work on a gate that was malfunctioning, she would needed to proceed there and work on that gate, do what functions needed to be done to be able to do that.  Another job that they had was to work inside the driver's assistance building.  Working with the drivers.  Helping the drivers in and out with their processing.

Page 25

Q    How would you describe your working relationship with Charlene?

A    It was quiet.  I mean, she came in.  We spoke.  I let her know anything that was important, whatever, and she went about her business.

Q    And when you first started working at Remprex, what kind of training did you receive?

A    Well, working at Remprex prior to that -- to that, I worked at CSX as an operations manager, so I already understood railroad, even though that's not what we did.  So all of my training I did was actually in Chicago at Corwith on the AGS system, inside driver's assistance building, and the different systems we used there.  And then also we trained -- I had the AS -- assistant terminal managers there teach me how to work with the gates.

Q    Were you ever referred to as a shadow while you were first starting or training at Remprex?

A    Yes.

Q    Were you referred to as the shadow or shadowing?

A    Shadowing.

Q    Were you ever referred to specifically as the shadow?

Page 26

A    Not there.

Q    Where were you referred to in that way?

A    In CSX, when I worked at the railroad.

Q    Is it typical to refer to an employee in training as someone who is shadowing?

A    I'm sorry.  Say it again?

Q    Sure.  Is it typical to refer to an employee who is training at Remprex as someone who is shadowing?

A    Yes.

Q    Is it typical to refer to an employee who is training at Remprex as "the shadow"?

A    I would say no.

Q    Did Charlene ever tell you that she was being called "the shadow"?

A    No.

Q    Did you ever hear anyone else at Remprex referred to Charlene as "the shadow"?

A    No.

Q    Could the term shadow be derogatory to Black people?

A    It sure could, yes.

Q    Did you ever hear anyone else at Remprex who was in training be referred to as "the shadow"?

Page 27

A    No.

Q    Would it be a violation of the discrimination policy to call a Black employee a shadow after they asked to not be called that?

A    Yes.

Q    Would It be a violation of the discrimination policy to treat a Black employee differently than a non-Black employee because of their race?

A    Yes.

Q    Would it be a violation of the harassment policy to call a Black employee a shadow after they asked to not be called that?

A    Yes.

Q    Did you ever hear Charlene call another employee a slur?

A    Yes.

Q    What did she say to you?

A    Okay.  From what my understanding -- okay. Can you rephrase the question?  I'm sorry,

MS. JAKUBOWSKI:  Danielle, could you just repeat the last two questions?

THE REPORTER:  Please stand by.

//

Page 28

(The reporter repeated the record as requested.)

THE WITNESS: I did not hear her call another employee, no.

BY MS. JAKUBOWSKI:

Q So Charlene never told you a slur describing another employee at Remprex?

A Correct. I was told Charlene had called somebody by a slur.

Q And who told you this?

A Jennifer Chaplin.

Q And what did Jennifer Chaplin say?

A Jennifer Chaplin had stated that Charlene had called her the devil, said she was Satanic.

Q Did Jennifer say that Charlene called her anything else?

A No.

Q And did you report this to HR?

A I reported it to Jana Davies.

Q Were there any differences in your reporting to Jana Davies between the complaints of Jennifer Chaplin and Charlene Coleman that you received?

A No. No.

Q You followed the exact same process for both

Page 29

of those complaints?

A     Correct.

Q     I will now share my screen again.  One moment.  Do you all see my screen?  It says Exhibit 2.

            (Exhibit 2 was marked for

            identification.)

A     Yes.

Q     Okay.  Mr. Massie, do you know what this exhibit is?

A     Yes.  It's a warning letter.  Corrective action notice.

Q     And you've seen this exact corrective action notice before?

A     Yes.

Q     Did you write this document?

A     Yes, I did.

Q     Were you told to write this document?

A     No, I did it with the understanding to Jana Davis that I was writing it.

Q     And did you consult anyone else while you were writing it?

A     No, just Jana Davis.

Q     And this corrective action notice is dated July 14, 2022; correct?

Page 30

A    Correct.

Q    And it is a first warning; correct?

A    Correct.  It's a verbal warning.  First warning.

Q    And it says "I spoke with Ms. Coleman in regards to a verbal altercation involving Donna Spivey"; correct?

A    Yes.

Q    And this was provided to Charlene?

A    Yes.

Q    And you also provided this to Jana Davies; correct?

A    Correct.  We had to -- I had -- any corrective action notices that I had done, once they were signed or not signed, I had to email them to her, in which she took it and went with -- sent them to HR.

Q    Were you told to alter this document at all?

A    No.

Q    I will now show you Exhibit 3.  Mr. Massie, are you aware of what this document is?

(Exhibit 3 was marked for identification.)

A    Yes.

Q    You've seen this exact document before?

A    Yes.

Q    Did you write this document?

A    This one -- if I did it, yeah.  I did it. So I guess I would have -- if anytime that are CANS, we forwarded them.  If they weren't written as HR wanted, they would have to send them back, and I'd have to redo them.

Q    So you rewrote this corrective action notice?

A    Yes.  I apologize, yes.

Q    And the date of the incident is indicated as July 14, 2022?

A    Correct.

Q    And the type of corrective action is a final warning?

A    Yes.

Q    Were you told to alter the type of corrective action on this notice?

A    Yes.

Q    Who told you to alter it?

A    That was brought down by HR and/or Jana Davies.

Q    What did they tell you?

A    This was the wording that they wanted to use

in the -- in the corrective action notice.

Q    And did they tell you to switch the corrective action from a first verbal warning to a final warning?

A    Yes.

Q    Did you agree with that decision

A    At the time, yes.  Due to other circumstances.

Q    And could you clarify exactly who you spoke to about amending this corrective action notice?  Was it Jana Davies only?

A    Yes.

Q    No one else you spoke with?

A    No.

Q    And then Jana Davies reviewed this document after you rewrote it?

A    Yes, I had to email it back.

Q    And you rewrote the description of the incident; correct?

A    Yes.

Q    Did they tell you specifically what wording to use --

A    Yes.

Q    -- for the description?

A    Yes.

Q    Did they give you a reason as to why they needed you to alter the notice?

A    The reason I was given, like most of them was, they just wanted the wording correctly.  And from what I'm understanding, that was coming from HR.

Q    And you said that at the time you agreed with the change to the corrective action notice?

A    Yes.

Q    Did that change at all?

A    No.

Q    I will now show you what is marked as Exhibit 4.  Mr. Massie, do you know what this document is?

Mr. Massie, did you hear my question?

(Exhibit 4 was marked for identification.)

A    Yes.  Yes.  I was just reading it.  I'm sorry.  It's been a while.

Q    No worries.

A    Yes.  Yes, I recognize it.

Q    I can zoom in as well.  It makes it a bit easier.

A    It's okay.  I got it.  I appreciate it

Page 34

though.

Q    Did you write this document?

A    Yes.

Q    Did you consult anyone in writing this document?

A    Yes, Jana Davies.

Q    Did you speak with anyone else?

A    No.

Q    Were you told to rewrite this document at all?

A    That I do not remember.  I do know that I was told to write out a -- a CAN on what was explained.  I sent it forward.  If it was sent back again, that was -- I don't remember.

Q    And this was written after Ms. Coleman was notified she was being terminated; correct?

A    Correct.  Or yes.

Q    Do you typically write a corrective action notice before issuing the discipline?

A    No.

Q    So this was a unique circumstance where you wrote the corrective action notice after the employee was terminated?

A    Correct.

Page 35

Q    You've never done that before; correct?

A    No.  No.

Q    Why did you change the process for Ms. Coleman's termination?

A    Okay.  With hers, with the circumstances as it was stated there, when the termination happened, I was on the phone with Jana Davies explaining the situation.  Once she was terminated, that's when I was told to write this CAN notice.

Q    Did you speak with Jana Davies before you terminated Charlene?

A    I was on the phone before she was terminated.

Q    And what did you speak to Jana about on the phone.

A    So I explained exactly what's written here. Ms. Coleman was in my office, and I had called Jana Davies to explain the situation, what had been going on, and explained she did not want to leave.  I said I've called security.  I said they're on their way. She arrived.  And, you know, after I just continued to explain the situation, Jana Davies said, she's just terminated.  She's gone.

Q    Is that the typical process for terminating

Page 36

an employee?

A    I would not know.  That's the only time I ever terminated an employee with Remprex.

Q    And could you just explain the situation that led to you calling Jana Davies and discussing the termination?

A    Correct.  So as it's stated here, lot 15 was a -- just another lot that was right off the ramp.  It was in another section, approximately, maybe a mile, if that, maybe a half a mile from where she worked on the ramp.  We had Remprex employees that worked inside of a -- what you might think of as a -- as a guard shack.  They in process and out process drivers taking loads in and out of there.

So we were told -- I was told by Jana Davies to start cross-training folks to work up in lot 15. They were doing the same job as what she would be doing in the driver's assistance building, but with different -- a different system on the computer.  So she went up there.  She said she didn't want to go. She wasn't trained.  I explained it's on-the-job training, as we had other folks go up there and learn the same thing.

Again, she says, I'm -- I'm not working

Page 37

there. Didn't -- didn't say anything other than the fact that she wasn't trained. And again, I was like, well, it's on-the-job training.

I said, okay, then come down to the driver's assistance building and learn down here as others had done. And she said, no, it's a hostile work environment, as it states here, due to the -- the drivers that come in and out of there, at times, can be hostile. There's -- they do a lot of yelling and screaming. It's up to us to try and stay professional and help them out, explain things to them. And some of them didn't understand English, so we tried to work with them as much as she could. She did not want to do that.

She actually had come down to the driver's assistance building, and we were standing in the middle there with everyone around, and she just, every time -- you know, I said, well, you don't want to go there. You don't want to learn here. I said, then go home, and she stated no. She -- again, she wanted to debate the issue. She -- I had went back to my office, which was in another building. And yes, she came over, and she wanted me to write an informal letter that I was sending her home. But I decided

Page 38

not, as I said, to pursue, because that's when I had called Jana Davies and explained what was going on. And Jana goes, no, you're not writing her a letter.

One issue I had with Ms. Coleman was every time we asked her to do something, she wanted it in writing. No other employee wanted that done. Only her. I could not tell you why, but I -- I wasn't doing it. If I wasn't doing it for the others, I wasn't going to write an instruction to her on a piece of paper. And so after all this happened, I asked her to leave the property three times to go home.

I had -- at that time, I had no intention of terminating her, I just wanted her to go home. However, she continued to debate the issue. And again, with other circumstances as well, that's when I had to get security. That's when I continued to talk with Ms. Jana Davies, and that's when Ms. Davies said to terminate her.

Q    You mentioned there are other circumstances as well that led you to call security. Could you speak on those other circumstances you would refer to? the

MR. HANSEN:  Mischaracterizes his testimony.

Page 39

BY MS. JAKUBOWSKI:

Q    Go ahead, Mr. Massie.  You can still answer.

A    So the other circumstances, it was not with the security officer.  The other -- excuse me, circumstances was other things that had been going on prior to this.  Honestly, I do not remember them all.  I do remember some of them.  I know it's with the -- debate with the -- with Jennifer Chaplin.  I know that there was the issue with Donna Spivey, when -- in which Jana Davies was physically there for that.  I was not.  I don't remember if I was off that day or if I was up in Chicago at another ramp doing something when all that unfolded.  There was an issue about Jennifer Chaplin training her on gate procedures, on what she believed was a live wire, which wasn't.  So all these circumstances.

I do not have it no more.  But I did have an entire list that I had printed -- printed out, and had given to Ms. Davies on certain circumstances that happened throughout from the time that I was there until she was terminated.  So my -- yeah.  I can't assume nothing, so.

Q    And just going back a little bit on the day that Charlene said that she was not going to work with

Page 40

the truck drivers.  Was there someone there to train Charlene?

A    Yes, there was.

Q    Who was there?

A    If I remember correctly, I know Kari McKay was there, and I do not remember if Janine Batchelor was in there or if she was outside doing inventory as well.

Q    Would you have sent her there if there was nobody to train her?

A    No.

Q    So at Remprex, you would not have an employee do a task on their own for the first time without training?

A    Correct, I would not.

Q    And do you agree with the description in the corrective action notice that you wrote on July 28, 2022, the one on the screen?

A    Yes.  Yes.

Q    Does this accurately portray what had occurred that day?

A    Yes.

Q    Is it prohibited for an employee to get a instruction in writing?

Page 41

A    It's not prohibited, but it's not -- we don't do it.  We didn't do it.  Or I would be writing notes all day.

Q    And Jana told you not to write this note as well; correct?

A    Correct.

Q    Are you aware of any Remprex employees who were terminated for refusing to perform an assignment?

A    No.

Q    What if it was a potentially dangerous task?

A    Dangerous tasks for my folks, you know, going out, driving around in the lot in an inventory truck with a computer, it was dangerous 'cause you had a lot of moving parts.  You had cranes.  You had other truck drivers.  You had -- I can't remember the company that was there at the time, but they were the ones who was moving the containers around the yard.  So there was a lot of -- there -- there could be anywhere from 100 to 200 people moving at once in every which direction.  So -- so that was dangerous.  As well as going out and working with the gate systems, the gates -- the gate arms that go up and down that let the drivers in.  Because even though you do, you know, cone off the lane to make sure they

Page 42

don't come in, you still have drivers on adjacent lanes that are moving in and out.

Q    Are you aware of any other employees who had refused an assignment while you were working at Remprex?

A    I know for a short time period after just starting when Ms. Coleman was terminated, I was working with Ms. -- Ms. Spivey to get her into the AGS to start learning it.  She was -- she was stubborn. She refused.  I let Ms. Jana Davies know, and she eventually started working in the DAB as -- as I was leaving.

Q    And what is Ms. Spivey's race?

A    She's white.

Q    And Ms. Spivey was not terminated for refusing to work in the job; correct?

A    No.

Q    Was she disciplined at all?

A    Yes.

Q    What form of discipline did she receive?

A    I -- I gave her a verbal warning just like I did with everybody else.

Q    But Ms. Coleman did not receive a verbal warning; correct?

Page 43

A    She received a verbal warning back when she -- we had the issue with between her and Ms. Chaplin.

Q    But she did not receive a verbal warning for not completing the assignment you asked her to do; correct?

A    I gave her the verbal warning this day that I would be sending her home.  Not to terminate her, but I would be sending her home.  And that's when she continued to refuse to do everything, and -- and refused to go home.

Q    So this essentially was turned into a final warning termination?

A    Yes.

Q    And the prior verbal warning that you mentioned, was that actually a final warning based on the corrective action notice that you had to amend?

A    No.  Are you talking about the written one? I apologize.  The written warning, or the one I gave her during this day?

Q    The written warning that was amended.

A    The -- that was the final, yes.

Q    But Ms. Coleman received an additional verbal warning prior to that?

Page 44

A    Yes.

Q    And what was that verbal warning about?

A    Verbal warning to go home.  Again, I did not want to terminate her.  I didn't want it to escalate.  I just wanted her to go home.  We start the new day the next day, but again, she would not leave.

Q    Besides Ms. Spivey, are you aware of any employees who refused to perform a duty but were not terminated?

A    No.

MS. JAKUBOWSKI:  Okay.  Let's take a quick break.  Maybe let's do, like, five minutes.  Maybe come back at 11:57.  if that works for everyone.

THE REPORTER:  We are off the record at 11:53 AM

(Off the record.)

THE REPORTER:  We are now back on the record at 12:08 p.m.

Counsel, you may now proceed.

MS. JAKUBOWSKI:  Thank you.

BY MS. JAKUBOWSKI:

Q    Okay.  I'm actually going to share my screen again.  Mr. Massie, do you see that this is Exhibit 2?  Just going back in time a little bit.

Page 45

A    Yes.  Yes.

Q    Okay, great.  Just wanted to clarify a couple things.

A    That's fine.

Q    So the incident that occurred on 07/14/2022, that's outlined in this corrective action notice, you were not present for it; correct?

A    No.  At the actual incident, no.  I was not when it happened.

Q    And how did you find out about the incident?

A    I found this out from Jennifer Chaplin, and I found this out from other employees as well.

Q    And you're referring to the verbal altercation between Ms. Coleman and Donna Spivey; correct?

A    Correct.

Q    And what did Jennifer Chaplin tell you she witnessed?

A    As far as with the two -- as far as -- well, Jennifer had already told me about being called devil Satan, all that.  And then I found out from Mr. Spivey that yes, Ms. Coleman had told Ms. Spivey the same thing about Jennifer Chaplin.

Q    Did Jennifer Chaplin tell you about the

Page 46

verbal altercation between Charlene and Donna?

A    The fact that they had gotten into it, but that was it.  Again, there was -- if I remember correctly, as far as between Ms. Coleman and Ms. Spivey, this was the altercation that -- when Jana Davies was present, and I was not.  I do know -- I believe Ms. Davies wrote a directive action notice up on concerning that issue specifically.

Q    And did you see that corrective action notice that Jana wrote?

A    I did see it, but I do not remember it as far as exactly, other than the fact that Ms. Coleman and Ms. Spivey got into it during lunch break.

Q    Is it typical for a manager to write up a corrective action notice for an incident that they did not witness?

A    No, not typically.

Q    And did Jana tell you that she witnessed the incident between Donna and Charlene?

A    Yes.

Q    Do you recall what Jana told you she witnessed?

A    I do not specifically remember.  I know that Ms. Coleman -- I believe, if I remember right, she

Page 47

showed up to work.  Ms. Spivey was getting out of her truck to do lunch, and there was an altercation.  I guess Ms. Coleman had said something to the fact, you know, hello, good day, whatever it was, and Ms. Spivey snapped back at her.  I know that there were witness statements that were taken that Jana had, Ms. Coleman, Ms. Spivey, and Ms. Chaplin all write.  Again, I do not have those witness statements.  Those stayed there.

But I -- again, she was -- she was actually -- Ms. Davies was actually sitting in my office utilizing my desk that day when the altercation happened just outside the window.

Q    And you were not present in your office that day; correct?

A    No, I wasn't even on the ramp that day. That's -- like I said, either I was off that day, or I was up in Chicago at another ramp.

Q    So did Jana tell you to describe the incident as being a verbal altercation?

A    Yes.

Q    And she did not tell you anything else about the incident besides that?

A    No, she did tell me.  Again, I do not

Page 48

remember exactly all what was said.

Q    And would you say that this description of the incident is accurate to what you were told and also witnessed with reference to the situation with Jennifer?

A    Yes.

Q    And do you agree that this corrective action notice warranted a first warning?

A    Yes.

Q    I will now go over to Exhibit 3. Mr. Massie, is the description of the incident in this corrective action notice different than the first corrective action notice that you drafted?

A    Yes, it is different.

Q    How is it different?

A    It states that Ms. Coleman engaged in an unprovoked and unprofessional conversation with Ms. Donna Spivey.

Q    Is this accurate to what you were told?

A    Yes.

Q    Why was this changed from a verbal altercation to an unprovoked and unprofessional conversation?

A    That I do not know.  Again, the way Remprex

Page 49

worked was she explained the situation. I explained it to Jana. Jana say -- would state, you know -- and this was with any. This just wasn't with this one. This was with any corrective action notice. We would write it up, send it to her, and if she wanted it changed to read more professionally, however she wanted, however you want to put it, she would send it back and say -- and, you know, this is what needs to be in there for HR.

Q    And do you agreed --

A    Many time -- I'm sorry.

Q    Sorry.  Continue.

A    There were -- there were many times any corrective action notices that were done, most of the time were sent back 'cause they wanted them worded as -- HR wanted them worded a specific way.

Q    Would they also often change the level of the corrective action?

A    Yes.

Q    How often would you issue discipline?

A    I'm sorry?

Q    How often would you issue discipline?

A    Quite a bit.

Q    On a weekly basis?

Page 50

A    No, not on a weekly basis.  At least on a monthly basis.  I would have one worker that did not want to work or did not want to do something.  But after speaking to them, giving them a verbal warning, they usually did it.

Q    How many times have you given a final warning?

A    Up to this point, or during my time at Remprex?

Q    During your time at Remprex.

A    There were two.

Q    So one included Charlene Coleman.  What was the other one?

A    The other one was toward the end of my tenure.  We had an assistant terminal manager at night that -- she wound up -- we -- in the driver's assistance buildings, we had video cameras that corporate utilized for any certain circumstances if needed.  Specifically, in case we had any altercations with drivers.

We found that she had left.  She was on nights.  So she worked from six at night till six in the morning, and probably, I think it was around midnight, one o'clock, she wound up leaving without

Page 51

notice to me or to call or anything.  She just got up and abandoned her position, her -- her job.  Plus we had other issues with her going on that she had been given a verbal first, second, and then a final warning.

Q   And what was the race of that employee?

A   I'm not sure if she was Black or if she was Indian.  I'm not too sure.  I take that back.  She was Hispanic.

Q   And did you also write the corrective action notice for that employee?

A   Yes.  During that timeframe, again, that was toward the end of my tenure or so.  This would've been probably September, October timeframe of the same year.  HR, they had a complete turnover of HR personnel.  And during this timeframe, anytime that I spoke with Ms. Davies, it was a conference call, which included somebody from HR.

Q   For that other incident, did you also have to amend the corrective action notice that you drafted?

A   Yes.

Q   What did you have to amend on it?

A   Again, just the wording as far as the

Page 52

professionalism.  And that was from the HR person on the line.

Q    And did you have to increase the level of the corrective action for that one as well?

A    The last one, yes.

Q    What was it initially?

A    If I remember correctly, and I'm not sure, I believe it was a second warning.

Q    And then Jana Davies told you to increase it to a final warning?

A    And the HR representative.  And the reason that was done was because between the first and the final, the employee actually came in and was -- we were on a conference call with myself, Jana Davies, and the HR representative.  The HR representative, now that I can remember and I'm going back through it. This employee was making some comments about her company and the folks she worked with outside of work, and it was witnessed by other employees.  Not just by Remprex, but other employees of the ramp there that she was making these comments.

So she couldn't understand why she was getting the first written warning.  Why she got the verbal and the first written warning.  So we had to

Page 53

get on the phone with myself, Jana Davies, and the HR representative, and this employee were actually, you know, talking back and forth. Jana and I just stayed quiet. HR was trying to explain to her why, you know, it's unprofessional as -- as an assistant terminal -- yeah, assistant terminal manager to be saying these things off the ramp. That they were still an employee of Remprex, and they still represented Remprex. And I -- there was two or three, I do not recall, but two or three phone calls made like that.

Q And just confirming for this corrective action notice on the screen, you agree with the description of the incident; correct? And you believe this accurately depicts what happened?

A Yes. As far as I can remember, yes.

Q And nobody else besides Jana Davies told you about the events in this corrective action notice?

A Yes. Jennifer Chaplin had told me 'cause she was there. She got pulled into it because she was the manager on duty since I was off -- off the ramp.

Q Okay. I'm going to move on to Exhibit 4. Just want to clarify a couple things on this as well. So initially you were not going to indicate this

Page 54

corrective action notice as termination; is that correct?

A    Correct.

Q    And you were going to indicate it as a verbal warning?

A    This would've been her -- so she had a verbal.  She had it written.  The next, as it states up there, is suspension.  But again, I got on the phone with Jana Davies when I -- when Ms. Coleman asked me to write a letter for her to go home.  That's when I got on the phone with Ms. Davies.  And Ms. Davies at that point had told me, just -- just tell her go home.  She's terminated.

Q    So what level of corrective action were you intending to write this corrective action notice as before your call with Jana?

A    Like I said, a suspension, because she'd been given -- as a stated below, she had been given a verbal, and she been -- had been given a written.  The next is a suspension.

Q    And can you just explain what the verbal warning that she received was?

A    The verbal warning was -- was due to, again, not -- saying no to me, as a terminal manager, she

Page 55

wasn't going to do something.

Q    And that occurred on the same day of this corrective action notice?

A    That is correct.

Q    And did you prepare any documentation for that verbal warning?

A    No, 'cause it all happened within 30 minutes to 45 minutes.

Q    Mr. Massie, do you have the ability to terminate an employee on your own?

A    No.

Q    Who has that ability?

A    HR and above.  It would be the Jana Davies, again, the director of intermodal operations, and HR. We could not -- we were not allowed to terminate on our own.  We had to go through this process of making phone calls, writing up corrective action notices.  At that time, and again, it was back and forth until HR or -- and/or Jana Davies had what they wanted.  And then it was I sat down with the employees and went through -- and, you know, went through the -- the final corrective action notice.  This just wasn't her. This was any -- any of them.

Q    And did you agree with Jana's request to

Page 56

make this determination?

A    Yes.  Again, not only for this refusing to do what was asked of her, which was in her duty -- her job description, but also from other circumstances prior to that.

Q    And this corrective action notice states that there were no previous warnings or statements due to insubordination; correct?

A    Correct.

Q    And it says "Ms. Coleman had been verbally warned in a statement written on July 14, 2022, for her attitude and misconduct toward another employee"; correct?

A    Correct.  That was against Ms. Spivey.

Q    Is that statement accurate?

A    There was no -- there was verbal warnings, again, to her, Ms. Chaplin, Ms. Spivey, but no -- state -- as far as no corrective action notices. I never had a problem with Ms. Coleman prior to this as far as insubordination until July 14th.

Q    And July 14th was the incident with Donna Spivey; correct?

A    Correct.

Q    And the verbal warning on 07/14, that was

Page 57

changed to a final warning; correct?

MR. HANSEN: Objection. Asked and answered.

BY MS. JAKUBOWSKI:

Q    Go ahead, Mr. Massie.

A    I'm sorry. Say again?

Q    Sure. The verbal warning on July 14th was changed to a final warning; correct?

A    That -- yes. Correct.

Q    Do you know why it says on this corrective action notice that Ms. Coleman has been verbally warned in a statement written on July 14th, when she in fact received a final warning?

A    Again, this is in touch with the July 14th issue. That or if -- can you scroll up please?

Q    Yes. Is that enough?

A    Okay. So, yes. Thank you. So as far as the verbally warned, again, that was on July 14th. That was from Ms. Jana Davies, not me.

Q    And do you know what the verbal warning was from Jana?

A    No, I do not.

Q    Did Ms. Coleman receive a verbal warning on any other date be besides July 14th or July 28th?

Page 58

A    For insubordination, no.  For the comments made toward Ms. Chaplin, yes.

Q    And did you give that verbal warning?

A    Yes.

Q    And what date was that?

A    I -- I do not remember what dates.  Again, I know that I -- I had a log, if you -- if you will, that Ms. Jana had -- Ms. Jana Davies had me to start due to certain circumstances.  One was with the -- again, with -- was with Jennifer Chaplin.  As far as the comments, one was about working -- going out and having Jennifer show her how to to fix something with the gate arm.  There was a couple other altercations I know with a keyboard.  She had me do all this, and I sent it to her.  Now I have not seen it since, but there was four or five different issues.

Q    Do you know why Jana asked you to keep that log?

A    No, I could not tell you why she asked me to keep that log.

Q    Have you ever had to keep such a log for any other employee at Remprex?

A    Not at -- not at Remprex, but other companies, yes.

Page 59

Q    Do you know why you do not issue corrective action notices on verbal warnings?

A    No.

Q    Are you supposed to issue a corrective action notice for a verbal warning?

A    Assuming to this, yes.  A lot of times I may not be at the place of time to do it.  So I give them a verbal warning at the place in time.  I know during my first, I'll say, six, seven months at Remprex, again, because we had to write these out, send them up, you know, it would be days or however long to get them back.  So kind of like what I usually say is I would rather give them a verbal warning right then and there.  That way they know what they did wrong.  Kind of like with a child, you know.  If the child does something wrong, you're not going to wait a couple days and go back and discipline them for something they did a couple days ago.

Q    So if you don't write a CAN for verbal warning, is there any other way it is documented or tracked?

A    No.

Q    Okay.  I'm going to ask you just a couple more questions about specific incidents.  Okay.  Are

Page 60

you aware of a bet between certain Remprex employees regarding how long Charlene would last at Remprex?

A    No.

Q    Are you aware of a deal between Remprex employees involving a referral bonus?

A    No.  I do not know anything about a deal.  I know that I did have employees come to me and say, hey, you know, I referred so and so.  I'm looking to see if I can get that referral, in which I did send that up to Jana Davies.

Q    Did anyone at Remprex receive a referral for referring Charlene?

A    Not to my awareness.

Q    Are you aware of an incident involving Charlene being told to sit away from others?

A    No, I do not know anything about that.  Again, the driver's assistance building, where my office was at the time, was probably about a quarter mile.  I was not aware of that.  But I do know that they took lunch breaks down at my building, which was outside.  We had picnic tables.  I do know a lot of times if Ms. Charlene was there and other folks came up for lunch, she would leave.

Q    Do you know why she would leave?

Page 61

A    No, I do not.

Q    And this is just based on your own observations; correct?

A    Correct.

Q    Are you aware of an incident involving Charlene having to go to the hospital after inhaling carbon monoxide from a Remprex truck?

A    No, I do not.

Q    Are you aware of an incident where Charlene was called the N word?

A    No.

Q    Are you aware of an incident involving Charlene's keyboard going missing?

A    That I am aware of.  The trucks in which they utilized for inventory had computers.  We did have keyboards.  Most people brought in their own keyboard that they had went and purchased themselves 'cause they were comfortable with it 'cause they had to do a lot of keyboarding.  Ones that the company had were kept in my office.  I know she did come to me one day and said, hey, this keyboard that I use, you know, it keeps disappearing out of the truck.  You know, and I -- from what I understand, it was not hers.  It was the company's.

Page 62

I explained to her. I said -- and I explained to everybody else as well, I said, if you have a specific keyboard that you want to utilize, if you don't have your own and you want to use one of the Remprex's and you like it, that's fine. I haven't got a problem with it. I said, put it in my office. My office was unlocked. They could bring it in, set it somewhere, and they could come and -- 'cause they had to clock in and they had to look through their safety stuff right outside my door.

I said, you can come in and get your get -- get that specific keyboard, but you know, put it up. If you leave it in the truck, you know, anybody's going to use it or anything like that. Bring it into my office, put it in a specific spot, which she started doing. And she was putting it on top of our supply wall locker. But other than that, that's all I know about a keyboard disappearance.

Q So Charlene told you that somebody took her keyboard?

A Correct. But again, it was not hers. It was the company's. It was just a -- the specific one that she liked to use.

Q And it was the same one?

Page 63

A    And I believe -- yeah, it was the same one. It was just that somebody came in, saw it, took it, and utilized it.  And that's when I brought this up 'cause she was quite upset about it.  And that's when I brought it up.  I mean, I understood if it was the one she bought, like others utilized, but there was a couple of them just -- that just utilized the company keyboard.

Q    Did the other employees -- sorry.

A    No, go ahead.

Q    Did the other employees who utilized the company keyboard, did they use the same one every single time as well?

A    We had two or three of them, yes.

Q    Did they ever have any issues with their keyboard going missing?

A    No, because when they got -- when they finished shift, they took it with them in their car.

Q    Did you follow up at all with Charlene about her keyboard?

A    Yes, I asked.  We had -- like I said, once she started bringing it in there and once I put it out about the personal keyboard -- boards, you know, the other things, and we didn't have an issue after that.

Page 64

Q    And so her keyboard was found; correct?

A    Yes.  It was found in one of the vehicles.

MS. JAKUBOWSKI:  Okay.  Let me just briefly go through my notes just to make sure I covered everything.  Perhaps we can take a just, like, three minute break until 12:40.

THE REPORTER:  We are now off the record at 12:37 p.m.

(Off the record.)

THE REPORTER:  We are now on the record at 12:40 p.m.

Counsel, you may now proceed.

MS. JAKUBOWSKI:  Thanks.  Mr. Massie, I went through all my notes, and I don't think I have anything else for you today.  So I'll turn it over to Attorney Hansen if he has anything to follow up on.

MR. HANSEN:  Yeah.  One thing.  Let me share my screen here.  All right.  Okay.  I hope I'm doing this right.

EXAMINATION

BY MR. HANSEN:

Q    Mr. Massie, can you see this document up that I have up here?

A    Yes.

Page 65

Q    All right.

A    It's -- it's small, but I can't see it.

Q    Well here, let me see if I can zoom in. Does that help?

A    Yeah.  It helps a little bit.  I'm sorry.  I have to tilt my screen because I have a glare, so -- but yes, this is -- this is the log in question

Q    When you say the log in question -- and I'm sorry.  Real quick.  Just for the record, the document that I'm looking at is Bates stamped Coleman 29.

Please continue.  You said the log in question.  What do you mean by that?

A    Well, I spoke earlier that I -- you know, there was the talk about the -- the termination and everything, and I spoke of a log that I had kept. This was the log in question.  This was told to me by Jana Davies to make a log because we were having issues with Mrs. Coleman -- with Ms. Coleman.  That she wanted a log kept, and this is what I had done, and this is what I had sent up to her.

Q    Okay.  All right.  I believe you may have been asked this, if so, I apologize.  But just to be sure, do you recall when Ms. Davies asked you to prepare this log?

Page 66

A    That I do not remember.

Q    Okay.  Okay.  Going through the log here, and I know it's difficult because the screen isn't huge, but can you just confirm that everything on here is accurate to the best of your recollection?

A    Yes.

MR. HANSEN:  Okay.  All right.  I don't have anything further.

THE REPORTER:  We are now off the record at 12:42 p.m.

(Signature reserved.)

(Whereupon, at 12:42 p.m., the proceeding was concluded.)

Page 67

CERTIFICATE OF DEPOSITION OFFICER

I, DANIELLE M. CRAIG, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Danielle Craig*

DANIELLE M. CRAIG
Notary Public in and for the
State of Illinois

[X] Review of the transcript was requested.

Page 68

CERTIFICATE OF TRANSCRIBER

I, SHANNON COVERT, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

SHANNON COVERT

Page 69

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

April 30, 2025

To: Mr. Hansen

Case Name: Coleman, Charlene v. Remprex, LLC

Veritext Reference Number: 7312420

Witness:  Tracy Massie Deposition Date:  4/16/2025

Dear Sir:

Enclosed please find a deposition transcript.  Please have the witness

review the transcript and note any changes or corrections on the

included errata sheet, indicating the page, line number, change, and

the reason for the change.  Have the witness' signature notarized and

forward the completed page(s) back to us at the Production address shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of
this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

Page 70

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7312420
CASE NAME: Coleman, Charlene v. Remprex, LLC
DATE OF DEPOSITION: 4/16/2025
WITNESS' NAME: Tracy Massie
In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
I have made no changes to the testimony
as transcribed by the court reporter.


_____        _____
Date                              Tracy Massie
Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

        They have read the transcript;
        They signed the foregoing Sworn
                Statement; and
        Their execution of this Statement is of
                their free act and deed.

        I have affixed my name and official seal

this _____ day of_____, 20_____.


        _____
        Notary Public
        _____
        Commission Expiration Date

Page 71

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7312420
CASE NAME: Coleman, Charlene v. Remprex, LLC
DATE OF DEPOSITION: 4/16/2025
WITNESS' NAME: Tracy Massie

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____          _____
Date                                     Tracy Massie

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.
I have affixed my name and official seal this _____ day of_____, 20____.
_____
Notary Public

_____
Commission Expiration Date

Page 72

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 7312420

PAGE/LINE(S) /       CHANGE       /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____



_____        _____

Date                    Tracy Massie

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

                    _____

                    Notary Public


                    _____

                    Commission Expiration Date

**[03606 - action]**

| 0 | 2 | 33 3:14 | 9 |
|---|---|---|---|

**0**

**03606** 1:7
**07/14** 56:24
**07/14/2022**
  3:10 45:5
**07/28/2022**
  3:14

**1**

**1** 3:8 13:3,4,8
**100** 41:19
**1100** 69:1
**11:02** 1:12 4:5
**11:53** 44:15
**11:57** 44:13
**12:08** 44:18
**12:37** 64:8
**12:40** 64:6,11
**12:42** 66:10,12
**13** 3:8
**14** 29:24 31:12
  56:11
**14th** 56:20,21
  57:7,12,14,18
  57:24
**15** 36:7,16
**16** 1:11 4:8
**17** 10:17
**1820** 69:2
**19** 3:19
**190** 2:5,12
**1969** 10:17

**2**

**2** 3:9 29:4,5
  44:23
**20** 70:16 71:22
  72:22
**200** 41:19
**2018** 11:16
  13:15
**2022** 8:23 14:2
  14:2 21:8
  29:24 31:12
  40:18 56:11
**2023** 8:23
**2025** 1:11 4:8
  69:4
**216-523-1313**
  69:3
**23** 1:7
**2550** 2:5,12
**27** 17:2
**28** 40:17
**28780** 68:14
**28th** 57:24
**29** 3:10 65:10

**3**

**3** 3:11 14:11
  30:19,21 48:10
**30** 3:12 55:7
  69:4
**301-3868** 2:15
**30724** 67:17
**312** 2:8,15

**33** 3:14
**332-7760** 2:8
**36** 22:16
**364** 10:20
**3815** 2:20

**4**

**4** 3:13 33:13,16
  53:22
**4/16/2025** 69:8
  70:3 71:3
**44114** 69:2
**45** 55:8

**5**

**5** 3:15
**587-7971** 2:23

**6**

**6** 3:3
**60174** 2:21
**60603** 2:6,13
**62521** 1:14
  10:21
**630** 2:23
**64** 3:4
**65** 10:21

**7**

**7/14/2022** 3:12
**7312420** 1:16
  69:7 70:2 71:2
  72:2

**9**

**9** 3:19

**a**

**a.m.** 1:12 4:5
**a1** 2:20
**abandoned**
  51:2
**ability** 10:13
  55:9,12 67:10
  68:7
**able** 7:9 8:7
  13:3 24:21
**above** 16:17
  55:13 69:16
**absent** 4:14
**accordance** 6:3
  70:5 71:5
**accurate** 48:3
  48:19 56:15
  66:5 67:9 68:5
**accurately**
  40:20 53:15
**acknowledge**
  70:11 71:16
**acknowledge...**
  4:11
**act** 22:23 23:3
  70:14 71:20
**action** 1:6 3:9
  3:11,13 18:12
  29:11,12,23
  30:14 31:8,14
  31:18 32:1,3

**[action - authorized]**

32:10 33:8
34:18,22 40:17
43:17 45:6
46:7,9,15 48:7
48:12,13 49:4
49:14,18 51:10
51:20 52:4
53:13,18 54:1
54:14,15 55:3
55:17,22 56:6
56:18 57:11
59:2,5 67:12
67:16 68:8,12
**actions** 7:10
**actual** 45:8
**actually** 19:13
25:11 37:15
43:16 44:22
47:11,11 52:13
53:2
**additional**
43:23
**additionally**
4:14
**address** 10:19
69:15
**adjacent** 42:1
**administer**
4:11
**affect** 10:13
**affixed** 70:15
71:21
**age** 14:18 17:12

**ago** 59:18
**agree** 4:12,16
32:6 40:16
48:7 53:13
55:24
**agreed** 33:7
49:10
**ags** 25:12 42:8
**ahead** 39:2
57:5 63:10
**allegation**
18:12
**allow** 7:16
17:10
**allowed** 55:15
**alter** 30:17
31:17,20 33:3
**altercation**
30:6 45:14
46:1,5 47:2,12
47:20 48:22
**altercations**
50:19 58:14
**amend** 43:17
51:20,23
**amended** 43:21
**amending**
32:10
**amundsen** 2:19
**amundsenda...**
2:22
**answer** 3:17
7:20 8:7 9:19
10:14 39:2

**answered** 8:1
57:3
**answering** 8:9
**answers** 7:8
**anthony** 21:11
**anti** 17:4
**anybody** 19:20
**anybody's**
62:14
**anytime** 31:4
51:16
**apologize** 31:10
43:19 65:22
**appear** 70:11
71:15
**appended**
71:11,18
**applicable** 4:20
**applicants**
17:11
**appreciate**
33:24
**approx** 12:21
**approximately**
36:9
**april** 1:11 4:8
69:4
**arm** 58:13
**arms** 41:22
**arrived** 35:21
**asked** 7:20 14:5
27:4,13 38:5
38:10 43:5
54:10 56:3

57:2 58:17,19
63:21 65:22,23
**asking** 7:17
**assign** 24:12,15
**assigned** 4:3
**assignment**
41:8 42:4 43:5
70:2 71:2 72:2
**assignments**
24:14,16
**assist** 13:19
**assistance**
24:10,22 25:13
36:18 37:5,16
50:17 60:17
**assistant** 24:8
25:15 50:15
53:5,6
**assume** 7:20
39:22
**assuming** 59:6
**attached** 71:7
**attendance** 5:3
**attitude** 56:12
**attorney** 5:6,8
5:9 6:10 8:5
9:13 64:16
67:14 68:10
**audio** 67:8 68:3
**august** 23:19
**authorize**
71:11
**authorized**
4:10

**[ave - charlene]** Page 3

ave 69:1
avoid 7:10
aware 30:20
41:7 42:3 44:7
60:1,4,14,19
61:5,9,12,14
awareness
60:13

**b**

b 3:6
back 18:11
20:15 24:6
31:6 32:17
34:13 37:21
39:23 43:1
44:13,17,24
47:5 49:8,15
51:8 52:16
53:3 55:18
59:12,17 69:15
based 43:16
61:2
basis 15:2,7,12
16:19,23 17:11
17:17,20 20:3
20:5 49:24
50:1,2
batchelor 40:6
bates 65:10
bear 6:21 17:2
behalf 2:2,17
believe 23:19
46:7,24 52:8

53:14 63:1
65:21
believed 39:15
best 7:15 66:5
67:10 68:6
bet 60:1
birth 10:16
bit 17:3 33:22
39:23 44:24
49:23 65:5
black 17:23
18:3 26:20
27:3,7,8,12
51:7
bluff 10:20
bnsf 8:20,21,24
9:1,3
boards 63:23
bonus 60:5
bought 63:6
brand 21:9
break 7:23 8:2
44:12 46:13
64:6
breaks 60:20
briefly 64:4
bring 62:7,15
bringing 63:22
brought 12:13
12:16 21:12
23:16 31:21
61:16 63:3,5
building 24:10
24:23 25:13

36:18 37:5,16
37:22 60:17,20
buildings 50:17
business 17:9
25:5

**c**

c 2:1 4:1
ca 69:23
call 20:21 27:3
27:12,15 28:3
38:20 51:1,17
52:14 54:16
called 5:17 24:8
26:15 27:4,13
28:8,14,15
35:17,20 38:2
45:20 61:10
calling 36:5
calls 53:10
55:17
cameras 50:17
cans 31:4
capture 7:9,12
7:14
car 63:18
carbon 61:7
case 5:24 6:17
50:19 69:6
70:3 71:3
cause 14:10
41:13 49:15
53:19 55:7
61:18,18 62:8

63:4
caveat 7:24
certain 22:20
39:19 50:18
58:9 60:1
certificate 67:1
68:1 71:11
certificates
11:18
certification
70:1 71:1
certified 4:17
certify 67:4
68:2
change 33:8,10
35:3 49:17
69:13,14 71:8
72:3
changed 48:21
49:6 57:1,8
changes 69:12
70:7 71:7,9
chaplin 19:24
22:8 28:11,12
28:13,22 39:8
39:14 43:3
45:11,17,23,24
47:7 53:19
56:17 58:2,10
characteristic
14:21
charlene 1:4
2:2 4:7 5:24
20:2,16 21:5,6

**[charlene - conversation]**

21:14 22:11,13 23:5,8,11,15,21 23:24 24:5,12 25:2 26:14,18 27:15 28:6,8 28:13,15,22 30:9 35:11 39:24 40:2 46:1,19 50:12 60:2,12,15,22 61:6,9 62:19 63:19 69:6 70:3 71:3

**charlene's** 21:16 24:2 61:13

**charles** 2:21

**chassis** 24:18

**chicago** 2:6,13 21:10 23:10 25:12 39:12 47:18

**child** 59:15,15

**circumstance** 34:21

**circumstances** 19:23,24 22:22 32:8 35:5 38:15,19,21 39:3,5,16,19 50:18 56:4 58:9

**civil** 1:6 6:4 70:5 71:5

**clarify** 32:9 45:2 53:23

**cleveland** 69:2

**clock** 62:9

**coleman** 1:4 2:2 4:7 5:24,24 9:12 20:2 21:14 23:6 28:22 30:5 34:15 35:17 38:4 42:7,23 43:23 45:14,22 46:4,12,24 47:3,6 48:16 50:12 54:9 56:10,19 57:11 57:23 65:10,18 65:18 69:6 70:3 71:3

**coleman's** 35:4

**college** 11:4

**color** 14:18 15:12 17:11

**come** 5:13 14:5 19:24 21:6,14 37:4,8,15 42:1 44:13 60:7 61:20 62:8,11

**comes** 21:24

**comfortable** 61:18

**coming** 33:6

**comments** 52:17,21 58:1

58:11

**commission** 70:19 71:25 72:25

**committed** 14:15

**companies** 58:24

**company** 6:19 8:14,19 11:12 41:16 52:18 61:19 63:7,12

**company's** 61:24 62:22

**complained** 19:20 21:3

**complaint** 19:9 20:23 21:17 22:7

**complaints** 18:10,22 19:2 28:21 29:1

**complete** 51:15

**completed** 69:15

**completing** 43:5

**compliance** 17:7

**computer** 36:19 41:13

**computers** 61:15

**concerning** 46:8

**concluded** 66:13

**conduct** 18:17 18:19,21 19:2 22:20

**cone** 41:24

**conference** 51:17 52:14

**confirm** 10:18 66:4

**confirmed** 6:10

**confirming** 53:12

**constitute** 4:24 22:21

**consult** 29:20 34:4

**contact** 19:15 19:17 20:18

**containers** 24:17 41:17

**continue** 49:12 65:11

**continued** 35:21 38:14,16 43:10

**contracted** 8:17

**contractors** 9:3

**conversation** 9:20 48:17,23

**[convicted - defendant]**

**convicted** 10:7 10:9

**corporate** 14:9 50:18

**correct** 14:13 14:22,23 15:16 15:20,23,24 16:2,8,13 17:5 17:15 18:13,22 19:2,6 21:2 22:24 24:6 28:8 29:2,24 30:1,2,3,7,12 30:13 31:13 32:19 34:16,17 34:24 35:1 36:7 40:15 41:5,6 42:16 42:24 43:6 45:7,15,16 47:15 53:14 54:2,3 55:4 56:8,9,13,14,22 56:23 57:1,8,9 61:3,4 62:21 64:1

**corrections** 69:12 71:17

**corrective** 3:9 3:11,13 29:10 29:12,23 30:14 31:8,14,18 32:1,3,10 33:8 34:18,22 40:17

43:17 45:6 46:9,15 48:7 48:12,13 49:4 49:14,18 51:10 51:20 52:4 53:12,18 54:1 54:14,15 55:3 55:17,22 56:6 56:18 57:10 59:1,4

**correctly** 33:5 40:5 46:4 52:7

**corwith** 25:12

**counsel** 5:21 44:19 64:12 67:11,14 68:7 68:10

**county** 70:10 71:15

**couple** 45:3 53:23 58:13 59:16,18,23 63:7

**course** 15:5 16:22

**court** 1:1 7:9 7:11 9:10,10 70:7

**covered** 64:5

**covert** 68:2,15

**craig** 1:15 4:3 67:2,18

**cranes** 41:14

**creating** 13:19

**crime** 10:9

**cross** 36:16

**csx** 25:9 26:3

**current** 10:3,18

**currently** 10:12 11:20,21

**cv** 1:7

**d**

**d** 3:1 4:1

**dab** 42:11

**dangerous** 18:4 41:10,11,13,20

**danielle** 1:15 4:3 27:21 67:2 67:18

**date** 1:11 10:16 31:11 57:24 58:5 69:8 70:3 70:9,19 71:3 71:13,25 72:20 72:25

**dated** 3:11 29:23

**dates** 58:6

**davies** 19:15 20:9,10,13 21:16 22:1,2,5 28:19,21 30:11 31:22 32:11,15 34:6 35:7,10 35:18,22 36:5 36:15 38:2,17

38:17 39:10,19 42:10 46:6,7 47:11 51:17 52:9,14 53:1 53:17 54:9,11 54:12 55:13,19 57:19 58:8 60:10 65:17,23

**davis** 2:19 22:15 29:19,22

**day** 24:1 39:12 39:23 40:21 41:3 43:7,20 44:5,6 47:4,12 47:15,16,17 55:2 61:21 70:16 71:22 72:22

**days** 22:6 59:11 59:17,18 69:18

**deal** 60:4,6

**dear** 69:10

**debate** 37:21 38:14 39:8

**decatur** 1:14 4:8 10:20

**decided** 37:24

**decision** 32:6

**deed** 70:14 71:20

**deemed** 69:19

**defendant** 1:8 2:17 5:10

**[degree - egregious]** Page 6

| | | | |
|---|---|---|---|
| **degree** 11:2,5 11:15 | 48:14,15 58:16 | **discrimination** 15:15 17:4,10 | **door** 62:10 |
| **demotion** 22:24 | **differently** 27:8 | 18:8,16,21 | **drafted** 48:13 51:21 |
| **department** 69:21 | **difficult** 7:14 66:3 | 19:1,9 27:3,7 | **drive** 10:20 |
| **depending** 22:22 | **digital** 67:8 68:3 | **discriminatory** 18:19 | **driver's** 24:9 24:22 25:13 |
| **depicts** 53:15 | **direct** 14:11 | **discussing** 36:5 | 36:18 37:4,15 |
| **deposed** 6:14 6:17 8:13 | 17:2 18:15 22:16 24:2,4 | **dishonesty** 10:10 | 50:16 60:17 |
| **deposition** 1:10 4:6,22 6:2,6,11 | **direction** 41:20 | **dismissal** 22:24 | **drivers** 24:23 24:24 36:13 |
| 7:4 8:5 9:6,11 67:1 69:8,11 | **directive** 46:7 | **district** 1:1,2 6:5 | 37:8 40:1 41:15,23 42:1 |
| 70:1,3 71:1,3 | **directly** 7:2 | **document** 13:8 13:9,11 29:15 | 50:20 |
| **derogatory** 26:20 | **director** 19:14 55:14 | 29:17 30:17,20 | **driving** 41:12 |
| **describe** 25:1 47:19 | **disability** 14:20 17:13 | 30:24 31:2 32:15 33:13 | **due** 12:11 32:7 37:7 54:23 |
| **describing** 28:6 | **disappearance** 62:18 | 34:2,5,9 64:22 65:9 | 56:7 58:9 |
| **description** 3:7 32:18,24 40:16 | **disappearing** 61:22 | **documentation** 55:5 | **duly** 5:17 67:5 |
| 48:2,11 53:14 56:4 | **discipline** 22:17 34:19 | **documented** 59:20 | **duties** 17:24 18:4 |
| **desk** 47:12 | 42:20 49:20,22 59:17 | **documents** 9:5 9:7,9 | **duty** 18:24 44:8 53:21 56:3 |
| **determination** 56:1 | **disciplined** 42:18 | **doing** 9:24 22:12 36:17,18 | |
| **devil** 28:14 45:20 | **disciplining** 17:20 | 38:8,8 39:12 | **e** |
| **differences** 28:20 | **discovery** 6:2 | 40:7 62:16 64:19 | **e** 2:1,1 3:1,6 4:1 4:1 |
| **different** 11:9 11:11 25:13 | **discriminate** 15:19 17:10 | **donna** 30:6 39:9 45:14 | **earlier** 65:13 |
| 36:19,19 48:12 | **discriminated** 19:5,21 20:2,4 21:1 | 46:1,19 48:18 56:21 | **easier** 33:23 |
| | | | **east** 2:20 |
| | | | **education** 11:1 |
| | | | **effective** 13:14 |
| | | | **egregious** 22:20 |

**either** 16:6 47:17

**email** 30:15 32:17 69:16

**employed** 11:20,21 14:1 19:10 24:5 67:11,14 68:8 68:11

**employee** 3:8 6:21 8:14 12:11,12 13:12 13:23 14:1 15:16,19,23 16:11,18,22 17:20,23 18:3 18:8,11,18 19:4 23:2,9 26:4,7,11 27:3 27:7,8,12,16 28:4,7 34:22 36:1,3 38:6 40:13,23 51:6 51:11 52:13,17 53:2,8 55:10 56:12 58:22 67:13 68:10

**employee's** 6:23 17:18

**employees** 10:3 14:6 17:11,24 18:4 36:11 41:7 42:3 44:8 45:12 52:19,20

55:20 60:1,5,7 63:9,11

**employer** 9:24

**employment** 14:12,16,17 15:1,6,7,11 16:2,4,5,24

**enclosed** 69:11

**engaged** 48:16

**english** 37:12

**entered** 71:9

**entire** 39:18 70:5 71:5

**environment** 37:7

**equal** 14:12,16 15:1,5,6,11 16:16 21:22

**errata** 69:13,18 71:7,10,18 72:1

**es** 67:4

**escalate** 44:4

**esquire** 2:3,10 2:18

**essentially** 43:12

**ethics** 11:10

**evenings** 24:8

**events** 53:18

**eventually** 42:11

**everybody** 21:19 42:22

62:2

**evidentiary** 4:21

**exact** 28:24 29:12 30:24

**exactly** 32:9 35:16 46:12 48:1

**examination** 3:2 6:12 64:20

**examined** 5:19

**excelsior** 11:4

**except** 16:8

**excuse** 10:21 39:4

**executed** 71:10

**execution** 70:14 71:19

**exhibit** 3:8,9,11 3:13,15 13:3,4 13:8 29:4,5,9 30:19,21 33:13 33:16 44:23 48:10 53:22

**exhibits** 6:8

**expiration** 70:19 71:25 72:25

**explain** 35:18 35:22 36:4 37:11 53:4 54:21

**explained** 20:15 21:19

34:13 35:16,19 36:21 38:2 49:1,1 62:1,2

**explaining** 35:7

**f**

**facets** 11:10

**fact** 37:2 46:2 46:12 47:3 57:13

**failed** 12:14

**fair** 7:21

**familiar** 7:3 13:9 23:5

**family** 9:22

**far** 13:15,24 45:19,19 46:4 46:12 51:24 53:16 56:18,20 57:17 58:11

**fashion** 12:15

**feature** 6:9

**february** 21:8

**federal** 6:3 14:21 17:8,15

**feeling** 19:21 21:1,4

**felony** 10:7

**felt** 19:4 20:1,3 21:6,14 22:3

**field** 23:22

**final** 3:12 31:14 32:4 43:12,16 43:22 50:6

**[final - harassment]**

51:4 52:10,13
55:22 57:1,8
57:13
**financially**
67:15 68:11
**find** 19:12
45:10 69:11
**findings** 18:11
**fine** 7:6 45:4
62:5
**finish** 7:15,17
**finished** 63:18
**fired** 21:11
**firm** 11:3
**first** 3:9 5:17
11:12 14:7
21:12 25:6,18
30:2,3 32:3
40:13 48:8,12
51:4 52:12,23
52:24 59:9
**five** 44:12
58:16
**fix** 58:12
**folks** 21:7
36:16,22 41:11
52:18 60:22
**follow** 20:13
63:19 64:16
**followed** 28:24
**follows** 5:19
**foregoing** 67:3
67:4 68:4
70:13 71:18

**form** 42:20
**former** 10:3
21:11
**forth** 53:3
55:18
**forward** 21:24
34:13 69:15
**forwarded** 31:5
**found** 45:11,12
45:21 50:21
64:1,2
**four** 58:16
**fraud** 10:10
**free** 70:14
71:20
**friends** 9:22
**function** 24:17
**functions** 24:20
**further** 66:8
67:13 68:9

**g**

**g** 4:1
**garner** 21:11
**gate** 23:22
24:18,20 39:14
41:21,22 58:13
**gates** 25:16
41:22
**gender** 14:19
17:12
**getting** 21:5
47:1 52:23

**give** 33:2 58:3
59:7,13
**given** 14:5 33:4
39:19 50:6
51:4 54:18,18
54:19
**giving** 50:4
**glare** 65:6
**go** 7:4 12:9,10
12:11 24:18
36:20,22 37:18
37:19 38:11,13
39:2 41:22
43:11 44:3,5
48:10 54:10,13
55:16 57:5
59:17 61:6
63:10 64:4
**goes** 38:3
**going** 14:8
20:17 35:18
38:2,9 39:5,23
39:24 41:12,21
44:22,24 51:3
52:16 53:22,24
54:4 55:1
58:11 59:16,23
61:13 62:14
63:16 66:2
**good** 4:2 47:4
**gotten** 46:2
**great** 45:2
**grounds** 22:19
22:21

**group** 21:19
**guard** 36:12
**guess** 31:4 47:3

**h**

**h** 3:6
**half** 36:10
**hand** 5:14
**handbook** 3:8
13:12,14,17,20
13:22 14:3,6
14:12 22:17
**handle** 21:23
22:3
**hansen** 2:18
3:4 5:9,9 6:10
8:5 9:7,13,17
9:19 38:23
57:2 64:16,17
64:21 66:7
69:5
**happened**
19:12 20:17
35:6 38:10
39:20 45:9
47:13 53:15
55:7
**happy** 7:19
**harass** 15:22
**harassed** 19:5
21:4,7,15,17
**harassment**
15:15 17:4
18:8,16,19,21

[harassment - item]

19:1,10 21:20 27:11

**head** 7:11

**headquarters** 14:9

**hear** 6:8 26:17 26:23 27:15 28:3 33:15

**hearing** 5:11 8:8

**hello** 47:4

**help** 37:11 65:4

**helping** 12:11 12:12 24:23

**helps** 65:5

**hereto** 67:15 68:11

**hey** 60:8 61:21

**highest** 11:1

**hired** 21:7

**hispanic** 51:9

**hold** 11:17 12:2 12:23 23:21

**home** 37:20,24 38:11,13 43:8 43:9,11 44:3,5 54:10,13

**honestly** 39:6

**hope** 7:16 64:18

**hospital** 61:6

**hostile** 37:6,9

**hr** 18:9 19:2,6 19:10,15,18

28:18 30:16 31:5,21 33:6 49:9,16 51:15 51:15,18 52:1 52:11,15,15 53:1,4 55:13 55:14,18

**huge** 66:4

**human** 18:20 18:22 20:19,24

**i**

**identification** 13:5 29:6 30:22 33:17

**identify** 5:3

**il** 1:14 2:6,13 2:21

**illinois** 1:2 4:9 4:11 6:5 10:20 10:23 67:19

**immediate** 22:19,21

**immediately** 18:9 22:10

**important** 25:4

**inappropriate** 18:17,21 19:2

**incident** 3:15 20:20 31:11 32:19 45:5,8 45:10 46:15,19 47:20,23 48:3 48:11 51:19

53:14 56:21 60:14 61:5,9 61:12

**incidents** 22:20 59:24

**include** 24:16

**included** 50:12 51:18 69:13

**includes** 11:10 11:11

**incorporated** 71:12

**increase** 52:3,9

**indian** 51:8

**indicate** 53:24 54:4

**indicated** 31:11

**indicating** 69:13

**indirectly** 7:2

**individual** 20:19,24

**informal** 37:23

**inhaling** 61:6

**initially** 52:6 53:24

**inside** 24:9,22 25:12 36:11

**instructed** 3:17

**instruction** 38:9 40:24

**insubordinati...** 56:8,20 58:1

**intended** 4:19

**intending** 54:15

**intention** 38:12

**interact** 23:23

**interested** 67:15 68:12

**intermodal** 19:14 55:14

**inventory** 24:17 40:7 41:12 61:15

**investigate** 18:10

**investigation** 19:11

**involved** 6:23 8:12

**involving** 10:10 30:6 60:5,14 61:5,12

**issue** 21:13 37:21 38:4,14 39:9,13 43:2 46:8 49:20,22 57:15 59:1,4 63:24

**issues** 21:23 51:3 58:16 63:15 65:18

**issuing** 34:19

**item** 12:16

**[jakubowski - live]**

**j**

**jakubowski** 2:3 3:3 5:5,5,22,23 6:13 9:21 27:21 28:5 39:1 44:11,20 44:21 57:4 64:3,13
**jana** 19:14 20:9 20:10,13 21:16 22:5 28:19,21 29:18,22 30:11 31:21 32:11,15 34:6 35:7,10 35:14,17,22 36:5,15 38:2,3 38:17 39:10 41:4 42:10 46:5,10,18,21 47:6,19 49:2,2 52:9,14 53:1,3 53:17 54:9,16 55:13,19 57:19 57:21 58:8,8 58:17 60:10 65:17
**jana's** 55:24
**janine** 40:6
**jennifer** 19:24 22:14 28:11,12 28:13,15,21 39:8,14 45:11 45:17,20,23,24

48:5 53:19 58:10,12
**job** 1:16 24:21 36:17,21 37:3 42:16 51:2 56:4
**joseph** 2:10 5:7
**jperkoski** 2:14
**july** 14:2 23:19 29:24 31:12 40:17 56:11,20 56:21 57:7,12 57:14,18,24,24
**june** 8:22 21:9 23:17

**k**

**kari** 40:5
**keep** 58:17,20 58:21
**keeps** 61:22
**kept** 61:20 65:15,19
**keyboard** 58:14 61:13,17 61:21 62:3,12 62:18,20 63:8 63:12,16,20,23 64:1
**keyboarding** 61:19
**keyboards** 61:16

**kind** 6:17 24:14 25:7 59:12,14
**know** 7:19,24 9:23 10:1 12:15 13:15 14:8,9 16:14 20:10,16 21:20 21:21 23:8,11 25:4 29:8 33:13 34:11 35:21 36:2 37:18 39:7,9 40:5 41:11,24 42:6,10 46:6 46:23 47:4,5 48:24 49:2,8 53:3,4 55:21 57:10,20 58:7 58:14,17 59:1 59:8,11,14,15 60:6,7,8,16,19 60:21,24 61:20 61:21,22 62:12 62:13,18 63:23 65:13 66:3
**knowledge** 67:10 68:6

**l**

**lane** 41:24
**lanes** 42:2
**lasalle** 2:5,12
**law** 14:22 16:8 16:12,15

**laws** 4:21 17:8 17:15
**lawsuit** 8:13
**leader** 12:3
**learn** 36:22 37:5,19
**learning** 42:9
**leave** 8:24 12:8 35:19 38:11 44:6 60:23,24 62:13
**leaving** 42:12 50:24
**led** 36:5 38:20
**left** 50:21
**legal** 69:1 72:1
**letter** 29:10 37:24 38:3 54:10 69:19
**level** 11:1 49:17 52:3 54:14
**licenses** 11:17
**liked** 62:23
**line** 3:18 11:12 52:2 69:13 71:7 72:3
**list** 39:18
**listed** 71:7,17
**listen** 8:6
**listing** 71:7
**little** 39:23 44:24 65:5
**live** 39:15

**[llc - national]** Page 11

**llc** 1:7 2:17 4:8
6:1 69:6 70:3
71:3
**loads** 36:14
**local** 6:4 14:21
17:8,15
**location** 1:13
19:13
**locker** 62:17
**log** 3:15 58:7
58:18,20,21
65:7,8,11,15,16
65:17,19,24
66:2
**logistics** 23:10
**long** 11:23
12:20 23:14
59:11 60:2
**look** 22:18 62:9
**looking** 60:8
65:10
**lot** 36:7,8,16
37:9 41:12,14
41:18 59:6
60:21 61:19
**loud** 7:8
**lpc** 21:10
**lunch** 46:13
47:2 60:20,23

**m**

**m** 1:15 67:2,18
**ma'am** 7:22 8:3
8:11 10:15

11:19 13:18,21
13:24
**made** 53:10
58:2 70:7
**main** 2:20
24:16
**make** 7:7,14
8:5 41:24 56:1
64:4 65:17
**makes** 33:22
**making** 18:11
52:17,21 55:16
**malfunctioning**
24:19
**management**
11:6,7,9,11
17:9
**manager** 8:22
9:2 12:7,24
15:16,19,23
18:20 19:8
21:11 24:2,4
25:9 46:14
50:15 53:6,21
54:24
**managers**
18:20,24 24:9
25:15
**manner** 4:22
**marital** 14:19
17:13
**marked** 13:4,8
29:5 30:21
33:12,16

**massie** 1:10 4:6
5:4,4,13,16 6:2
6:14 13:7 23:5
29:8 30:19
33:13,15 39:2
44:23 48:11
55:9 57:5
64:13,22 69:8
70:4,9 71:4,13
72:20
**master's** 11:2,5
11:14
**matter** 4:7
**mckay** 40:5
**mean** 25:3 63:5
65:12
**meaning** 16:5
**means** 4:23
**medications**
10:12
**mentioned**
38:19 43:16
**mid** 23:17
**middle** 37:17
**midnight** 50:24
**midwest** 69:16
72:1
**mile** 36:9,10
60:19
**military** 14:20
17:13
**mine** 23:9
**minute** 64:6

**minutes** 44:12
55:7,8
**mischaracteri...**
38:23
**misconduct**
56:12
**missing** 61:13
63:16
**moment** 29:4
**monoxide** 61:7
**monthly** 50:2
**months** 12:1
59:9
**morning** 4:2
50:23
**move** 53:22
**moved** 21:9
**moving** 10:22
41:14,17,19
42:2
**mute** 5:14

**n**

**n** 2:1 3:1 4:1
61:10
**name** 4:2 5:4
5:22 8:19 69:6
70:3,4,15 71:3
71:4,21
**natalie** 2:3 5:5
5:23
**national** 14:18
17:12

**[nature - parts]** Page 12

**nature** 18:10
**need** 7:23
**needed** 24:18
24:19,20 33:3
50:19
**needs** 21:22
49:8
**neither** 67:11
68:7
**never** 28:6 35:1
56:19
**new** 14:6 44:5
**night** 50:15,22
**nights** 50:22
**njakubowski**
2:7
**non** 27:8
**northern** 1:2
6:5
**notarized**
69:14
**notary** 4:10
67:18 69:23
70:10,18 71:15
71:23 72:23
**note** 41:4 69:12
**notes** 41:3 64:4
64:14
**notice** 3:9,11
3:13 6:3 16:7
29:11,13,23
31:9,18 32:1
32:10 33:3,8
34:19,22 35:9

40:17 43:17
45:6 46:7,10
46:15 48:8,12
48:13 49:4
51:1,11,20
53:13,18 54:1
54:15 55:3,22
56:6 57:11
59:5
**notices** 30:14
49:14 55:17
56:18 59:2
**notified** 34:16
**november** 8:23
**number** 69:7
69:13
**numbers** 71:7

**o**

**o** 4:1
**o'clock** 50:24
**oaths** 4:11
**objection** 4:14
5:12 8:6,6,8,8
9:17 57:2
**observations**
61:3
**occurred** 40:21
45:5 55:2
**october** 10:17
51:14
**offended** 10:6
**office** 35:17
37:22 47:12,14

60:18 61:20
62:6,7,15
**officer** 39:4
67:1,2
**official** 70:15
71:21
**ohio** 69:2
**okay** 8:12 13:2
18:7 27:19,19
29:8 33:24
35:5 37:4
44:11,22 45:2
53:22 57:17
59:23,24 64:3
64:18 65:21
66:2,2,7
**once** 30:14 35:8
41:19 63:21,22
**ones** 41:17
61:19
**ongoing** 22:15
**operations**
19:14 25:9
55:14
**operator** 23:22
**opportunities**
14:16 15:1,7
15:11
**opportunity**
14:13 15:6
16:17 21:22
**organizational**
11:6,7,8

**orientation**
14:10,19 17:13
20:5
**origin** 14:18
17:12
**outcome** 67:16
68:12
**outlined** 21:21
45:6
**outside** 23:11
40:7 47:13
52:18 60:21
62:10
**own** 21:23 22:4
40:13 55:10,16
61:2,16 62:4

**p**

**p** 2:1,1 4:1
**p.m.** 44:18 64:8
64:11 66:10,12
**page** 3:2,7,18
7:7 14:11 16:1
17:2,3 22:16
69:13,15 71:7
72:3
**paper** 38:10
**park** 23:10
**part** 71:9
**parties** 4:12,15
19:12 67:12,14
68:8,11
**parts** 41:14

**[pending - purchased]**                                                Page 13

**pending** 8:1
**people** 26:21
　41:19 61:16
**perform** 17:23
　18:1,4,5 41:8
　44:8
**period** 22:6
　42:6
**perjury** 10:10
**perkoski** 2:10
　5:7,7
**permitted** 4:19
**perpetrator**
　18:13
**person** 52:1
**personal** 19:17
　63:23
**personally** 20:1
　70:11 71:15
**personnel**
　51:16
**persons** 14:17
**peter** 2:18 5:9
**phansen** 2:22
**phone** 9:14
　35:7,12,15
　53:1,10 54:9
　54:11 55:17
　69:3
**physically**
　39:10
**picnic** 60:21
**piece** 38:9

**place** 59:7,8
**plaintiff** 1:5 2:2
　5:6,8,23
**plan** 10:22
**please** 5:3,14
　7:7,10,18,23
　10:6 15:4
　22:12 27:23
　57:15 65:11
　69:11,11
**plus** 51:2
**point** 7:18,23
　10:20 50:8
　54:12
**policies** 13:13
**policy** 14:24
　15:6,10,18,22
　16:20,24 17:5
　17:18,21 18:1
　18:5,24 22:17
　27:3,7,12
**portray** 40:20
**position** 12:2,6
　23:21 51:2
**positions** 12:23
**potentially**
　41:10
**practices** 14:17
**prepare** 55:5
　65:24
**prepared** 68:3
**present** 45:7
　46:6 47:14

**prevents** 8:9
**previous** 56:7
**previously** 8:12
**primarily** 11:8
**principle** 17:8
**printed** 39:18
　39:18
**prior** 6:11 8:13
　9:5 12:4 25:8
　39:6 43:15,24
　56:5,19 67:5
**privileged** 9:20
**probably** 7:3
　50:23 51:14
　60:18
**problem** 56:19
　62:6
**procedural**
　4:20
**procedure** 6:4
　70:5 71:5
**procedures**
　13:13 39:15
**proceed** 5:21
　24:19 44:19
　64:12
**proceeding**
　1:13 4:4,18
　66:13 68:4
**proceedings**
　67:3,5,6,9 68:6
**process** 28:24
　35:3,24 36:13
　36:13 55:16

**processing**
　24:24
**produced** 4:17
**production**
　69:15,16,21
**professional**
　37:10
**professionali...**
　52:1
**professionally**
　49:6
**prohibited** 16:8
　16:11,15,19,23
　40:23 41:1
**prohibition**
　15:15
**prompt** 18:12
**promptly** 18:10
**property** 12:13
　12:14,17 38:11
**protected**
　14:21 17:14
**provide** 15:1,6
　15:11
**provided** 13:22
　14:6 30:9,11
**providing**
　14:16
**public** 67:18
　70:10,18 71:15
　71:23 72:23
**pulled** 53:20
**purchased**
　61:17

**[pursuant - remprex]** Page 14

**pursuant** 6:2
**pursue** 38:1
**put** 9:11 49:7
  62:6,12,15
  63:22
**putting** 62:16

**q**

**qualified** 14:17
  67:7
**quarter** 60:18
**question** 7:18
  7:20 8:1,7
  27:20 33:15
  65:7,8,12,16
**questions** 3:17
  7:17 8:10 10:5
  10:14 27:22
  59:24
**quick** 44:12
  65:9
**quiet** 25:3 53:4
**quite** 17:3
  49:23 63:4

**r**

**r** 2:1 4:1
**race** 14:18 15:2
  15:8 16:19,23
  17:11,18,21
  27:9 42:13
  51:6
**rail** 9:3
**railroad** 6:20
  8:16 25:10

26:3
**railserve** 11:22
  11:23,24 12:2
  12:4
**raise** 5:14
**ramp** 36:8,11
  39:12 47:16,18
  52:20 53:7,21
**rather** 59:13
**read** 49:6 70:5
  70:6,12 71:5,6
  71:17
**reading** 33:18
  69:19
**real** 65:9
**reason** 16:7,8
  16:11,14,19,23
  22:23 33:2,4
  52:11 69:14
  71:8 72:3
**recall** 46:21
  53:10 65:23
**receipt** 69:18
**receive** 11:14
  25:7 42:20,23
  43:4 57:23
  60:11
**received** 6:11
  14:2 28:22
  43:1,23 54:22
  57:13
**recognize**
  33:21

**recollection**
  66:5
**record** 4:4,5,15
  5:3 6:1 10:19
  28:1 44:14,16
  44:18 64:8,9
  64:10 65:9
  66:10 67:9
  68:5 71:9
**recorded** 4:22
  67:6
**recording** 4:17
  67:8 68:4
**redo** 31:7
**reduced** 67:7
**refer** 26:4,7,11
  38:21
**reference** 48:4
  69:7 70:2 71:2
**referenced**
  70:11 71:15
**referral** 60:5,9
  60:11
**referred** 25:17
  25:20,23 26:2
  26:18,24 60:8
**referring** 45:13
  60:12
**reflect** 6:1
**refuse** 43:10
**refused** 42:4,10
  43:11 44:8
**refusing** 41:8
  42:16 56:2

**regard** 14:18
  22:22
**regarding**
  20:19,24 60:2
**regards** 30:6
**related** 67:11
  68:7
**relationship**
  25:2
**relative** 67:13
  68:10
**religion** 14:18
  17:12
**remedial** 18:12
**remember**
  34:11,14 39:6
  39:7,11 40:5,6
  41:15 46:3,11
  46:23,24 48:1
  52:7,16 53:16
  58:6 66:1
**remote** 1:13 6:7
**remotely** 4:13
**remprex** 1:7
  2:17 3:8 4:7
  5:24 6:20 8:17
  9:2,2 10:3 12:5
  12:6,8,20,21,24
  13:12,16,23
  14:7,15 15:16
  15:19,23 16:5
  16:6,6,10 17:9
  18:9 19:10,21
  21:4,8,9,10

22:22 23:10 24:5 25:7,8,18 26:8,12,17,23 28:7 36:3,11 40:12 41:7 42:5 48:24 50:9,10 52:20 53:8,9 58:22 58:23 59:9 60:1,2,4,11 61:7 69:6 70:3 71:3

**remprex's** 62:5
**repeat** 27:22
**repeated** 28:1
**rephrase** 7:19 27:20
**report** 18:9,11 18:19,20 19:1 19:5,9,16 20:6 20:8 21:16 22:2,5,7 28:18
**reported** 1:15 19:13 20:11,14 20:15,24 22:15 28:19
**reporter** 4:2,3 5:11,20 7:9,12 27:23 28:1 44:14,17 64:7 64:10 66:9 70:7
**reporting** 18:16 28:20

**represent** 5:23
**representative** 52:11,15,15 53:2
**represented** 53:9
**request** 55:24 71:9,11
**requested** 28:2 67:21
**required** 17:24 18:5 69:23
**requiring** 17:23 18:3
**reserved** 66:11
**resource** 20:19
**resources** 18:20,22 20:24
**responsibility** 18:18
**returned** 69:18
**review** 9:5 67:21 69:12 70:1 71:1
**reviewed** 32:15
**rewrite** 34:9
**rewrote** 31:8 32:16,18
**right** 5:14 18:18 36:8 46:24 59:13 62:10 64:18,19 65:1,21 66:7

**robbins** 2:4,7 2:11,14
**role** 8:21
**rules** 4:21 6:3,4 7:4 70:5 71:5
**run** 11:9

**s**

**s** 2:1 3:6 4:1 69:15 71:8,8 72:3
**safety** 62:9
**sat** 55:20
**satan** 45:21
**satanic** 28:14
**saw** 63:2
**saying** 7:10 53:7 54:24
**says** 29:4 30:5 36:24 56:10 57:10
**schwartz** 2:4 2:11
**schwartz.com** 2:7,14
**screaming** 37:10
**screen** 6:9 13:2 29:3,4 40:18 44:22 53:13 64:18 65:6 66:3
**scroll** 17:3 57:15

**seal** 70:15 71:21
**second** 22:13 22:14 51:4 52:8
**section** 14:12 14:15 15:14 16:1,4 17:4,7 18:7,15,17 22:17,18,19 36:9
**security** 35:20 38:16,20 39:4
**see** 6:7 13:3 20:16 29:4 44:23 46:9,11 60:9 64:22 65:2,3
**seen** 29:12 30:24 58:15
**send** 31:6 49:5 49:7 59:10 60:9
**sending** 37:24 43:8,9
**sent** 6:10 9:8 30:16 34:13,13 40:9 49:15 58:15 65:20
**september** 51:14
**set** 11:9 62:7
**seven** 59:9

**[sexual - stipulation]**

**sexual** 14:19 17:12 20:5
**shack** 36:13
**shadow** 25:17 25:20,24 26:12 26:15,18,20,24 27:4,12
**shadowing** 25:21,22 26:5 26:9
**shaking** 7:11
**shannon** 68:2 68:15
**share** 6:9 13:2 29:3 44:22 64:18
**sharing** 6:8
**she'd** 54:17
**sheet** 69:13 71:7,10,18 72:1
**shift** 63:18
**short** 22:6 42:6
**show** 30:19 33:12 58:12
**showed** 47:1
**showing** 13:7
**shown** 69:15
**shrugging** 7:11
**signature** 66:11 67:17 68:14 69:14
**signed** 30:15,15 70:13 71:18

**signing** 69:19
**sincerely** 69:20
**single** 22:23 23:3 63:13
**sir** 69:10
**sit** 20:16 60:15
**site** 12:3
**sitting** 47:11
**situation** 35:8 35:18,22 36:4 48:4 49:1
**six** 50:22,22 59:9
**skills** 67:10 68:6
**slur** 27:16 28:6 28:9
**small** 65:2
**snapped** 47:5
**solutions** 69:1 72:1
**somebody** 28:9 51:18 62:19 63:2
**sorry** 15:3 16:21 21:2 26:6 27:20 33:19 49:11,12 49:21 57:6 63:9 65:5,9
**sound** 17:9
**south** 2:5,12
**speak** 9:13,16 9:22 10:2 34:7

35:10,14 38:21
**speaking** 7:16 50:4
**specific** 21:18 49:16 59:24 62:3,12,15,22
**specifically** 22:18 25:23 32:21 46:8,23 50:19
**spivey** 30:7 39:9 42:8,15 44:7 45:14,21 45:22 46:5,13 47:1,4,7 48:18 56:14,17,22
**spivey's** 42:13
**spoke** 9:15,23 9:24 21:18 25:4 30:5 32:9 32:13 51:17 65:13,15
**spot** 62:15
**st** 2:21
**stamped** 65:10
**stand** 27:23
**standing** 37:16
**start** 14:7 36:16 42:9 44:5 58:8
**started** 21:12 25:6 42:11 62:16 63:22

**starting** 25:18 42:7
**state** 7:8 10:22 14:21 17:8,15 49:2 56:18 67:19 70:10 71:15
**stated** 16:16 28:13 35:6 36:7 37:20 54:18
**statement** 56:11,15 57:12 70:13,14 71:19 71:19
**statements** 47:6,8 56:7
**states** 1:1 14:15 15:14 16:4 17:7 18:7,17 22:20 37:7 48:16 54:7 56:6
**status** 14:19,20 17:13,14,14
**stay** 37:10
**stayed** 47:8 53:3
**stenographic** 4:23
**steps** 19:8
**stipulation** 4:24

**stop** 21:22 22:12
**strategic** 11:11
**street** 2:5,12,20
**stubborn** 42:9
**stuff** 62:10
**subscribed** 70:10 71:14 72:21
**sufficient** 22:23
**suite** 2:5,12,20 69:2
**superior** 69:1
**supervisor** 8:14 12:15 19:13
**supervisors** 11:13
**supply** 62:17
**supposed** 59:4
**sure** 7:8 26:7 26:22 41:24 51:7,8 52:7 57:7 64:4 65:23
**suspects** 18:8
**suspension** 22:23 54:8,17 54:20
**swear** 4:12 5:12
**switch** 32:2
**sworn** 4:15 5:17 67:5 70:10,13 71:14

71:18 72:21
**system** 25:12 36:19
**systems** 25:14 41:22

**t**

**t** 3:6
**tables** 60:21
**take** 4:4,10 8:2 18:12 19:9 44:11 51:8 64:5
**taken** 4:7 6:2,6 47:6 67:3,12 68:9
**talk** 7:13 20:16 38:16 65:14
**talking** 43:18 53:3
**task** 40:13 41:10
**tasks** 24:12,14 41:11
**teach** 25:15
**tell** 5:18 20:3 26:14 31:23 32:2,21 38:7 45:17,24 46:18 47:19,22,24 54:13 58:19
**tenure** 50:15 51:13

**term** 26:20
**terminal** 8:22 9:2 12:7,24 19:8 21:11 24:9 25:15 50:15 53:6,6 54:24
**terminate** 16:11 38:18 43:8 44:4 55:10,15
**terminated** 6:21 16:6 23:2 23:17,18 34:16 34:23 35:8,11 35:13,23 36:3 39:21 41:8 42:7,15 44:9 54:13
**terminating** 16:18,22 35:24 38:13
**termination** 6:24 16:14 17:17 22:19,21 35:4,6 36:6 43:13 54:1 65:14
**testified** 5:19
**testifying** 67:5
**testimony** 38:24 70:6,7 71:6,9,12

**thank** 5:11,20 5:22 13:7 44:20 57:17
**thanks** 64:13
**thing** 22:11 36:23 45:23 64:17
**things** 21:21 37:11 39:5 45:3 53:7,23 63:24
**think** 7:1 23:16 36:12 50:23 64:14
**thirty** 69:18
**three** 12:1 38:11 53:9,10 63:14 64:6
**till** 50:22
**tilt** 65:6
**time** 1:12 5:2 6:16 13:24 16:7,21 21:18 22:6,14 24:5 24:11 32:7 33:7 36:2 37:18 38:5,12 39:20 40:13 41:16 42:6 44:24 49:11,15 50:8,10 55:18 59:7,8 60:18 63:13

**[timeframe - verbal]**

**timeframe** 51:12,14,16
**timely** 12:15
**times** 8:4 37:8 38:11 49:13 50:6 59:6 60:22
**titled** 14:12 16:1 17:4 18:15 22:17,18
**today** 64:15
**today's** 9:6
**told** 19:4 22:11 28:6,8,10 29:17 30:17 31:17,20 34:9 34:12 35:9 36:15,15 41:4 45:20,22 46:21 48:3,19 52:9 53:17,19 54:12 60:15 62:19 65:16
**tolerate** 21:20 21:20
**took** 30:16 60:20 62:19 63:2,18
**top** 62:17
**touch** 57:14
**toward** 50:14 51:13 56:12 58:2

**tracked** 59:21
**tracy** 1:10 4:6 5:4,16 6:2 69:8 70:4,9 71:4,13 72:20
**train** 40:1,10
**trained** 25:14 36:21 37:2
**training** 25:7 25:11,18 26:5 26:8,12,24 36:16,22 37:3 39:14 40:14
**transcribed** 70:7
**transcriber** 68:1
**transcript** 4:17 7:12 67:21 68:3,5 69:11 69:12 70:5,12 71:5,11,17
**transcriptionist** 67:8
**treat** 27:7
**tried** 37:12
**truck** 40:1 41:13,15 47:2 61:7,22 62:13
**trucks** 61:14
**true** 67:9 68:5
**truth** 5:18,18 5:19

**try** 37:10
**trying** 7:1 21:23 53:4
**turn** 64:15
**turned** 43:12
**turnover** 51:15
**two** 12:21 19:12 27:22 45:19 50:11 53:9,10 63:14
**type** 31:14,17
**types** 11:11
**typewriting** 67:7
**typical** 26:4,7 26:11 35:24 46:14
**typically** 34:18 46:17

**u**

**under** 4:20 16:19,23 24:11
**understand** 4:16 7:18 10:13 37:12 52:22 61:23
**understanding** 16:10 27:19 29:18 33:6
**understood** 7:21 8:2 25:10 63:5

**unfolded** 39:13
**unique** 34:21
**united** 1:1
**unlocked** 62:7
**unprofessional** 48:17,22 53:5
**unprovoked** 48:17,22
**upset** 63:4
**use** 31:24 32:22 61:21 62:4,14 62:23 63:12
**used** 25:14
**uses** 4:19
**using** 6:9 7:10
**usually** 50:5 59:12
**utilize** 13:17 62:3
**utilized** 50:18 61:15 63:3,6,7 63:11
**utilizing** 47:12

**v**

**v** 1:6 69:6 70:3 71:3
**vehicles** 64:2
**verbal** 30:3,6 32:3 42:21,23 43:1,4,7,15,24 44:2,3 45:13 46:1 47:20 48:21 50:4

**[verbal - written]**

51:4 52:24 54:5,7,19,21,23 55:6 56:16,24 57:7,20,23 58:3 59:2,5,8 59:13,19

**verbally** 56:10 57:11,18

**veritext** 4:4 69:1,7 72:1

**veritext.com.** 69:16

**veteran** 14:20 17:14

**video** 6:7 50:17

**videoconfere...** 2:3,10,18

**violate** 17:18 17:21

**violation** 14:24 15:5,10,18,22 18:1,5 27:2,6 27:11

**vs** 4:7 5:24

**w**

**wait** 59:16

**waived** 69:19

**wall** 62:17

**want** 35:19 36:20 37:13,18 37:19 44:4,4 49:7 50:3,3 53:23 62:3,4

**wanted** 31:6,24 33:5 37:20,23 38:5,6,13 44:5 45:2 49:5,7,15 49:16 55:19 65:19

**warned** 56:11 57:12,18

**warning** 3:10 3:12 29:10 30:2,3,4 31:15 32:3,4 42:21 42:24 43:1,4,7 43:13,15,16,19 43:21,24 44:2 44:3 48:8 50:4 50:7 51:5 52:8 52:10,23,24 54:5,22,23 55:6 56:24 57:1,7,8,13,20 57:23 58:3 59:5,8,13,20

**warnings** 56:7 56:16 59:2

**warranted** 18:13 48:8

**way** 11:12 12:12 26:2 35:20 48:24 49:16 59:14,20

**weapon** 12:18

**wednesday** 1:11 4:8

**weekend** 24:7

**weekly** 49:24 50:1

**went** 25:5 30:16 36:20 37:21 55:20,21 61:17 64:14

**white** 17:24 18:4 42:14

**wife** 9:23

**window** 47:13

**wire** 39:15

**witness** 4:12,15 4:16 5:12,17 6:22 9:18 28:3 46:16 47:5,8 67:4 69:8,11 70:1,4,11 71:1 71:4,15

**witnessed** 45:18 46:18,22 48:4 52:19

**witness'** 69:14

**word** 7:1 61:10

**worded** 49:15 49:16

**wording** 31:24 32:21 33:5 51:24

**work** 10:1 23:12 24:18,20 24:22 25:16 36:16 37:6,12 39:24 42:16

47:1 50:3 52:18

**worked** 9:1 13:16 21:8 23:9,14 24:9 25:9 26:3 36:10,11 49:1 50:22 52:18

**worker** 50:2

**working** 14:7 24:23 25:1,6,8 36:24 41:21 42:4,8,11 58:11

**works** 44:13

**worries** 33:20

**would've** 14:5 51:13 54:6

**wound** 50:16 50:24

**write** 29:15,17 31:2 34:2,12 34:18 35:9 37:23 38:9 41:4 46:14 47:7 49:5 51:10 54:10,15 59:10,19

**writing** 29:19 29:21 34:4 38:3,6 40:24 41:2 55:17

**written** 4:24 31:5 34:15

**[written - zoom]**

Page 20

35:16 43:18,19
43:21 52:23,24
54:7,19 56:11
57:12
**wrong**   59:14,16
**wrote**   34:22
40:17 46:7,10

### x

**x**   3:1,6 67:21

### y

**yard**   9:4 24:17
41:17
**yeah**   12:18
31:3 39:21
53:6 63:1
64:17 65:5
**year**   10:23
11:14,24,24
23:20 51:15
**years**   12:22
**yelling**   37:9

### z

**zoom**   6:7,9
33:22 65:3

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Exhibit E

Case: 1:23-cv-03606 Document #: 113 Filed: 06/18/26 Page 191 of 269 PageID #:1253

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLENE COLEMAN,                          )
                                           )
              Plaintiff,                   )
                                           )
        vs.                                )  No. 23 CV 03606
                                           )
REMPREX, LLC,                              )
                                           )
              Defendant.                   )

The deposition of JANA DAVIES, called by the Plaintiff for examination taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before Debra Lynn Schultz, CSR, taken via Veritext Videoconference, on April 23, 2025, at 2:30 P.M.

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

Page 2

APPEARANCES:

  ROBBINS SCHWARTZ, LTD.
  BY:  MS. NATALIE A. JAKUBOWSKI and
        MS. NIKOLETA LAMPRINAKOS
        190 South LaSalle Street, Ste. 2550
        Chicago, Illinois  60603,
        (312) 332-7760
        njakubowski@robbins-schwartz.com
        nlamprinakos@robbins-schwartz.com

             appeared on behalf of the Plaintiff;

  AMUNDSEN DAVIS, LLC
  BY:  MR. PETER E. HANSEN
        3815 East Main Street, Ste. A-1
        St. Charles, Illinois  60174
        (630) 587-7910
        phansen@amundsendavislaw.com

             appeared on behalf of the Defendant.

               * * * * *

Reported By:  Debra Lynn Schultz, CSR
License No.:  084-001307

Page 3

INDEX

WITNESS                                              PAGES

JANA DAVIES

    Examination by Ms. Jakubowski          4-53


* * * * *


EXHIBITS

                                          IDENTIFIED

Exhibit 1                                      13

Exhibit 2                                      29

Exhibit 3                                      30

Exhibit 4                                      32

Exhibit 5                                      35

Exhibit 6                                      37

Exhibit 7                                      40


* * * * *

Page 4

(Witness sworn.)

JANA DAVIES,

called as a witness, having been first duly sworn, was examined and testified as follows via Veritext Videoconference:

EXAMINATION

By Ms. Jakubowski:

Q. Good afternoon, everyone. My name is Natalie Jakubowski, and I represent the plaintiff, Charlene Coleman, in the case Coleman versus Remprex, LLC.

Let the record reflect that this is the discovery deposition of Jana Davies taken pursuant to notice and in accordance with the Federal Rules of Civil Procedure as well as the local rules for the Northern District of Illinois.

This deposition is being taken via Zoom. We can all hear and see each other. I will also be utilizing the screen share feature to share exhibits. Those exhibits were also emailed to Attorney Hansen prior to the deposition.

Did you receive those?

MR. HANSEN: Yes.

MS. JAKUBOWSKI: Great.

Page 5

BY MS. JAKUBOWSKI:

Q. Miss Davis, have you ever been deposed before?

A. One time.

Q. When were you deposed?

A. I think it was last month actually.

Q. What kind of case was it for?

A. I used to work for CSX Railroad, and there was a vender/employee that had been injured in an accident and had filed a lawsuit.

Q. So I'll just go over some deposition rules. I'm sure you're probably familiar since you just had a deposition last month.

But just so we're all on the same page, please make sure to state your answers out loud. The court reporter cannot capture shrugs or actions. We cannot talk over each other as well because that also makes it difficult for the court reporter to capture everything.

I will do my best to let you finish. If you would just do the same for me, that would be appreciated. And if at any point you do not understand a question I ask, please feel free to let me know and I can rephrase it. But if you

Page 6

answer the question, I will assume that you understood it the way that I asked it; is that fair?

A. Yes.

Q. If you need a break at any point, that is totally fine. The only caveat with that is that if there's a question pending, please just answer the question, and then we can take a break. So if you need a break at all, no worries.

And there may also be times during the deposition during which Attorney Hansen may make an objection. You should listen to his objection, but you will also be able to answer the question unless it's an objection that prevents you from answering. Understood?

A. Yes.

Q. Do you have any questions for me before we begin?

A. No, ma'am.

Q. Okay. Great. Have you ever been involved in any other lawsuits besides the one that you were deposed for last month?

A. No.

Q. Have you reviewed any documents in

Page 7

preparation for today's deposition?

A. Yes.

Q. What documents did you review?

A. Emails that had been sent previously around the timeline of the events of Miss Coleman's termination.

Q. And who are these emails between?

A. Ones between myself and Jennifer Chaplin.

Q. Were there emails with any other Remprex employees?

A. Tracy Massie would have been in some of them.

Q. And did you review any other documents besides the emails?

A. The write-ups that were issued for Donna Spivey and Charlene.

Q. And any other documents besides those?

A. No.

Q. Did you speak with anyone about your deposition today?

A. I spoke with Mr. Hansen about it, and I let my boss know, my direct manager, that I was going to be out of pocket for a few hours this afternoon.

Page 8

Q.   How long did you speak with Attorney Hansen for?

MR. HANSEN:  Objection.  Don't answer that.  Calls for privileged information.

MS. JAKUBOWSKI:  Discover the privilege, it was just a question about the timeline or timeframe that she spoke on the phone with you.

MR. HANSEN:  I'm sorry.  I misheard the question then.  My fault.

MS. JAKUBOWSKI:  No worries.  I will just repeat the question just to make it clear, Miss Davies.

BY MS. JAKUBOWSKI:

Q.   How long did you speak on the phone with Attorney Hansen for?  You don't need to tell me what you spoke about.

A.   Maybe 20 minutes.

Q.   And did you speak with any family or friends?

A.   No.

Q.   And these are just a couple questions that we ask of everyone, so please do not be offended.

Have you ever been convicted of a felony?

Page 9

A.   No.

Q.   Have you ever been convicted of a crime involving dishonesty such as fraud or perjury?

A.   No.

Q.   And are you currently on any medication that would affect your ability to understand and answer my questions?

A.   No.

Q.   I'm just going to ask you a few questions about your personal background.

What is your date of birth?

A.   5/5/76.

Q.   Happy early birthday.

A.   Thank you.

Q.   Do you plan on moving out of the State of Illinois any time soon?

A.   I don't live in Illinois.

Q.   Where do you live?

A.   Indiana.

Q.   What is your highest level of education?

A.   I have a bachelor's degree.

Q.   From where?

A.   Indiana Institute of Technology.

Q.   And what year did you graduate?

Page 10

A.   2001.

Q.   And what was your degree in?

A.   Business administration.

Q.   Do you have any other licenses or certificates?

A.   I have an Associate's Degree from Perdue in human services.

Q.   And you're currently employed with Remprex; correct?

A.   Correct.

Q.   How long have you been employed with Remprex?

A.   It was three years in February.

Q.   And what is your position title?

A.   I am the Senior Director of Operations.

Q.   Did you hold any other positions during your time at Remprex?

A.   I have been Director of Operations and Project Manager.

Q.   Did you ever hold a title of Director of Intelligent Gate Operations?

A.   Yes.

Q.   So you've held four total titles?

A.   I just shortened the Intelligent Gate

Page 11

Operations to Operations, same thing.

Q. Understood. Can you explain your duties generally in your current position?

A. I handle the BNSF, which is Burlington Northern Santa Fe, a Class 1 railroad on the western side of the U.S. We have 12 terminals that we perform operations for. Oftentimes, there's inventory involved. Sometimes there's locating and coordination, and sometimes there's payroll depending on the terminal.

Q. And can you talk about your duties generally when you were the Director of Operations?

A. For the 12 terminals, each terminal has a Terminal Manager. The remote operating center in Lisle also backs up those terminals, and they report to me as well. Any issues that they might have whether it's a technical issue, a software issue, a hardware issue, a personnel issue.

THE COURT REPORTER: Could you slow down a little, please. You're breaking up.

THE WITNESS: Yeah, when I have video on, it does that. I'm sorry.

BY THE WITNESS:

Q. So I handle anything related to software

Page 12

issue, a hardware issue, personnel issues, staffing, any communications that need to go back to the railroad or to our remote center as far as like standardization of policy and in-compliance.

BY MS. JAKUBOWSKI:

Q. And do you work out of a certain office?

A. I work out of the Lisle terminal sometimes, the Chicago terminal, the home office. I travel to the other terminals around the country sometimes. I'm not usually in one place. I'm at my home office two or three days a week, though.

Q. And when did you become the Senior Director of Operations?

A. At the end of February.

Q. And then during the year 2022, you were the Director of Operations; correct?

A. Correct.

Q. And when you're the Director of Operations, do you have the authority to discipline employees?

A. Yes.

Q. And did you have the authority to terminate an employee in that position as well?

A. I do. I generally consult with HR, but

yes.

Q.   Who do you consult with at HR?

A.   Our new HR VP is Christina Trujillo (phonetic).  I don't know how you spell her last name.

Q.   What about in 2022?  Was it is also Christina then?

A.   No.  No.  She just got hired in the last couple of weeks.  It would have been Derek Greer.

Q.   And what position was Derek Greer?

A.   I don't remember what his title was then.

Q.   I'm going to use the share screen feature now.  Can you all see my screen?

MR. HANSEN:  Yes.

BY THE WITNESS:

A.   Yes.

(Exhibit No. 1 was marked for identification.)

BY MS. JAKUBOWSKI:

Q.   Miss Davies, I will now show you a document that is marked as Exhibit 1.  I'm just going to scroll down.  Are you familiar with this document?

A.   I'm familiar with the handbook.

Page 14

Q.   When was this handbook effective?

A.   I don't know.  It says 2018 edition.  I don't know what the effective date is.

Q.   It's not the current handbook; correct?

A.   Correct.

Q.   Would this have been the handbook used during 2022?

A.   I cannot say that for sure.  I don't know.

Q.   How often do you refer to the employee handbook in your position?

A.   The current one that we're using a couple of times a month.

Q.   And what do you refer to often?

A.   Everything is in there for, like, if employees want to know what holidays we have, who is covered under bereavements, vacation accruals, the sick time, the hot line for calling off.  All of those things are housed in there and then some.

Q.   Is this handbook provided to every new Remprex employee?

A.   Yes.

Q.   Do you assist with the facilitation of providing handbooks to new employees?

A.   No.

Page 15

Q.    Who assists with that?

A.    Should be Human Resources.

Q.    And it would have been Human Resources back in 2022 as well?

A.    I can't say a hundred percent for certain.

Q.    I will now direct you to Page 3 of the handbook.  There's a section on this page titled Equal Employment Opportunity; correct?

A.    Correct.

Q.    And this section states "Remprex is committed to providing equal employment opportunities to all qualified persons and all employment practices without regard to race, color, religion, national origin, age, gender, sexual orientation, marital status, disability, military or veteran status, or any other characteristic protected by federal, state or local law;" correct?

A.    Correct.

Q.    Is it a violation of the Equal Employment Opportunity Policy to not provide equal employment opportunities to someone on the basis of their race?

A.    Yes.

Q.    And is it a violation of this policy to

Page 16

not provide equal employment opportunities to
someone on the basis of color?

A. Correct.

Q. The section also states that there is a
"prohibition against discrimination and harassment
by any Remprex employee or manager;" correct?

A. Yes.

Q. Is it a violation of this policy to
discriminate against a Remprex employee as a
manager or employee; correct?

A. I'm sorry. Can you repeat the question?

Q. Is it a violation of this policy to
discriminate against a Remprex employee as a
manager or employee?

A. As a manager of an employee? Is that what
you said?

Q. As a manager or employee.

A. Oh, yes.

Q. Is it a violation of this policy to harass
a Remprex employee as a manager or employee?

A. Yes.

Q. There's also a section here titled At-Will
Employment; correct?

A. Yes.

Page 17

Q.   And this section states "Employment at Remprex is at-will meaning that your employment with Remprex can be terminated by either you or Remprex at any time, with or without notice, for any reason or for no reason, except as prohibited by law;" correct?

A.   Yes.

Q.   Is that your understanding that Remprex cannot terminate an employee for a reason that is prohibited by law?

A.   Correct.

Q.   Do you know of any termination reason that would be prohibited under law?

A.   I would assume when you're talking about the equal opportunity employment that's listed above that you just read out loud.

Q.   So it's your understanding that violating the equal employment opportunity in terminating an employee on the basis of their race or color would violate the At-Will Employment Policy?

A.   Yes, ma'am.

Q.   I'll now direct you to Page 27.  Bear with me as I scroll to get there.

There's a section on this page titled

Page 18

Anti-discrimination and Harassment Policy; correct?

A.    Correct.

Q.    And this section states that "In compliance with federal, state and local laws and as principle of sound business management, Remprex does not discriminate or allow discrimination against applicants or employees on the basis of race, color, religion, national origin, age, gender, sexual orientation, marital status, disability, military or veteran status, or any other status protected by federal, state or local law;" correct?

A.    Correct.

Q.    Would termination on the basis of a employee's race violate this policy?

A.    Yes.

Q.    Would disciplining an employee on the basis of their race violate this policy?

A.    Yes.

Q.    Would requiring a black employee to perform duties that white employees are not required to perform be a violation of this policy?

A.    Yes.

Q.    And would requiring a black employee to

Page 19

perform dangerous duties that white employees are not required to perform be a violation of this policy?

A. Yes.

Q. The section also states that "Any employee that suspects discrimination or harassment should report it immediately to Human Resources. Remprex will promptly investigate all complaints of this nature and report its findings back to the employee making the allegation and take prompt remedial action against the perpetrator if warranted;" correct?

A. Yes.

Q. I will now direct you to a section titled Reporting Discrimination, Harassment or Inappropriate Conduct. This section states "It is the right and responsibility of each employee to report any harassment or discriminatory conduct to a Manager or Human Resources. Managers must report all discrimination, harassment or inappropriate conduct complaints to Human Resources;" correct?

A. Correct.

Q. And in your position as Director of Operations, did you have this duty to report

Page 20

complaints up to Human Resources?

A.   Yes.

Q.   And all managers have a duty to report all discrimination, harassment and inappropriate conduct to HR; correct?

A.   Correct.

Q.   If an employee told a manager they felt discriminated or harassed and then the manager told you, would you report this to Human Resources?

A.   Yes.

Q.   What steps would you take to report such a complaint to Human Resources?

A.   If I had something in writing, I would turn that over.  If it were a verbal conversation, I would ask for something in writing to be able to have the facts of the situation to give to HR. Obviously, if it were a video or picture or something, I would present that to Human Resources.

Q.   And would Human Resources follow up with you?

A.   I would assume so.

Q.   Have you ever reported such a complaint to Human Resources?

A.   I have.

Page 21

Q.   Have you ever reported specifically a discrimination claim to Human Resources?

A.   Not specifically discrimination.

Q.   What about harassment?

A.   I can't think of one other than in this case.  I can't think of any others.

Q.   And when you say "in this case," what are you referring to?

A.   Other than in the case of Charlene Coleman with Jennifer Chaplin, I can't think of any others that I've had to do that.

Q.   So you have only ever reported one claim of harassment to Human Resources?

A.   At Remprex, I believe so.

Q.   And did Human Resources follow up with you after you reported the complaints?

A.   Yes.

Q.   What did they do to follow up with you?

A.   I know I talked to Derek Greer about this situation a few different times and how to approach it.  I know that we had verbally talked to Charlene about the comments that she made about Jennifer Chaplin, and then when they did not stop, I did talk to Derek again, and he suggested putting

Page 22

something in writing for her, which we did.

Q. So you never made any reports to Human Resources about any complaints that Charlene Coleman had; correct?

A. I never received a complaint from Charlene Coleman.

Q. I will now direct you to Page 36. There's a section here titled Discipline Policy. We're going to look at the subsection Grounds for Immediate Termination.

The section states "Certain egregious incidents or conduct can constitute grounds for immediate termination. Depending on the circumstances, Remprex may regard a single act as sufficient reason for suspension, demotion or dismissal;" correct?

A. Correct.

Q. How many times have you terminated an employee?

A. At Remprex or in my career?

Q. At Remprex.

A. Okay. At Remprex, probably 30, 35, somewhere in there, I'm guessing.

Q. And out of those 30 to 35, how many did

Page 23

you terminate for a single act would you say?

A.    A single act?  That's a hard one because job abandonment happens quite a bit.  People stop coming to work, that they have to not come multiple days, so I don't know if you consider that a single act.  If that's a single act, then a lot.

Q.    What about besides job abandonment?

A.    Violation of drug policy has been on the spot.  Those are the only ones that I can really tell you off the top of my head was immediate.  Yeah.  Like failure to call or appear, that has to happen repeatedly, those kinds of things so --

Q.    And what process did you follow to terminate an employee?

A.    On which issue?

Q.    Let's say for a single act.  What is the typical process you would follow?

A.    For job abandonment, if they don't come, the first day we do try to call the employee to make sure they weren't in an accident or something didn't happen or whatever.

The second day, sometimes we'll try to give them a call, too, but when you get past that, generally, that's when we shoot the email over to

Page 24

HR, hey, so and so missed 4/1, 4/2, 4/3. You know, they are now subject to termination for job abandonment.

Q. And how many times did you say you've terminated an employee for their behavior in the workplace?

A. I can't give you an exact number on any of these without, like, combing through records, but more than once. But that's not, in general, the leading item that somebody gets terminated for. It's generally attendance.

Q. Would you say maybe more than once but less than five times?

A. Yeah. Probably. I don't know. Probably.

Q. Would it have been more than ten?

A. No.

Q. Do you recall any of the situations specifically?

A. Not without going back and combing through files and trying to dig into that.

Q. Miss Davies, are you familiar with Charlene Coleman?

A. Yes.

Q. And how do you know Charlene?

Page 25

A.   Charlene was employed at the BNSF LPC terminal.

Q.   And in what capacity did you interact with Charlene, if ever?

A.   I didn't interact with her a lot.  Like I said, I visit the terminals, but I'm not, in general, in the DA or out doing inventory or any of those job functions, but when visit, I do interact with the employees.

Q.   Did you ever have a one-on-one conversation with Charlene?

A.   I did.  I did.  On the day that I was there and I was inside and overheard her and Donna get into an argument.

Q.   But that was the only time you had a conversation Charlene?

A.   I don't remember having any kind of one-on-one with her other than that day.

Q.   And you were not involved at all with Charlene's hiring; correct?

A.   Correct.

Q.   And you said that Charlene never came to you with any workplace complaints; correct?

A.   So the day that she and Donna got into the

Page 26

argument, she did come to me after I had sent Donna home and was complaining about Jen Chaplin.

Q. What did she say about Jen?

A. She said that Jen smelled bad, like had this demonic aura, which was something that had been reported to me previously so I, again, told her that isn't how we talk about people. We are not going to do that, especially in the workplace. It's unprofessional. It's unfounded. I did have that discussion with her on that day.

Q. Did she tell you anything else besides Jen smelling bad or having a demonic aura?

A. I remember she called her dad and brought her cell phone in and wanted me to talk to her dad, and I politely declined and stated I could not discuss employment matters with anyone other than the actual employees. And I had her write up her statement on what happened with her and Donna.

Q. Why did she call her dad?

A. I don't know.

Q. She didn't explain why she was calling her dad?

A. She said she wanted me to talk to her dad about all of it, and I told her I could not do

Page 27

that.

Q. And when she said "all of it," do you believe she was referring to the situation with Donna that had occurred?

A. That was what I assumed she meant.

Q. Do you think she may have meant any other complaints in the workplace that she had?

A. I don't know.

Q. And did you tell anyone else about these complaints that Charlene had?

A. I called Derek Greer.

Q. And what did you tell Derek?

A. That because I had talked to him previously about this, that she was continuing on this line with Jen, and did we want to put something on paper at that point because she's been warned not to do this, that this isn't creating an environment we want in the workplace, and he agreed that we needed to give her some notice in writing on that.

Q. And how did you know that she had done this before?

A. Tracy Massie reported it to me.

Q. Do you recall how long before the incident

Page 28

he reported that to you?

A. I do not.

Q. And what did Tracy tell you?

A. The same thing that she was saying, Jen had this aura, that she couldn't sit in a chair that Jen had sat in without a raincoat or something like that on the chair. And I don't know if that was a chair in the office or it was the vehicle. I don't remember which one it was, but it was that line of talk, that she couldn't be in close proximity to her and that she smelled very bad, that kind of thing.

Q. Did Tracy tell you that Charlene had called Jennifer a slur?

A. I don't recall that.

Q. Did Jennifer Chaplin tell you that Charlene had called her a slur?

A. I don't recall that.

Q. Did you report Jennifer's complaints to anyone else besides Derek Greer?

A. No.

Q. And did Derek reach back out to you to follow up about the complaints from Jennifer?

A. Well, he did because we ended up issuing

Page 29

Charlene discipline off of that conversation.

(Exhibit No. 2 was marked for identification.)

BY MS. JAKUBOWSKI:

Q. I'm going to show you now what is marked as Exhibit 2.

Are you familiar with this email? Please let me know if you need me to zoom in at all.

A. I had forgotten about it, but reading it then, yes, I was familiar with it.

Q. Did you discuss this situation with anyone?

A. I don't remember about this one because the keyboard wasn't actually missing, so I don't feel like this one went anywhere. But the actual details of it from July of '22, I don't -- I don't remember.

Q. So you don't know what ended up happening with the keyboard; correct?

A. I don't remember. I remember that it wasn't actually missing, but I don't remember that.

Q. And how did you find out that it wasn't actually missing?

Page 30

A.   I let her know it was in Truck 62, and it was plugged in this morning.

Q.   That's how you knew that it wasn't missing?

A.   Yeah, because it was in the truck.

Q.   And did you speak to Charlene about this keyboard situation?

A.   No.

Q.   And do you know if Human Resources spoke to Charlene or Jennifer about this situation?

A.   I don't know.

              (Exhibit No. 3 was marked for
              identification.)

BY MS. JAKUBOWSKI:

Q.   I will now show you what is marked as Exhibits 3.

     Are you familiar with this document?

A.   Yes.

Q.   What is this document?

A.   This is an email.  It looks like it's dated July 14th, 2022, from Jennifer Chaplin to myself about Charlene Coleman.

Q.   And what was the email about specifically?

A.   This was -- in reading it, Jennifer was

Page 31

talking about how -- I mean, do you want me to read it or what do you want?

Q. Just from your recollection, what was this email about generally?

A. About the things that Charlene was saying about Jennifer and how it was making Jennifer feel.

Q. Do you believe Jennifer was feeling harassed?

A. Yes.

Q. Did you forward this email to anyone?

A. I'm sure I sent it to Derek Greer, but I can't a hundred percent tell you what I did in 2022.

Q. Do you recall speaking to anyone about this email or these complaints?

A. I know Derek and I talked about this.

Q. And do you know if Derek followed up with Jennifer?

A. I don't know.

Q. And you didn't follow up with Jennifer about this; correct?

A. I know I talked to Jennifer about this, but the lines are so blurred on the timeline there since it was so long ago. I can't tell for certain

Page 32

when.

Q. But you do recall speaking to Jennifer about the complaint after she sent the email; correct?

A. I do.

Q. And did you receive any direction from Human Resources as to how to address this complaint?

A. As I stated previously, we did provide discipline to Charlene.

(Exhibit No. 4 was marked for identification.)

BY MS. JAKUBOWSKI:

Q. I'm going to show you what is marked as Exhibit 4.

Are you familiar with this document?

A. Yes.

Q. What is it?

A. This is a Corrective Action Notice given to Donna Spivey.

Q. And when did -- this Corrective Action Notice, when was it drafted?

A. It says the date of the incident was 7/14. I don't know if there's another -- of '22. I don't

Page 33

know if there's another date below.  I can't see the bottom.  That says 7/18 is when it was given to her, of '22.

Q.    And did you write this document?

A.    I wrote that with Derek Greer.

Q.    And you witnessed this incident; correct?

A.    That correct.

Q.    Can you explain what you witnessed that day?

A.    So I was inside of an office that we have in the building labeled 106.  I was by myself in the building, and at the corner of the building there's -- on the one side, there's a picnic table where employees can sit and take a break, and that's where in the front of the building the employee trucks are parked where they come and go and leave the trucks right outside of the terminal fence.  And I heard Donna yelling at someone, and then I didn't know who it was at first, but then I heard fuck you, Charlene, more than once.  I never heard Charlene say anything during that, but when I heard the yelling and the foul language, I did go outside and was like, hey, what's going on.

And I asked them to come in the office

Page 34

and to get statements from both of them because both of them when I went out there said there was no problem.

Q.   And what did you do after you intervened?

A.   I got the statements from both of them, which both statements were not necessarily, I'm assuming, the whole truth, especially since Donna did not say that she said a lot of the things I actually heard her say to Charlene.  And I did tell Donna that due to the language she was using and the volume of her voice, I was sending her home without pay pending the investigation.

I did ask Charlene to write a statement.  She did write a statement as well.  I did present those to Derek who said I did the right thing sending Donna home, and I know I got those over to him.

Q.   And Donna went home without pay pending investigation.  Did you conduct the investigation?

A.   Well, yes, because I got the statements from both of them and sent them to Derek and consulted with him, and the decision was made to give Donna a final warning for this behavior because it was egregious.  We weren't going to go

Page 35

through a verbal or a Step 1. This one was serious enough it went right to a final warning for her.

Q. And Donna's Corrective Action Notice is only pertaining to the incident that occurred that day; correct?

A. Correct.

(Exhibit No. 5 was marked for identification.)

BY MS. JAKUBOWSKI:

Q. Okay. Now I'm going to show you what is marked as Exhibit 5.

Are you familiar with this document?

A. Yes.

Q. What is this document?

A. This is after I had sent Donna home, Miss Coleman came in the office and was talking about Jennifer, which didn't make sense because Jennifer wasn't even there, and saying that Miss Chaplin had a demonic aura and all these other -- and I told her you've been told not to talk like that. You've been told this is not professional. This is not how we talk about our co-workers. You don't have to like her, but we're not going to do this, and that's when she left the

Page 36

room.  She came back with her dad on the phone, and I was, like, I'm not talking about this any longer.

And I know I called Derek and said, hey, what do you want me to do with this?  She's not stopping.  And he agreed that we needed to put something into writing for her, and that's where this document came from.

Q.   And this document is marked as a First Warning; correct?

A.   Correct.

Q.   And did you draft the description of the incident here?

A.   Did I do what?  I'm sorry.

Q.   Did you draft the description?

A.   Draft the description?

Q.   Did you write the description?

A.   Oh, yes.  Sorry.

Q.   Did anyone else assist you with writing the description?

A.   Derek Greer.

Q.   And was this the final version of the Corrective Action Notice?

A.   I believe so.

Page 37

(Exhibit No. 6 was marked for identification.)

BY MS. JAKUBOWSKI:

Q. I will now show you what's marked as Exhibit 6.

Are you familiar with this document?

A. Sorry. Something is on my screen. It's been enough time I'm not -- this one doesn't look like one I wrote, but I'm not going to tell you I've never seen it. I don't know.

Q. So you did not assist with writing this one?

A. I cannot say yes or no to that.

Q. And this Corrective Action Notice indicates it's a final warning; correct?

A. Yes, it does.

Q. Were you aware that Charlene received a final warning for this conduct?

A. I don't remember what she received for that honestly.

Q. But you initially drafted it as a First Warning; correct?

A. I think so, yeah.

Q. Do you think the type of corrective action

Page 38

for Charlene's behavior was appropriate as a First Warning?

A.    I'm not an HR personnel expert by any means.  This was one of those cases where it -- the Donna Spivey incident, no, Charlene would not have been terminated for her part in that.  I didn't hear indirectly whether there was anything there, but the continued bringing up of Jennifer was concerning.  I honestly could see that going either way.

Q.    And this Corrective Action Notice indicates that there's two separate incidents in the description; correct?

A.    This one?

Q.    Yes.  This one on the screen.

A.    She had an unprovoked and unprofessional conversation, which that's one incident to me, because it was that Donna incident that brought the Jennifer incident in.  I don't know.  It looks like the same one.

Q.    So is it your belief that the Donna Spivey incident and the Jennifer Chaplin incidents are the same incident?

A.    As far as Charlene goes?  I don't --

Page 39

there's no two separate discipline incidences for her for that. She wasn't disciplined in the Donna Spivey incident. It was when I was investigating, she took a statement that she said everything else that led to her discipline.

Q. But this Corrective Action Notice states that Miss Coleman engaged in an unprovoked and unprofessional conversation; correct?

A. Yeah, but the word "unprovoked," it's not on Miss Coleman on that, the Donna Spivey situation.

Q. This is Charlene Coleman's Corrective Action Notice; correct?

A. Yes.

Q. So this is discipline issued to Miss Coleman; correct?

A. I don't know. I don't see a signature on that document. Is there one on there? No.

Q. Do you, personally, believe that Miss Coleman engaged in an unprovoked and unprofessional conversation with Miss Spivey?

A. I was not out there to witness what the start of that. It was definitely unprofessional on Donna's part. I'll tell you that.

Page 40

Q.   From what you witnessed, was it unprofessional on Charlene's part?

A.   I did not witness any part of Charlene's conversation with Donna.

Q.   Did anyone witness Charlene's conversation with Donna?

A.   Not to my knowledge.

Q.   Do you know why the Corrective Action Notice for Charlene ended up being a final warning instead of a first warning?

A.   I can't say without signatures which one of those was actually administered.

Q.   Is it common for the type of corrective action to be increased?

A.   After an investigation it could be if more facts were found out.  I don't know that I'd say common, but I won't say it can't happen.

Q.   And is it common practice to include separate incidents in the same Corrective Action Notice or separate them?

A.   I can't say that I have any experience separating or condensing.

(Exhibit No. 7 was marked for identification.)

Page 41

Q. I'm going to show you now what is marked as Exhibit 7.

Are you familiar with this document?

A. I know that she was terminated, but terminations are -- termination statements are done by HR and sent out by them, so I did not write this.

Q. Do you know who wrote this?

A. I do not.

Q. Are you familiar with the situation that is described in the description?

A. I am.

Q. How are you familiar?

A. Because Tracy called me and said I don't know what to do. We had some issues with the trucks. There is actually anti-freeze leaking from one of the trucks and the other ones were taken, and he said he told Charlene to go to Lot 15 to train, and she didn't want to do that. So then he told her to go to the DA to train, and she didn't want to do that. There was no choice but send her home. I mean, if you're not going to work, why are you there being paid?

Q. Did Tracy ask you if he could terminate

Page 42

Charlene?

A. No. He asked if he could send her home.

Q. And what did you say?

A. Absolutely.

Q. And did you tell Tracy --

THE COURT REPORTER: You're breaking up. Can you repeat that, please?

MS. JAKUBOWSKI: No problem.

BY MS. JAKUBOWSKI:

Q. Miss Davies, is it true that you told Tracy to terminate Charlene that day?

A. I do not know if it was that day on the spot or if I talked to Derek and we terminated the next day. I know I told him to send her home without a doubt because I wanted to talk to Derek about it.

Q. Are you aware that Charlene was terminated that same day?

A. I don't remember if it happened the same day or the next day. I really don't remember.

Q. On the Corrective Action Notice, it says that the day of the incident was July 28th; correct?

A. Yes.

Page 43

Q.   Is it common for employees to be immediately terminated by the Terminal Manager?

A.   No.

Q.   Does the Terminal Manager have that authority to do so?

A.   No.

Q.   Did you discuss termination with Tracy after July 28th?

A.   I don't know.  I don't have a recollection of the date line on this.  And if it happened on the 28th and the termination is on the 28th, then it must have all happened on the same day, but I don't recall the exact timeline there.  If it was that day or the next day, I don't recall.

Q.   Are you aware of any employees who have been terminated for refusing to perform an assignment?

A.   That doesn't happen often, no.

Q.   Are you aware of any employees who have refused to perform an assignment before but were not terminated?

A.   Not that I'm aware of.

Q.   And if an employee says that there's a hostile work environment that they don't want to go

Page 44

into, shouldn't you figure out why the work environment is hostile?

A. If I have a claim of a hostile work environment, yes, I would investigate it.

Q. Did you investigate the hostile work environment that Charlene referenced when she told Tracy she didn't want to work?

MR. HANSEN: Object to form.

BY MS. JAKUBOWSKI:

Q. Go ahead, Miss Davis. You can still respond.

A. Okay. I'm sorry. I didn't know what that meant.

Well, the fact that she was given the option to go to Lot 15 and work and she wouldn't do that, and then she was told to work in the DA and train in there and she refused to do that, and just a few weeks prior we had all these other issues, that work environment had been investigated, and it wasn't a hostile work environment, and she had an option to work in two separate places and wouldn't do either.

Q. And when you spoke with Tracy over the phone, did he tell you that he was going to

Page 45

terminate Charlene?

A. I don't remember him using those words. I remember him saying he wanted to send her home.

Q. And what investigation did you do prior?

A. The one that we just discussed from July 14th.

Q. And that was the investigation into Miss Coleman's conduct?

A. And to Donna's and to Charlene's and to what was happening with Jen, all of that that we just discussed.

Q. I'm just going to go through some other incidents as well. Are you aware of the shadow incident?

A. I am aware that there was exception taken to talking about job shadowing.

Q. What do you mean there's exception taken?

A. That Charlene was instructed to shadow another person, and she got upset about it.

Q. Do you know why she was upset?

A. And I -- I don't remember if I was told about this at the time or this is after. So I cannot tell you when exactly this was, but that after Charlene was terminated, I know I was made

Page 46

aware of her being upset because they told her to shadow people, which is common practice, what we do every single day. On-the-job learning is job shadowing. It is following the person that's already qualified and trained in the job to learn the functions of the job. And I don't recall being made aware she had an issue with that term while she was employed, but I do recall after them saying, oh, she was really upset about that.

Q. And it's common to call employees who are in this training process as shadowing; correct?

A. Yes. They job shadow the qualified person.

Q. Is it common to refer to them as the shadow?

A. No.

Q. Have you ever heard anyone be referred to as the shadow?

A. Not one time.

Q. Are you aware that Charlene was being referred to as the shadow?

A. I was never told that. I never heard that.

Q. Would it be a violation of Remprex

Page 47

discrimination to call a black employee a shadow after they asked to not be called that?

A. If they're being called a derogatory name, that would be a violation. But if they're being told you are going to shadow today, no, that is not a violation.

Q. What if the employee expresses that they feel it is in a derogatory manner?

A. Then that should be escalated and addressed with the situation at the time.

Q. And what process should be followed to escalate and address the situation?

A. Per the handbook, it should go to HR.

Q. And any manager who witnessed such should have reported it; correct?

A. Well, if they heard them to tell her to shadow, no, because she have would have been told that everyday of the week. We use that term. If she voiced discomfort at that to a manager, that should have been escalated.

Q. Would it be a violation of Remprex's harassment policy to call a black employee a shadow after they asked to not be called that?

A. Yes.

Page 48

Q. Are you aware of a bet between certain Remprex employees regarding how long Charlene would last at Remprex?

A. No, I'm not.

Q. Are you aware of a deal between Remprex employees involving a referral bonus?

A. No.

Q. Are you aware of an incident where Charlene was told to sit away from others?

A. No.

Q. Are you aware of an incident where someone told Charlene they are a murderer, so she should not make her angry?

A. No.

Q. Are you aware of an incident involving Charlene being told to pull a wire or cord?

A. If you're talking to when Jen was training her in the lane on one of the kiosks, Jen did let me know that Charlene was hesitant to perform the duties that she was trying to train her on.

Q. Do you know why Charlene was hesitant to perform that duty?

A. Well, what she said was to pull a wire in a running machine, but we don't have running

Page 49

machines out there.  We have kiosks that we turn off and on.  It's not a manufacturing situation. It's a kiosk the driver pushes numbers into, and sometimes it will get stuck, and we have to go out there.  We call it power cycle but, essentially, it's open the cover and turn it off and on.

Q.  Do you think someone working on this for the first time might be hesitant to pull a wire or cord on it because they are fearful they could get hurt?

A.  I never heard of that before this or since.

Q.  Is it common to have employees who are working on an assignment or task for the first time to do it before observing someone else do it?

A.  Yes.

Q.  Are you aware of an incident involving Charlene having to go to the hospital after inhaling carbon monoxide from a Remprex truck?

A.  Carbon monoxide?  No.

Q.  Are you aware of an incident involving Charlene having to go to the hospital?

A.  I'm aware that she requested to go, that she wanted to go to the hospital, and the truck had

Page 50

an anti-freeze leak, not carbon monoxide.

Q. Do you know what Remprex did to fix the truck after, if they did?

A. Put it out of service and got the anti-freeze leak fixed.

MR. HANSEN: Natalie, I hesitate to ask because I think you're wrapping up. Can I take, like, five minutes, please?

MS. JAKUBOWSKI: No worries. Yeah. No problem at all. We are wrapping up soon but, yes, let's take a break. No problem. Let me also stop screen sharing, so we can talk face-to-face instead of minus the screen the whole time. Let's do -- you want to do five minutes, or do you need more time?

MR. HANSEN: Five minutes I'm sure is fine.

MS. JAKUBOWSKI: Thanks.

(A short break was taken.)

BY MS. JAKUBOWSKI:

Q. Miss Davies, did you ever tell Tracy Massie to keep a log of incidents involving Charlene?

A. I tell all of my managers to keep a log of

Page 51

incidents involving any employee they have concerns over.

Q. And why did you tell Tracy to do so for Charlene Coleman specifically?

A. I don't remember telling him to do so for Charlene specifically.

Q. So you tell managers just generally to keep a log of incidents?

A. We have a meeting once a week with the TMs. We talk about all the issues in the terminal, and if a manager has an issue, the process is always documented so that we have the facts, that that is the direction given to every Terminal Manager for every employee.

Q. And is it your testimony that you investigated all of Charlene's complaints relating to race discrimination or harassment?

MR. HANSEN: Objection. Misstates prior testimony.

BY MS. JAKUBOWSKI:

Q. Go ahead, Miss Davies. You can still answer.

A. No. I testified that she's never reported a racial discrimination issue to me.

Page 52

Q. And no one has ever reported seeing race discrimination or harassment against Miss Coleman in the workplace to you either?

A. Correct.

Q. And just a general question about the workplace. When employees would have a personnel issue in the workplace, would they come to you or to Human Resources?

A. They can do either as they are comfortable and see fit.

Q. And what do you think is more common for employees to do?

A. I would assume they would go to HR.

Q. And was it clear to employees who they would go to to contact HR?

A. Yeah. They go through two days of orientation with all of that information when they first start before they start in the terminal.

Q. And does Human Resources ever visit the terminals?

A. They have a few times.

Q. Why would they visit the terminals?

A. To see where the employees that we employ are working, the conditions, to get their face out

Page 53

there to make themselves familiar so employees know who they're talking to, face with the name kind of thing.

Q. And would you say that was the same back in 2022 as well?

A. I believe I've seen -- I know Derek was out at LPC and at Willow Springs at least once, and since then with the different people that we've had come and go, I've seen them definitely at LPC just because of the size of it. It's a a great terminal to be able to see the operation at.

Q. Let me just briefly check over my notes, but I think that might be all I have for you today.

MR. HANSEN: I knew I should have waited. Sorry about that.

MS. JAKUBOWSKI: No worries. I think that's everything I have. Attorney Hansen, if there's anything you want to follow up on, please.

MR. HANSEN: No questions.

MS. JAKUBOWSKI: Okay. Great. That's all then.

Debbie, I will mark the exhibits and email them over to you to be attached to the transcript.

Page 54

THE COURT REPORTER: What about signature?

MR. HANSEN: Yeah. Yeah. We'll reserve.

THE COURT REPORTER: Natalie, are you ordering this?

MS. JAKUBOWSKI: Yes, please.

THE COURT REPORTER: Mr. Hansen?

MR. HANSEN: Copy, please.

MS. JAKUBOWSKI: Great. We're all set. Thank you very much for your time. I appreciate it.

FURTHER DEPONENT SAITH NAUGHT

(Proceedings concluded at 3:45 p.m.)

Page 55

STATE OF ILLINOIS )
                  )  SS:
COUNTY OF LAKE    )

         I, Debra Lynn Schultz, CSR, do hereby certify that JANA DAVIES was duly sworn by me to testify the whole truth, and that the foregoing deposition was recorded stenographically by me via Veritext Videoconference and was reduced to computerized transcript under my direction, and that the said deposition constitutes a true record of the testimony given by said witness.

         I further certify that the reading and signing of the deposition was not waived, and that the deposition was submitted to Mr. Peter E. Hansen, defendant's counsel, for signature. Pursuant to Rule 30(e) of the Federal Rules of Procedure, if deponent does not appear or read and sign the deposition within 30 days, the deposition may be used as fully as though signed, and this certificate will then evidence such failure to appear as the reason for signature not being obtained.

         I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

         IN WITNESS WHEREOF, I have hereunto set my hand this

         *Debra Lynn Schultz, CSR*

         Debra Lynn Schultz, CSR
         Illinois CSR License 084-001307

Page 56

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

May 6, 2025

To: Peter Hansen, Esq.

Case Name: Coleman, Charlene v. Remprex, LLC

Veritext Reference Number: 7334454

Witness:  Jana Davies      Deposition Date:  4/23/2025

Dear Sir/Madam:

Enclosed please find a deposition transcript.  Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change.  Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

Page 57

                    DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS

        ASSIGNMENT REFERENCE NO: 7334454
        CASE NAME: Coleman, Charlene v. Remprex, LLC
        DATE OF DEPOSITION: 4/23/2025
        WITNESS' NAME: Jana Davies
        In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
        I have made no changes to the testimony
as transcribed by the court reporter.


_____        _____
Date                         Jana Davies
        Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

        They have read the transcript;
        They signed the foregoing Sworn
                Statement; and
        Their execution of this Statement is of
                their free act and deed.

        I have affixed my name and official seal

this _____ day of_____, 20_____.


                _____
                Notary Public
                _____
                Commission Expiration Date

Page 58

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7334454
CASE NAME: Coleman, Charlene v. Remprex, LLC
DATE OF DEPOSITION: 4/23/2025
WITNESS' NAME: Jana Davies

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____          _____
Date                      Jana Davies

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:
    They have read the transcript;
    They have listed all of their corrections
        in the appended Errata Sheet;
    They signed the foregoing Sworn
        Statement; and
    Their execution of this Statement is of
        their free act and deed.
    I have affixed my name and official seal
this _____ day of_____, 20_____.
            _____
            Notary Public


            _____
            Commission Expiration Date

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

Page 59

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 7334454

PAGE/LINE(S) /        CHANGE        /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____        _____

Date                     Jana Davies

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

                 _____

                 Notary Public

                 _____

                 Commission Expiration Date

**[03606 - afternoon]**

Page 1

**0**

**03606** 1:5
**084-001307**
2:24 55:20

**1**

**1** 2:9 3:10 11:5
13:17,21 35:1
**106** 33:11
**1100** 56:1
**12** 11:6,13
**13** 3:10
**14th** 30:21 45:6
**15** 41:18 44:15
**1820** 56:2
**190** 2:3

**2**

**2** 3:11 29:2,6
**20** 8:17 57:16
58:22 59:22
**2001** 10:1
**2018** 14:2
**2022** 12:15
13:6 14:7 15:4
30:21 31:13
53:5
**2025** 1:15
55:17 56:4
**216-523-1313**
56:3
**22** 29:17 32:24
33:3

**23** 1:5,15
**2550** 2:3
**27** 17:22
**27th** 55:17
**28th** 42:22 43:8
43:11,11
**29** 3:11
**29891** 55:19
**2:30** 1:15

**3**

**3** 3:12 15:6
30:12,16
**30** 3:12 22:22
22:24 55:9,10
**312** 2:4
**32** 3:13
**332-7760** 2:4
**35** 3:14 22:22
22:24
**36** 22:7
**37** 3:15
**3815** 2:9
**3:45** 54:12

**4**

**4** 3:13 32:11,15
**4-53** 3:4
**4/1** 24:1
**4/2** 24:1
**4/23/2025** 56:8
57:3 58:3
**4/3** 24:1
**40** 3:16

**44114** 56:2

**5**

**5** 3:14 35:7,11
**5/5/76** 9:12
**587-7910** 2:10

**6**

**6** 3:15 37:1,5
56:4
**60174** 2:9
**60603** 2:4
**62** 30:1
**630** 2:10

**7**

**7** 3:16 40:23
41:2
**7/14** 32:23
**7/18** 33:2
**7334454** 56:7
57:2 58:2 59:2

**a**

**a.d.** 55:17
**abandonment**
23:3,7,18 24:3
**ability** 9:6
**able** 6:13 20:15
53:11
**above** 17:16
56:17
**absolutely** 42:4
**accident** 5:10
23:20

**accordance**
4:14 57:5 58:5
**accruals** 14:16
**acknowledge**
57:11 58:16
**act** 22:14 23:1
23:2,6,6,16
57:14 58:20
**action** 19:11
32:19,21 35:3
36:23 37:14,24
38:11 39:6,13
40:8,14,19
42:21 55:15
**actions** 5:17
**actual** 26:17
29:16
**actually** 5:6
29:15,22,24
34:9 40:12
41:16
**address** 32:7
47:12 56:15
**addressed**
47:10
**administered**
40:12
**administration**
10:3
**affect** 9:6
**affixed** 57:15
58:21
**afternoon** 4:8
7:24

**age** 15:14 18:8
**ago** 31:24
**agreed** 27:18
  36:6
**ahead** 44:10
  51:21
**allegation**
  19:10
**allow** 18:6
**amundsen** 2:8
**amundsenda...**
  2:10
**angry** 48:13
**answer** 6:1,7
  6:13 8:3 9:7
  51:22
**answering** 6:14
**answers** 5:15
**anti** 18:1 41:16
  50:1,5
**appear** 23:11
  55:10,12 57:11
  58:15
**appearances**
  2:1
**appeared** 2:6
  2:11
**appended**
  58:11,18
**applicants** 18:7
**appreciate** 54:9
**appreciated**
  5:22

**approach**
  21:20
**appropriate**
  38:1
**april** 1:15
  55:17
**argument**
  25:14 26:1
**asked** 6:2 33:24
  42:2 47:2,23
**assignment**
  43:17,20 49:14
  57:2 58:2 59:2
**assist** 14:22
  36:19 37:11
**assists** 15:1
**associate's** 10:6
**assume** 6:1
  17:14 20:21
  52:13
**assumed** 27:5
**assuming** 34:7
**attached** 53:23
  58:7
**attendance**
  24:11
**attorney** 4:21
  6:11 8:1,15
  53:17 55:14,14
**aura** 26:5,12
  28:5 35:19
**authority** 12:19
  12:22 43:5

**authorize**
  58:11
**ave** 56:1
**aware** 37:17
  42:17 43:15,19
  43:22 45:13,15
  46:1,7,20 48:1
  48:5,8,11,15
  49:17,21,23

**b**

**bachelor's** 9:21
**back** 12:2 15:4
  19:9 24:19
  28:22 36:1
  53:4 56:15
**background**
  9:10
**backs** 11:15
**bad** 26:4,12
  28:11
**basis** 15:21
  16:2 17:19
  18:7,14,18
**bear** 17:22
**behalf** 2:6,11
**behavior** 24:5
  34:23 38:1
**belief** 38:21
**believe** 21:14
  27:3 31:7
  36:24 39:19
  53:6

**bereavements**
  14:16
**best** 5:20
**bet** 48:1
**birth** 9:11
**birthday** 9:13
**bit** 23:3
**black** 18:20,24
  47:1,22
**blurred** 31:23
**bnsf** 11:4 25:1
**bonus** 48:6
**boss** 7:22
**bottom** 33:2
**break** 6:5,8,9
  33:14 50:11,19
**breaking** 11:20
  42:6
**briefly** 53:12
**bringing** 38:8
**brought** 26:13
  38:18
**building** 33:11
  33:12,12,15
**burlington**
  11:4
**business** 10:3
  18:5

**c**

**ca** 56:24
**call** 23:11,19,23
  26:19 46:10
  47:1,22 49:5

**[called - computerized]**

**called** 1:9 4:3 26:13 27:11 28:14,17 36:4 41:14 47:2,3 47:23

**calling** 14:17 26:21

**calls** 8:4

**capacity** 25:3

**capture** 5:16,19

**carbon** 49:19 49:20 50:1

**career** 22:20

**case** 4:10 5:7 21:6,7,9 56:6 57:3 58:3

**cases** 38:4

**caveat** 6:6

**cell** 26:14

**center** 11:14 12:3

**certain** 12:6 15:5 22:11 31:24 48:1

**certificate** 55:11 58:11

**certificates** 10:5

**certification** 57:1 58:1

**certify** 55:3,7 55:13

**chair** 28:5,7,8

**change** 56:13 56:14 58:8 59:3

**changes** 56:12 57:7 58:7,9

**chaplin** 7:8 21:10,23 26:2 28:16 30:21 35:19 38:22

**characteristic** 15:16

**charlene** 1:3 4:10 7:16 21:9 21:21 22:3,5 24:22,24 25:1 25:4,11,16,22 27:10 28:13,17 29:1 30:6,10 30:22 31:5 32:10 33:20,21 34:9,13 37:17 38:5,24 39:12 40:9 41:18 42:1,11,17 44:6 45:1,18 45:24 46:20 48:2,9,12,16,19 48:21 49:18,22 50:23 51:4,6 56:6 57:3 58:3

**charlene's** 25:20 38:1 40:2,3,5 45:9 51:16

**charles** 2:9

**check** 53:12

**chicago** 2:4 12:8

**choice** 41:21

**christina** 13:3,7

**circumstances** 22:14

**civil** 1:11 4:15 57:5 58:5

**claim** 21:2,12 44:3

**class** 11:5

**clear** 8:11 52:14

**cleveland** 56:2

**close** 28:10

**coleman** 1:3 4:10,10 21:9 22:4,6 24:22 30:22 35:16 39:7,10,16,20 51:4 52:2 56:6 57:3 58:3

**coleman's** 7:5 39:12 45:8

**color** 15:13 16:2 17:19 18:8

**combing** 24:8 24:19

**come** 23:4,18 26:1 33:16,24 52:7 53:9

**comfortable** 52:9

**coming** 23:4

**comments** 21:22

**commission** 57:19 58:25 59:25

**committed** 15:11

**common** 40:13 40:17,18 43:1 46:2,10,14 49:13 52:11

**communicati...** 12:2

**complaining** 26:2

**complaint** 20:12,22 22:5 32:3,8

**complaints** 19:8,21 20:1 21:16 22:3 25:23 27:7,10 28:19,23 31:15 51:16

**completed** 56:15

**compliance** 12:4 18:4

**computerized** 55:5

**[concerning - defendant]** Page 4

concerning 38:9

concerns 51:1

concluded 54:12

condensing 40:22

conditions 52:24

conduct 19:16 19:18,21 20:5 22:12 34:19 37:18 45:8

consider 23:5

constitute 22:12

constitutes 55:6

consult 12:24 13:2

consulted 34:22

contact 52:15

continued 38:8

continuing 27:14

conversation 20:14 25:11,16 29:1 38:17 39:8,21 40:4,5

convicted 8:23 9:2

coordination 11:9

copy 54:7

cord 48:16 49:9

corner 33:12

correct 10:9,10 12:16,17 14:4 14:5 15:8,9,17 15:18 16:3,6 16:10,23 17:6 17:11 18:1,2 18:12,13 19:12 19:21,22 20:5 20:6 22:4,16 22:17 25:20,21 25:23 29:20 31:21 32:4 33:6,7 35:5,6 36:10,11 37:15 37:22 38:13 39:8,13,16 42:23 46:11 47:15 52:4

corrections 56:12 58:17

corrective 32:19,21 35:3 36:23 37:14,24 38:11 39:6,12 40:8,13,19 42:21

counsel 55:9,14 55:15

country 12:9

county 55:2 57:10 58:15

couple 8:21 13:9 14:11

court 1:1 5:16 5:18 11:19 42:6 54:1,3,6 57:7

courts 1:12

cover 49:6

covered 14:16

creating 27:17

crime 9:2

csr 1:13 2:23 55:3,19,20

csx 5:8

current 11:3 14:4,11

currently 9:5 10:8

cv 1:5

cycle 49:5

**d**

da 25:7 41:20 44:16

dad 26:13,14 26:19,22,23 36:1

dangerous 19:1

date 9:11 14:3 32:23 33:1 43:10 56:8 57:3,9,19 58:3 58:13,25 59:20 59:25

dated 30:21

davies 1:9 3:3 4:2,13 8:12 13:20 24:21 42:10 50:21 51:21 55:3 56:8 57:4,9 58:4,13 59:20

davis 2:8 5:2 44:10

day 23:19,22 25:12,18,24 26:10 33:9 35:5 42:11,12 42:14,18,20,20 42:22 43:12,14 43:14 46:3 55:17 57:16 58:22 59:22

days 12:11 23:5 52:16 55:10 56:18

deal 48:5

dear 56:10

debbie 53:22

debra 1:13 2:23 55:3,19

decision 34:22

declined 26:15

deed 57:14 58:20

deemed 56:19

defendant 1:7 2:11

**[defendant's - early]** Page 5

**defendant's** 55:9

**definitely** 39:23 53:9

**degree** 9:21 10:2,6

**demonic** 26:5 26:12 35:19

**demotion** 22:15

**department** 56:22

**depending** 11:10 22:13

**deponent** 54:11 55:10

**deposed** 5:2,5 6:22

**deposition** 1:9 4:13,17,21 5:11,13 6:11 7:1,20 55:4,6,8 55:8,10,10 56:8,11 57:1,3 58:1,3

**depositions** 1:13

**derek** 13:9,10 21:19,24 27:11 27:12 28:20,22 31:11,16,17 33:5 34:15,21 36:4,21 42:13 42:15 53:6

**derogatory** 47:3,8

**described** 41:11

**description** 36:12,15,16,17 36:20 38:13 41:11

**details** 29:17

**different** 21:20 53:8

**difficult** 5:18

**dig** 24:20

**direct** 7:22 15:6 17:22 19:14 22:7

**direction** 32:6 51:13 55:5

**directly** 55:15

**director** 10:15 10:18,20 11:12 12:13,16,18 19:23

**disability** 15:15 18:10

**discipline** 12:19 22:8 29:1 32:10 39:1,5,15

**disciplined** 39:2

**disciplining** 18:17

**discomfort** 47:19

**discover** 8:5

**discovery** 4:13

**discriminate** 16:9,13 18:6

**discriminated** 20:8

**discrimination** 16:5 18:1,6 19:6,15,20 20:4 21:2,3 47:1 51:17,24 52:2

**discriminatory** 19:18

**discuss** 26:16 29:12 43:7

**discussed** 45:5 45:11

**discussion** 26:10

**dishonesty** 9:3

**dismissal** 22:16

**district** 1:1,1 1:12 4:16

**division** 1:2

**document** 13:21,23 30:17 30:19 32:16 33:4 35:12,14 36:8,9 37:6 39:18 41:3

**documented** 51:12

**documents** 6:24 7:3,13,17

**doing** 25:7

**donna** 7:15 25:13,24 26:1 26:18 27:4 32:20 33:18 34:7,10,16,18 34:23 35:15 38:5,18,21 39:2,10 40:4,6

**donna's** 35:3 39:24 45:9

**doubt** 42:15

**draft** 36:12,15 36:16

**drafted** 32:22 37:21

**driver** 49:3

**drug** 23:8

**due** 34:10

**duly** 4:3 55:3

**duties** 11:2,11 18:21 19:1 48:20

**duty** 19:24 20:3 48:22

**e**

**e** 2:8 55:8,9

**early** 9:13

**[east - february]** Page 6

east 2:9
eastern 1:2
edition 14:2
education 9:20
effective 14:1,3
egregious
22:11 34:24
either 17:3 38:9
44:22 52:3,9
email 23:24
29:7 30:20,23
31:4,10,15
32:3 53:23
56:17
emailed 4:20
emails 7:4,7,9
7:14
employ 52:23
employed 10:8
10:11 25:1
46:8
employee 5:9
12:23 14:9,20
16:6,9,10,13,14
16:15,17,20,20
17:9,19 18:17
18:20,24 19:5
19:9,17 20:7
22:19 23:14,19
24:5 33:16
43:23 47:1,7
47:22 51:1,14
55:14,14

employee's
18:15
employees 7:10
12:20 14:15,23
18:7,21 19:1
25:9 26:17
33:14 43:1,15
43:19 46:10
48:2,6 49:13
52:6,12,14,23
53:1
employment
15:8,11,13,19
15:20 16:1,23
17:1,2,15,18,20
26:16
enclosed 56:11
ended 28:24
29:19 40:9
engaged 39:7
39:20
entered 58:9
entire 57:5 58:5
environment
27:18 43:24
44:2,4,6,19,20
equal 15:8,11
15:19,20 16:1
17:15,18
errata 56:13,18
58:7,10,18
59:1
escalate 47:12

escalated 47:9
47:20
especially 26:8
34:7
esq 56:5
essentially 49:5
events 7:5
everyday 47:18
evidence 55:11
exact 24:7
43:13
exactly 45:23
examination
1:10 3:4 4:6
examined 4:4
except 17:5
exception
45:15,17
executed 58:10
execution
57:14 58:19
exhibit 3:10,11
3:12,13,14,15
3:16 13:17,21
29:2,6 30:12
32:11,15 35:7
35:11 37:1,5
40:23 41:2
exhibits 3:8
4:20,20 30:16
53:22
experience
40:21

expert 38:3
expiration
57:19 58:25
59:25
explain 11:2
26:21 33:8
expresses 47:7

**f**

face 50:12,12
52:24 53:2
facilitation
14:22
fact 44:14
facts 20:16
40:16 51:12
failure 23:11
55:11
fair 6:3
familiar 5:12
13:22,24 24:21
29:7,11 30:17
32:16 35:12
37:6 41:3,10
41:13 53:1
family 8:18
far 12:3 38:24
fault 8:9
fe 11:5
fearful 49:9
feature 4:19
13:12
february 10:13
12:14

**[federal - happening]**

**federal** 1:11 4:15 15:17 18:4,11 55:9
**feel** 5:23 29:16 31:6 47:8
**feeling** 31:7
**felony** 8:24
**felt** 20:7
**fence** 33:18
**figure** 44:1
**filed** 5:10
**files** 24:20
**final** 34:23 35:2 36:22 37:15,18 40:9
**financially** 55:15
**find** 29:23 56:11
**findings** 19:9
**fine** 6:6 50:17
**finish** 5:20
**first** 4:3 23:19 33:19 36:9 37:21 38:1 40:10 49:8,14 52:18
**fit** 52:10
**five** 24:13 50:8 50:14,16
**fix** 50:2
**fixed** 50:5
**follow** 20:19 21:15,18 23:13

23:17 28:23 31:20 53:18
**followed** 31:17 47:11
**following** 46:4
**follows** 4:4
**foregoing** 55:4 57:13 58:18
**forgotten** 29:10
**form** 44:8
**forward** 31:10 56:15
**foul** 33:22
**found** 40:16
**four** 10:23
**fraud** 9:3
**free** 5:23 57:14 58:20
**freeze** 41:16 50:1,5
**friends** 8:19
**front** 33:15
**fuck** 33:20
**fully** 55:11
**functions** 25:8 46:6
**further** 54:11 55:7,13

**g**

**gate** 10:21,24
**gender** 15:14 18:9

**general** 24:9 25:7 52:5
**generally** 11:3 11:12 12:24 23:24 24:11 31:4 51:7
**give** 20:16 23:23 24:7 27:19 34:23
**given** 32:19 33:2 44:14 51:13 55:6
**go** 5:11 12:2 33:16,22 34:24 41:18,20 43:24 44:10,15 45:12 47:13 49:4,18 49:22,23,24 51:21 52:13,15 52:16 53:9
**goes** 38:24
**going** 7:23 9:9 13:12,22 22:9 24:19 26:8 29:5 32:14 33:23 34:24 35:10,24 37:9 38:9 41:1,22 44:24 45:12 47:5
**good** 4:8
**graduate** 9:24
**great** 4:24 6:20 53:10,20 54:8

**greer** 13:9,10 21:19 27:11 28:20 31:11 33:5 36:21
**grounds** 22:9 22:12
**guessing** 22:23

**h**

**hand** 55:17
**handbook** 13:24 14:1,4,6 14:10,19 15:7 47:13
**handbooks** 14:23
**handle** 11:4,24
**hansen** 2:8 4:21,23 6:11 7:21 8:2,3,8,15 13:14 44:8 50:6,16 51:18 53:14,17,19 54:2,6,7 55:9 56:5
**happen** 23:12 23:21 40:17 43:18
**happened** 26:18 42:19 43:10,12
**happening** 29:19 45:10

**[happens - investigation]** Page 8

| | | | |
|---|---|---|---|
| **happens** 23:3 | 34:18 35:15 | **identified** 3:9 | **indicating** |
| **happy** 9:13 | 41:22 42:2,14 | **illinois** 1:1 2:4 | 56:13 |
| **harass** 16:19 | 45:3 | 2:9 4:16 9:16 | **indirectly** 38:7 |
| **harassed** 20:8 | **honestly** 37:20 | 9:17 55:1,20 | 55:15 |
| 31:8 | 38:9 | **immediate** | **information** |
| **harassment** | **hospital** 49:18 | 22:10,13 23:10 | 8:4 52:17 |
| 16:5 18:1 19:6 | 49:22,24 | **immediately** | **inhaling** 49:19 |
| 19:15,18,20 | **hostile** 43:24 | 19:7 43:2 | **initially** 37:21 |
| 20:4 21:4,13 | 44:2,3,5,20 | **inappropriate** | **injured** 5:9 |
| 47:22 51:17 | **hot** 14:17 | 19:16,20 20:4 | **inside** 25:13 |
| 52:2 | **hours** 7:23 | **incidences** 39:1 | 33:10 |
| **hard** 23:2 | **housed** 14:18 | **incident** 27:24 | **institute** 9:23 |
| **hardware** | **hr** 12:24 13:2,3 | 32:23 33:6 | **instructed** |
| 11:18 12:1 | 20:5,16 24:1 | 35:4 36:13 | 45:18 |
| **head** 23:10 | 38:3 41:6 | 38:5,17,18,19 | **intelligent** |
| **hear** 4:18 38:7 | 47:13 52:13,15 | 38:22,23 39:3 | 10:21,24 |
| **heard** 33:18,20 | **human** 10:7 | 42:22 45:14 | **interact** 25:3,5 |
| 33:21,22 34:9 | 15:2,3 19:7,19 | 48:8,11,15 | 25:8 |
| 46:17,22 47:16 | 19:21 20:1,9 | 49:17,21 | **interested** |
| 49:11 | 20:12,18,19,23 | **incidents** 22:12 | 55:15 |
| **held** 10:23 | 21:2,13,15 | 38:12,22 40:19 | **intervened** |
| **hereunto** 55:16 | 22:2 30:9 32:7 | 45:13 50:22 | 34:4 |
| **hesitant** 48:19 | 52:8,19 | 51:1,8 | **inventory** 11:8 |
| 48:21 49:8 | **hundred** 15:5 | **include** 40:18 | 25:7 |
| **hesitate** 50:6 | 31:12 | **included** 56:13 | **investigate** |
| **hey** 24:1 33:23 | **hurt** 49:10 | **incorporated** | 19:8 44:4,5 |
| 36:5 | **i** | 58:12 | **investigated** |
| **highest** 9:20 | | **increased** | 44:19 51:16 |
| **hired** 13:8 | **identification** | 40:14 | **investigating** |
| **hiring** 25:20 | 13:18 29:3 | **index** 3:1 | 39:3 |
| **hold** 10:16,20 | 30:13 32:12 | **indiana** 9:19,23 | **investigation** |
| **holidays** 14:15 | 35:8 37:2 | **indicates** 37:15 | 34:12,19,19 |
| **home** 12:8,11 | 40:24 | 38:12 | 40:15 45:4,7 |
| 26:2 34:11,16 | | | |

**[involved - locating]** Page 9

| | | | |
|---|---|---|---|
| **involved** 6:20 11:8 25:19 | 59:20 | **know** 5:24 7:22 13:4 14:2,3,8 | **lawsuit** 5:10 |
| **involving** 9:3 48:6,15 49:17 49:21 50:22 51:1 | **jen** 26:2,3,4,11 27:15 28:4,6 45:10 48:17,18 | 14:15 17:12 21:19,21 23:5 24:1,14,24 | **lawsuits** 6:21 **leading** 24:10 **leak** 50:1,5 **leaking** 41:16 |
| **issue** 11:17,18 11:18,18 12:1 12:1 23:15 46:7 51:11,24 52:7 | **jennifer** 7:8 21:10,22 28:14 28:16,23 30:10 30:21,24 31:6 31:6,7,18,20,22 32:2 35:17,18 38:8,19,22 | 26:20 27:8,21 28:7 29:8,19 30:1,9,11 31:16,17,19,22 32:24 33:1,19 34:16 36:4 | **learn** 46:5 **learning** 46:3 **leave** 33:17 **led** 39:5 **left** 35:24 **legal** 56:1 59:1 |
| **issued** 7:15 39:15 | **jennifer's** 28:19 | 37:10 38:19 39:17 40:8,16 | **letter** 56:19 **level** 9:20 |
| **issues** 11:16 12:1 41:15 44:18 51:10 | **job** 23:3,7,18 24:2 25:8 45:16 46:3,3,5 46:6,12 | 41:4,8,15 42:12,14 43:9 44:12 45:20,24 48:19,21 50:2 | **license** 2:24 55:20 **licenses** 10:4 **line** 14:17 |
| **issuing** 28:24 **item** 24:10 | **july** 29:17 30:21 42:22 43:8 45:6 | 53:1,6 **knowledge** 40:7 | 27:15 28:10 43:10 56:13 58:7 59:3 |
| **j** | | | **lines** 31:23 |
| **jakubowski** 2:2 3:4 4:7,9,24 5:1 8:5,10,13 12:5 13:19 29:4 30:14 32:13 35:9 37:3 42:8,9 44:9 50:9,18 50:20 51:20 53:16,20 54:5 54:8 | **k** | **l** | **lisle** 11:15 12:7 **listed** 17:15 58:7,17 |
| | **keep** 50:22,24 51:8 | **labeled** 33:11 **lake** 55:2 | **listen** 6:12 **listing** 58:7 |
| | **keyboard** 29:15,20 30:7 | **lamprinakos** 2:3 | **little** 11:20 **live** 9:17,18 |
| | **kind** 5:7 25:17 28:12 53:2 | **lane** 48:18 **language** 33:22 34:10 | **llc** 1:6 2:8 4:11 56:6 57:3 58:3 |
| | **kinds** 23:12 **kiosk** 49:3 **kiosks** 48:18 49:1 | **lasalle** 2:3 **law** 15:17 17:6 17:10,13 18:12 | **local** 4:16 15:17 18:4,11 |
| **jana** 1:9 3:3 4:2 4:13 55:3 56:8 57:4,9 58:4,13 | **knew** 30:3 53:14 | **laws** 18:4 | **locating** 11:8 |

**[log - notice]**

**log** 50:22,24 51:8
**long** 8:1,14 10:11 27:24 31:24 48:2
**longer** 36:3
**look** 22:9 37:8
**looks** 30:20 38:19
**lot** 23:6 25:5 34:8 41:18 44:15
**loud** 5:16 17:16
**lpc** 25:1 53:7,9
**lynn** 1:13 2:23 55:3,19

**m**

**ma'am** 6:19 17:21
**machine** 48:24
**machines** 49:1
**madam** 56:10
**made** 21:22 22:2 34:22 45:24 46:7 57:7
**main** 2:9
**make** 5:15 6:11 8:11 23:20 35:17 48:13 53:1
**makes** 5:18

**making** 19:10 31:6
**management** 18:5
**manager** 7:22 10:19 11:14 16:6,10,14,15 16:17,20 19:19 20:7,8 43:2,4 47:14,19 51:11 51:14
**managers** 19:19 20:3 50:24 51:7
**manner** 47:8
**manufacturing** 49:2
**marital** 15:15 18:9
**mark** 53:22
**marked** 13:17 13:21 29:2,5 30:12,15 32:11 32:14 35:7,11 36:9 37:1,4 40:23 41:1
**massie** 7:11 27:23 50:22
**matters** 26:16
**mean** 31:1 41:22 45:17
**meaning** 17:2
**means** 38:4

**meant** 27:5,6 44:13
**medication** 9:5
**meeting** 51:9
**midwest** 56:17 59:1
**military** 15:15 18:10
**minus** 50:13
**minutes** 8:17 50:8,14,16
**misheard** 8:8
**missed** 24:1
**missing** 29:15 29:22,24 30:4
**misstates** 51:18
**monoxide** 49:19,20 50:1
**month** 5:6,13 6:22 14:12
**morning** 30:2
**moving** 9:15
**multiple** 23:4
**murderer** 48:12

**n**

**name** 4:8 13:5 47:3 53:2 56:6 57:3,4,15 58:3 58:4,21
**natalie** 2:2 4:9 50:6 54:3

**national** 15:14 18:8
**nature** 19:9
**naught** 54:11
**necessarily** 34:6
**need** 6:5,9 8:15 12:2 29:8 50:14
**needed** 27:19 36:6
**never** 22:2,5 25:22 33:20 37:10 46:22,22 49:11 51:23
**new** 13:3 14:19 14:23
**nikoleta** 2:3
**njakubowski** 2:5
**nlamprinakos** 2:5
**northern** 1:1 4:16 11:5
**notarized** 56:14
**notary** 56:24 57:10,18 58:15 58:23 59:23
**note** 56:12
**notes** 53:12
**notice** 4:14 17:4 27:19 32:19,22 35:3

**[notice - point]**

36:23 37:14 38:11 39:6,13 40:9,20 42:21

**number** 24:7 56:7,13

**numbers** 49:3 58:7

**o**

**object** 44:8

**objection** 6:12 6:12,14 8:3 51:18

**observing** 49:15

**obtained** 55:12

**obviously** 20:17

**occurred** 27:4 35:4

**offended** 8:22

**office** 12:6,8,11 28:8 33:10,24 35:16

**official** 57:15 58:21

**oftentimes** 11:7

**oh** 16:18 36:18 46:9

**ohio** 56:2

**okay** 6:20 22:22 35:10 44:12 53:20

**once** 24:9,12 33:20 51:9 53:7

**ones** 7:8 23:9 41:17

**open** 49:6

**operating** 11:14

**operation** 53:11

**operations** 10:15,18,21 11:1,1,7,12 12:13,16,19 19:24

**opportunities** 15:12,21 16:1

**opportunity** 15:8,20 17:15 17:18

**option** 44:15,21

**ordering** 54:4

**orientation** 15:15 18:9 52:17

**origin** 15:14 18:8

**outside** 33:17 33:23

**overheard** 25:13

**p**

**p.m.** 1:15 54:12

**page** 5:15 15:6 15:7 17:22,24 22:7 56:13,15 58:7 59:3

**pages** 3:2

**paid** 41:23

**paper** 27:16

**parked** 33:16

**part** 38:6 39:24 40:2,3 58:9

**parties** 55:14

**past** 23:23

**pay** 34:12,18

**payroll** 11:9

**pending** 6:7 34:12,18

**people** 23:3 26:7 46:2 53:8

**percent** 15:5 31:12

**perdue** 10:6

**perform** 11:7 18:21,22 19:1 19:2 43:16,20 48:19,22

**perjury** 9:3

**perpetrator** 19:11

**person** 45:19 46:4,13

**personal** 9:10

**personally** 39:19 57:11 58:15

**personnel** 11:18 12:1 38:3 52:6

**persons** 15:12

**pertaining** 1:12 35:4

**peter** 2:8 55:8 56:5

**phansen** 2:10

**phone** 8:7,14 26:14 36:1 44:24 56:3

**phonetic** 13:4

**picnic** 33:13

**picture** 20:17

**place** 12:10

**places** 44:21

**plaintiff** 1:4,10 2:6 4:9

**plan** 9:15

**please** 5:15,23 6:7 8:22 11:20 29:8 42:7 50:8 53:18 54:5,7 56:11,11

**plugged** 30:2

**pocket** 7:23

**point** 5:22 6:5 27:16

**[policy - referring]** Page 12

**policy** 12:4 15:20,24 16:8 16:12,19 17:20 18:1,15,18,22 19:3 22:8 23:8 47:22
**politely** 26:15
**position** 10:14 11:3 12:23 13:10 14:10 19:23
**positions** 10:16
**power** 49:5
**practice** 40:18 46:2
**practices** 15:13
**preparation** 7:1
**present** 20:18 34:15
**prevents** 6:14
**previously** 7:4 26:6 27:14 32:9
**principle** 18:5
**prior** 4:21 44:18 45:4 51:18
**privilege** 8:5
**privileged** 8:4
**probably** 5:12 22:22 24:14,14
**problem** 34:3 42:8 50:10,11

**procedure** 1:11 4:15 55:10 57:5 58:5
**proceedings** 54:12
**process** 23:13 23:17 46:11 47:11 51:11
**production** 56:15,17,22
**professional** 35:22
**prohibited** 17:5 17:10,13
**prohibition** 16:5
**project** 10:19
**prompt** 19:10
**promptly** 19:8
**protected** 15:17 18:11
**provide** 15:20 16:1 32:9
**provided** 14:19
**providing** 14:23 15:11
**proximity** 28:11
**public** 57:10,18 58:15,23 59:23
**pull** 48:16,23 49:8
**pursuant** 1:10 4:14 55:9

**pushes** 49:3
**put** 27:15 36:6 50:4
**putting** 21:24

**q**

**qualified** 15:12 46:5,12
**question** 5:23 6:1,7,8,13 8:6,9 8:11 16:11 52:5
**questions** 6:17 8:21 9:7,9 53:19
**quite** 23:3

**r**

**race** 15:13,22 17:19 18:8,15 18:18 51:17 52:1
**racial** 51:24
**railroad** 5:8 11:5 12:3
**raincoat** 28:6
**reach** 28:22
**read** 17:16 31:1 55:10 57:5,6 57:12 58:5,6 58:17
**reading** 29:10 30:24 55:7 56:19

**really** 23:9 42:20 46:9
**reason** 17:5,5,9 17:12 22:15 55:12 56:14 58:8 59:3
**recall** 24:17 27:24 28:15,18 31:14 32:2 43:13,14 46:6 46:8
**receipt** 56:18
**receive** 4:22 32:6
**received** 22:5 37:17,19
**recollection** 31:3 43:9
**record** 4:12 55:6 58:9
**recorded** 55:4
**records** 24:8
**reduced** 55:5
**refer** 14:9,13 46:14
**reference** 56:7 57:2 58:2
**referenced** 44:6 57:11 58:15
**referral** 48:6
**referred** 46:17 46:21
**referring** 21:8 27:3

**[reflect - send]** Page 13

reflect 4:12
refused 43:20
  44:17
refusing 43:16
regard 15:13
  22:14
regarding 48:2
related 11:24
relating 51:16
relative 55:13
  55:14
religion 15:14
  18:8
remedial 19:10
remember
  13:11 25:17
  26:13 28:9
  29:14,18,21,21
  29:22 37:19
  42:19,20 45:2
  45:3,21 51:5
remote 11:14
  12:3
remprex 1:6
  4:11 7:9 10:9
  10:12,17 14:20
  15:10 16:6,9
  16:13,20 17:2
  17:3,4,8 18:5
  19:7 21:14
  22:14,20,21,22
  46:24 48:2,3,5
  49:19 50:2
  56:6 57:3 58:3

remprex's
  47:21
repeat 8:11
  16:11 42:7
repeatedly
  23:12
rephrase 5:24
report 11:16
  19:7,9,18,19,24
  20:3,9,11
  28:19
reported 2:23
  20:22 21:1,12
  21:16 26:6
  27:23 28:1
  47:15 51:23
  52:1
reporter 5:16
  5:19 11:19
  42:6 54:1,3,6
  57:7
reporting
  19:15
reports 22:2
represent 4:9
request 58:9,11
requested
  49:23
required 18:22
  19:2 56:24
requiring
  18:20,24
reserve 54:2

resources 15:2
  15:3 19:7,19
  19:21 20:1,9
  20:12,18,19,23
  21:2,13,15
  22:3 30:9 32:7
  52:8,19
respond 44:11
responsibility
  19:17
returned 56:18
review 7:3,13
  56:12 57:1
  58:1
reviewed 6:24
right 19:17
  33:17 34:15
  35:2
robbins 2:2,5,5
room 36:1
rule 55:9
rules 1:11 4:15
  4:16 5:12 55:9
  57:5 58:5
running 48:24
  48:24

**s**

s 56:15 58:8,8
  59:3
saith 54:11
santa 11:5
sat 28:6

saying 28:4
  31:5 35:18
  45:3 46:9
says 14:2 32:23
  33:2 42:21
  43:23
schultz 1:13
  2:23 55:3,19
schwartz 2:2
schwartz.com
  2:5,5
screen 4:19
  13:12,13 37:7
  38:15 50:12,13
scroll 13:22
  17:23
seal 57:15
  58:21
second 23:22
section 15:7,10
  16:4,22 17:1
  17:24 18:3
  19:5,14,16
  22:8,11
see 4:18 13:13
  33:1 38:9
  39:17 52:10,23
  53:11
seeing 52:1
seen 37:10 53:6
  53:9
send 41:21 42:2
  42:14 45:3

| | | | |
|---|---|---|---|
| **sending** 34:11 34:16 | **short** 50:19 | **situations** 24:17 | 44:23 |
| **senior** 10:15 12:12 | **shortened** 10:24 | **size** 53:10 | **spot** 23:9 42:13 |
| **sense** 35:17 | **show** 13:20 29:5 30:15 | **slow** 11:19 | **springs** 53:7 |
| **sent** 7:4 26:1 31:11 32:3 34:21 35:15 41:6 | 32:14 35:10 37:4 41:1 | **slur** 28:14,17 | **ss** 55:1 |
| | **shown** 56:16 | **smelled** 26:4 28:11 | **st** 2:9 |
| **separate** 38:12 39:1 40:19,20 44:21 | **shrugs** 5:16 | **smelling** 26:12 | **staffing** 12:2 |
| | **sick** 14:17 | **software** 11:17 11:24 | **standardization** 12:4 |
| **separating** 40:22 | **side** 11:6 33:13 | **solutions** 56:1 59:1 | **start** 39:23 52:18,18 |
| **serious** 35:1 | **sign** 55:10 | **somebody** 24:10 | **state** 5:15 9:15 15:17 18:4,11 55:1 57:10 58:15 |
| **service** 50:4 | **signature** 39:17 54:1 55:9,12 55:19 56:14 | **soon** 9:16 50:10 | |
| **services** 10:7 | | **sorry** 8:8 11:22 16:11 36:14,18 37:7 44:12 53:15 | **stated** 26:15 32:9 |
| **set** 54:8 55:16 | **signatures** 40:11 | | **statement** 26:18 34:14,14 39:4 57:13,14 58:19,19 |
| **sexual** 15:14 18:9 | **signed** 55:11 57:13 58:18 | | |
| **shadow** 45:13 45:18 46:2,12 46:15,18,21 47:1,5,17,22 | **signing** 55:8 56:19 | **sound** 18:5 | |
| | | **south** 2:3 | **statements** 34:1,5,6,20 41:5 |
| | **sincerely** 56:21 | **speak** 7:19 8:1 8:14,18 30:6 | |
| **shadowing** 45:16 46:4,11 | **single** 22:14 23:1,2,5,6,16 46:3 | **speaking** 31:14 32:2 | **states** 1:1,12 15:10 16:4 17:1 18:3 19:5 19:16 22:11 39:6 |
| **share** 4:19,19 13:12 | **sir** 56:10 | **specifically** 21:1,3 24:18 30:23 51:4,6 | |
| **sharing** 50:12 | **sit** 28:5 33:14 48:9 | **spell** 13:4 | **status** 15:15,16 18:9,10,11 |
| **sheet** 56:13 58:7,10,18 59:1 | **situation** 20:16 21:20 27:3 29:12 30:7,10 39:11 41:10 47:10,12 49:2 | **spivey** 7:16 32:20 38:5,21 39:3,10,21 | **ste** 2:3,9 |
| | | | **stenographic...** 55:4 |
| **shoot** 23:24 | | **spoke** 7:21 8:7 8:16 30:9 | |

**[step - title]**

Page 15

| | | | |
|---|---|---|---|
| **step** 35:1 | **taken** 1:10,13 | **terminal** 11:10 | 58:12 |
| **steps** 20:11 | 1:14 4:13,17 | 11:13,14 12:7 | **thank** 9:14 54:9 |
| **stop** 21:23 23:3 | 41:17 45:15,17 | 12:8 25:2 | **thanks** 50:18 |
| 50:11 | 50:19 | 33:17 43:2,4 | **thing** 11:1 28:4 |
| **stopping** 36:6 | **talk** 5:17 11:11 | 51:10,13 52:18 | 28:12 34:16 |
| **street** 2:3,9 | 21:24 26:7,14 | 53:10 | 53:3 |
| **stuck** 49:4 | 26:23 28:10 | **terminals** 11:6 | **things** 14:18 |
| **subject** 24:2 | 35:21,22 42:15 | 11:13,15 12:9 | 23:12 31:5 |
| **submitted** 55:8 | 50:12 51:10 | 25:6 52:20,22 | 34:8 |
| **subscribed** | **talked** 21:19,21 | **terminate** | **think** 5:6 21:5 |
| 57:10 58:14 | 27:13 31:16,22 | 12:23 17:9 | 21:6,10 27:6 |
| 59:21 | 42:13 | 23:1,14 41:24 | 37:23,24 49:7 |
| **subsection** 22:9 | **talking** 17:14 | 42:11 45:1 | 50:7 52:11 |
| **sufficient** 22:15 | 31:1 35:16 | **terminated** | 53:13,16 |
| **suggested** | 36:2 45:16 | 17:3 22:18 | **thirty** 56:18 |
| 21:24 | 48:17 53:2 | 24:5,10 38:6 | **three** 10:13 |
| **suite** 56:2 | **task** 49:14 | 41:4 42:13,17 | 12:11 |
| **superior** 56:1 | **technical** 11:17 | 43:2,16,21 | **time** 5:4 9:16 |
| **sure** 5:12,15 | **technology** | 45:24 | 10:17 14:17 |
| 14:8 23:20 | 9:23 | **terminating** | 17:4 25:15 |
| 31:11 50:16 | **tell** 8:15 23:10 | 17:18 | 37:8 45:22 |
| **suspects** 19:6 | 26:11 27:9,12 | **termination** | 46:19 47:10 |
| **suspension** | 28:3,13,16 | 7:6 17:12 | 49:8,14 50:13 |
| 22:15 | 31:12,24 34:9 | 18:14 22:10,13 | 50:15 54:9 |
| **sworn** 4:1,3 | 37:9 39:24 | 24:2 41:5 43:7 | **timeframe** 8:7 |
| 55:3 57:10,13 | 42:5 44:24 | 43:11 | **timeline** 7:5 8:6 |
| 58:14,18 59:21 | 45:23 47:16 | **terminations** | 31:23 43:13 |
| **t** | 50:21,24 51:3 | 41:5 | **times** 6:10 |
| | 51:7 | **testified** 4:4 | 14:12 21:20 |
| **table** 33:13 | **telling** 51:5 | 51:23 | 22:18 24:4,13 |
| **take** 6:8 19:10 | **ten** 24:15 | **testify** 55:4 | 52:21 |
| 20:11 33:14 | **term** 46:7 | **testimony** | **title** 10:14,20 |
| 50:7,11 | 47:18 | 51:15,19 55:6 | 13:11 |
| | | 57:6,7 58:6,9 | |

**[titled - want]**

**titled** 15:7 16:22 17:24 19:14 22:8
**titles** 10:23
**tms** 51:10
**today** 7:20 47:5 53:13
**today's** 7:1
**told** 20:7,8 26:6 26:24 35:20,20 35:21 41:18,20 42:10,14 44:6 44:16 45:21 46:1,22 47:5 47:17 48:9,12 48:16
**took** 39:4
**top** 23:10
**total** 10:23
**totally** 6:6
**tracy** 7:11 27:23 28:3,13 41:14,24 42:5 42:11 43:7 44:7,23 50:21 51:3
**train** 41:19,20 44:17 48:20
**trained** 46:5
**training** 46:11 48:17
**transcribed** 57:7

**transcript** 53:24 55:5 56:11,12 57:5 57:12 58:5,11 58:17
**travel** 12:9
**truck** 30:1,5 49:19,24 50:3
**trucks** 33:16,17 41:16,17
**true** 42:10 55:6
**trujillo** 13:3
**truth** 34:7 55:4
**try** 23:19,22
**trying** 24:20 48:20
**turn** 20:14 49:1 49:6
**two** 12:11 38:12 39:1 44:21 52:16
**type** 37:24 40:13
**typical** 23:17

**u**

**u.s.** 11:6
**under** 14:16 17:13 55:5
**understand** 5:23 9:6
**understanding** 17:8,17

**understood** 6:2 6:15 11:2
**unfounded** 26:9
**united** 1:1,11
**unprofessional** 26:9 38:16 39:8,21,23 40:2
**unprovoked** 38:16 39:7,9 39:20
**ups** 7:15
**upset** 45:19,20 46:1,9
**use** 13:12 47:18
**used** 5:8 14:6 55:11
**using** 14:11 34:10 45:2
**usually** 12:10
**utilizing** 4:19

**v**

**v** 56:6 57:3 58:3
**vacation** 14:16
**vehicle** 28:8
**vender** 5:9
**verbal** 20:14 35:1
**verbally** 21:21
**veritext** 1:14 4:4 55:5 56:1,7

59:1
**veritext.com.** 56:17
**version** 36:22
**versus** 4:10
**veteran** 15:16 18:10
**video** 11:21 20:17
**videoconfere...** 1:14 4:5 55:5
**violate** 17:20 18:15,18
**violating** 17:17
**violation** 15:19 15:24 16:8,12 16:19 18:22 19:2 23:8 46:24 47:4,6 47:21
**visit** 25:6,8 52:19,22
**voice** 34:11
**voiced** 47:19
**volume** 34:11
**vp** 13:3
**vs** 1:5

**w**

**waited** 53:14
**waived** 55:8 56:19
**want** 14:15 27:15,18 31:1

**[want - zoom]**

31:2 36:5 41:19,21 43:24 44:7 50:14 53:18
**wanted** 26:14 26:23 42:15 45:3 49:24
**warned** 27:17
**warning** 34:23 35:2 36:10 37:15,18,22 38:2 40:9,10
**warranted** 19:11
**way** 6:2 38:10
**we've** 53:8
**week** 12:11 47:18 51:9
**weeks** 13:9 44:18
**went** 29:16 34:2,18 35:2
**western** 11:6
**whereof** 55:16
**white** 18:21 19:1
**willow** 53:7
**wire** 48:16,23 49:8
**witness** 3:2 4:1 4:3 11:21,23 13:15 39:22 40:3,5 55:6,16 56:8,11 57:1,4

57:11 58:1,4 58:15
**witnessed** 33:6 33:8 40:1 47:14
**witness'** 56:14
**word** 39:9
**words** 45:2
**work** 5:8 12:6,7 23:4 41:22 43:24 44:1,3,5 44:7,15,16,19 44:20,21
**workers** 35:23
**working** 49:7 49:14 52:24
**workplace** 24:6 25:23 26:8 27:7,18 52:3,6 52:7
**worries** 6:9 8:10 50:9 53:16
**wrapping** 50:7 50:10
**write** 7:15 26:17 33:4 34:13,14 36:17 41:6
**writing** 20:13 20:15 22:1 27:19 36:7,19 37:11

**wrote** 33:5 37:9 41:8

**y**

**yeah** 11:21 23:11 24:14 30:5 37:23 39:9 50:9 52:16 54:2,2
**year** 9:24 12:15
**years** 10:13
**yelling** 33:18 33:22

**z**

**zoom** 4:18 29:8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.